UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LISA HOOPER, *et al.*,

    Plaintiffs,

v.

CITY OF SEATTLE, WASHINGTON, *et al.*,

    Defendants.

CASE NO. C17-0077RSM

ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## I. INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order ("TRO"). Dkt. #23. Oral argument occurred on February 13, 2017. The Court has considered the written and oral arguments of the parties, along with the remainder of the record. For the reasons set forth below, the Court now DENIES Plaintiffs' motion.

## II. BACKGROUND

This case arises out of the City of Seattle's management of homeless[1] encampments located on City and other public property. Plaintiffs allege that Defendants City of Seattle (the "City") and the Washington State Department of Transportation ("WSDOT") regularly conduct

---

[1] Plaintiffs use the term "unhoused" rather than homeless in this litigation. "Unhoused" refers to all individuals who lack fixed, stable, or adequate shelter or housing. Dkt. #1 at ¶ 30, fn.2. While the term "homeless" is often utilized to refer to this population, Plaintiffs use the term "unhoused" because people who lack permanent or stable housing still have homes in which they sleep and go about their private affairs. *Id.*

ORDER
PAGE - 1

"sweeps" where they seize and destroy the property of unhoused people living within the City without constitutionally-required notice, without a warrant or probable cause, and without providing an opportunity to be heard, or a meaningful way to reclaim any property that was not destroyed. Dkt. #23 at 1.

The individual Plaintiffs in this litigation are two unhoused women who currently live outside on public property in the City of Seattle. Dkt. #1 at ¶¶ 17 and 23. Plaintiffs allege that over the past 18 months, they have had critical personal belongings taken and destroyed during sweeps conducted by the City and WSDOT. Dkt. #1 at ¶¶ 18-22 and 24-29. They assert that neither was ever given an opportunity to contest the confiscation and destruction of their property. *Id.* Further, they assert that neither was ever given notice or any reason to believe that any of their property would be stored and could be later retrieved. *Id.*

Plaintiff Diocese of Olympia is a diocese of The Episcopal Church in Washington State. Dkt. #1 at ¶ 31. It is comprised of more than 26,000 Episcopalians in more than 100 worshiping communities throughout Western Washington. *Id.* Diocese congregations include numerous members who are unhoused. *Id.* The mission of the Diocese of Olympia is to build strong communities of faith. *Id.* There are a number of churches in the City of Seattle that are members of the Episcopal Diocese, including St. Luke's Episcopal Church and Trinity Parish of Seattle. *Id.* at ¶ 32. Plaintiffs assert that these churches, as an integral part of their mission and ministry, provide services to unhoused people in Seattle. *Id.* For example, St. Luke's Episcopal Church in Ballard operates a Meals Ministry called Edible Hope, wherein the church and its congregation serve a hot breakfast five days a week to approximately 150-180 people each day, 90 to 95 percent of whom are unhoused. *Id.* at ¶ 33. The church also co-sponsors a program called the Bridge Drop In which offers a number of drop in services to unhoused

ORDER
PAGE - 2

individuals, including counseling, and stations for people to charge their electronics, and operates a shelter on site. Dkt. #1 at ¶ 33.

The Diocese alleges that the confiscation and destruction of the belongings of people living outside has affected the church's operation in a number of ways. *Id.* at ¶ 34. It further alleges that since Defendants have increased their use of sweeps, the church has had significantly more unhoused people needing its meal and Bridge Drop In services. This increased demand has put additional burden on the church's facilities, and required significant additional church resources. *Id.* The Diocese also alleges that the church is affected by Defendants' actions through its membership, as approximately 20 percent of the church's congregation is unhoused. *Id.* Trinity Parish of Seattle is also a member of the Diocese of Olympia. *Id.* at ¶ 35. As a part of its mission, Trinity Parish offers a number of services for unhoused individuals in Seattle, including a food bank and thrift shop in First Hill. *Id.* The food bank, operated by Northwest Harvest, but located at Trinity Parish, provides food three days a week to residents in need, with approximately 3,000-5,000 instances of giving food each week. *Id.* Trinity Parish also operates a Thrift Store, and a voucher program for the store wherein people can get clothing and other items they might need, like blankets or coats to survive the cold weather for free. *Id.* Trinity is near an encampment area that is swept frequently, and a number of those residents utilize Trinity's services. *Id.* Plaintiffs allege that Trinity has reason to believe that items it has provided to the unhoused have been seized and destroyed by Defendants. *Id.*

Plaintiff Real Change states that it exists to provide opportunity and a voice for low-income and unhoused people while taking action for economic, social and racial justice. *Id.* at ¶ 36. Tim Harris founded Real Change in 1994 and has served as its director since. *Id.* Real

ORDER
PAGE - 3

Change's mission is to offer immediate employment options for the poor and unhoused and challenge the structures that create poverty. Dkt. #1 at ¶ 36. Real Change publishes a weekly newspaper of the same name that provides employment to about 800 poor and unhoused people annually, who sell the papers throughout the greater Seattle area. *Id.* At any given time, about half of Real Change's vendors are unhoused, and one-third of Real Change's vendors live outside, many in greenbelts and other encampments throughout the City. *Id.* Real Change alleges that many of the unhoused vendors living outside who work for it have been victimized by Defendants' sweeps, which have seized and destroyed valuables like sleeping bags, medicines, and clothing – items that were purchased with the income they earned as Real Change newspaper vendors. *Id.* Real Change further alleges that City and WSDOT employees have also seized and destroyed irreplaceable mementos and photographs belonging to Real Change vendors, essential identification papers, and the Real Change newspapers that provide the basis of their income. *Id.* As a result, Real Change alleges that Defendants' actions have severely disrupted the lives of Real Change vendors, who are unable to sell papers and earn an income after their property is seized and destroyed because they must instead devote their time to replacing lost articles. *Id.* Thus, some vendors have become unable to work for Real Change, which reduces the organization's presence on the streets and negatively impacts its fulfillment of its mission, and deprives the vendors of much needed income. *Id.* In addition, Real Change alleges that it has been impacted by Defendants' actions both by and through its vendors and because it has had to divert organizational resources as a result of Defendants' sweeps.

///

///

### III.  DISCUSSION

A federal court may issue a TRO "with or without written or oral notice to the adverse party" only if "specific facts in the affidavit . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the moving party "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).  The standards for issuing a TRO are similar to those required for a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D. Ca. 1995).

The Ninth Circuit has described the standards for deciding whether to grant a motion for a preliminary injunction:

> To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (citations omitted).  The speculative risk of a possible injury is not enough; the threatened harm must be imminent. *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); Fed. R. Civ. Proc. 65(b)(1)(A).

The Ninth Circuit has recently reiterated that courts analyzing TRO requests are

> guided by four questions: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken*, 556 U.S. at 434). 'The first two factors . . .

ORDER
PAGE - 5

> are the most critical,' *Nken*, 556 U.S. at 434, and the last two steps are reached '[o]nce an applicant satisfies the first two factors.' *id.* at 435.

*State of Washington v. Trump*, __ F.3d __, 2017 U.S. App. LEXIS 2369, *21 (9th Cir. Feb. 9, 2017).

**A. Likelihood of Success on the Merits**

In this application for a temporary restraining order, Plaintiffs seek an Order prohibiting Defendants from seizing and summarily destroying unhoused people's property without probable cause and constitutionally adequate notice. There are significant factual disputes between the parties, both with respect to the way the various policies and procedures are followed in general, and with respect to the interactions between the parties on the specific dates discussed in the Complaint and in the motion. Nonetheless, Plaintiffs argue that they have demonstrated a likelihood of success on the merits of both their Fourth and Fourteenth Amendment claims. The Court disagrees.

The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *see also Lavan v. City of L.A.*, 693 F.3d 1022, 1027-28 (9th Cir. 2012). As the Ninth Circuit Court of Appeals has stated, the movants need not show a reasonable expectation of privacy to enjoy the protection of the Fourth Amendment against *seizures* of their unabandoned property. *Lavan*, 693 F.3d at 1027-28. Instead, the constitutional standard is whether there was "some meaningful interference" with Plaintiffs' possessory interest in the property. *Id.*

ORDER
PAGE - 6

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "Any significant taking of property by the State is within the purview of the Due Process Clause." *Fuentes v. Shevin*, 407 U.S. 67, 86, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). "Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977). *See also Lavan*, 693 F.3d at 1031.

Relying primarily on *Lavan*, *supra*, Plaintiffs argue that the Fourth and Fourteenth Amendments protect unhoused persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property. Dkt. #23 at 12-21. They argue that there is no legitimate reason for Defendants to seize and destroy the property of unhoused Seattle residents without adequate notice, a warrant or probable cause, an opportunity to be heard, or a meaningful way to reclaim seized property. *Id.* They further argue that concern for the general health and safety of the community cannot justify Defendant's actions. *Id.* Plaintiffs also assert that Defendants' policy and practice of destroying property without any process, and storing property without sufficient notice or procedures to ensure its return, ignores clearly established legal standards. *Id.* Further, they assert that Defendants violate individuals' rights when they provide no meaningful notice or process to get back the few items they seize and store, let alone challenge the underlying seizure. *Id.* Plaintiffs claim that the owners of property are frequently given no notice where they can pick up their property or even if property has been preserved. *See* Dkts. #25-#32. If they are given notice, the notice is

inaccurate and does not outline the process actually required to get their property back. *See* Dkts. #25-#32. Further, they assert that the process itself is convoluted and does not take into account any of the "capacities and circumstances" of the parties, as the Defendants are required to do. Accordingly, Plaintiffs assert that, taken together, the Defendants' policies are inadequate, given the serious deprivation to Plaintiffs, and that they are likely to succeed on the merits of their claims under the Fourth and Fourteenth Amendments. Dkt. #23 at 12-21.

WSDOT asks this Court to deny Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. Dkt. #38. WSDOT asserts that the Order sought by Plaintiffs would completely prohibit Defendants from removing unauthorized objects from public areas like highways and bridge structures unless Defendants can demonstrate that the property presents an "immediate threat to public health or safety," or is abandoned, evidence of a crime, or contraband. *See* Dkts. #38 at 10-14, #39, #40 and #41. WSDOT argues that this is unworkable for many reasons. First, WSDOT has the statutory authority to build, operate, and maintain state highways, including bridges and other structures that support state highways. Dkt. #38 at 2 (citing RCW 47.01).260. Within Seattle city limits, WSDOT owns a substantial amount of real property that constitutes the right-of-way for Interstates 5 (I-5) and 90 (I-90). Dkt. #38 at 2-3. This includes the area underneath overpasses that support those highways, including associated interchanges and on- and off- ramp facilities. *Id.* Second, WSDOT is required to maintain right-of-way for the benefit of the traveling public. *Id.* It must ensure the area remains free of debris and the right-of-way's slope maintains its designed grade for erosion control purposes. Debris within WSDOT's right-of-way poses a risk to the traveling public if it finds its way onto the roadway or a nearby street. *Id.* at 2-3 and Dkts. #39 and #41. Debris that is comprised of human or animal waste, toxic chemicals, or illegal drugs poses a

ORDER
PAGE - 8

health hazard to WSDOT personnel performing maintenance or any members of the public who finds themselves on WSDOT right-of-way, lawfully or not. Dkt. #38 at 2-3 and Dkts. #39 and #41. Similarly individuals occupying the right-of-way during maintenance or repair operations presents a safety risk not only to the individual, but to WSDOT personnel or its contractors. *Id.* Finally, these rights-of-way were not designed to be easily accessible by pedestrians; individuals that attempt to gain access to the right-of-way from surrounding neighborhoods have been observed crossing parts of the interstate, which is dangerous to both the individuals and the traveling public. *Id.* Moreover, I-5 as it passes through the downtown Seattle area is largely comprised of a series of bridges from the Corson Avenue Interchange up to and beyond I-5's interchange with I-90. Numerous bridges support I-90 in this vicinity as well. Many of these bridges are located in areas that are the subject of this lawsuit. *Id.* WSDOT is required to inspect these bridges on a regular basis in order to comply with federal regulations. *Id.* Critical components of each bridge must be carefully examined, including its support columns, pedestrian rails and sidewalks (if any), and expansion joints. WSDOT must also ensure the highway's drainage system is properly conveying stormwater runoff from the highway, so that WSDOT remains in compliance with all relevant stormwater discharge permits. *Id.* Specifically, WSDOT is required to comply with a stormwater permit issued by the Washington Department of Ecology (WDOE) pursuant to section 402 of the Clean Water Act. That permit requires WSDOT to implement and enforce a stormwater management program, reduce the discharge of pollutants from the highway system, and protect water quality. *Id.*

WSDOT argues that it has not violated either the Fourth or Fourteenth Amendments because, in order to address encampments within its right-of-way, WSDOT drafted guidelines that set forth procedures for the removal of personal property from the right-of-way. *See* Dkt.

ORDER
PAGE - 9

#33, Exhibit B. These Guidelines apply state-wide. The Guidelines specifically outline procedures for WSDOT to implement prior to any scheduled clean-up of right-of-way. The Guidelines provide that before any scheduled cleanup takes place, WSDOT posts notices of the upcoming clean-up at least 72 hours in advance. *Id*., sec. 3B; 5. The notice shall include the identification of WSDOT as the agency of the cleanup, the date the notice was posted, and the date the clean-up will occur. *Id*. The Guidelines set forth examples of lost personal property that may need to be stored, including but not limited to tents, sleeping bags, stoves and cooking utensils, blankets, pillows, personal papers, medication, and books. *Id*. Any personal property item that is not refuse, contaminated, illegal, or hazardous shall be stored in large transparent bags and will be inventoried, including the date, location and brief description of the bag's contents. *Id*.

In the event that WSDOT acquires personal property for storage, the Guidelines provide that WSDOT shall "use reasonable efforts to protect the personal property from adverse weather conditions." *Id*., at sec. 6. The Guidelines describe procedures for an individual to identify and retrieve their personal property, and to notify potential owners of the lost property for a period of ten (10) days after acquisition. *Id*. If the property is not retrieved within another sixty (60) days, WSDOT may dispose of the property as it deems appropriate. *Id*.

The Guidelines also set forth WSDOT policy that not all cleanup activities can be posted with 72 hours' advance notice. For example, emergency repairs may require WSDOT to clear the right-of-way without notice, for the safety of WSDOT personnel and anyone within the right-of-way at that time. *Id*., at sec. 3A. Also, for cleanups in areas where maintenance occurs on a frequent but random basis, that area will be posted "No Trespassing" and WSDOT will clean-up illegal encampments upon arrival. *Id*.

ORDER
PAGE - 10

As the WSDOT Guidelines apply state-wide, they also recognize that processes may require variance depending on the jurisdiction. Accordingly, each region is authorized to coordinate with local jurisdictions to determine a process that makes sense for the particular circumstances, as long as those processes are "at least as effective as the provisions contained in these Guidelines." *Id.*, at 1.

Specifically as it relates to this case, WSDOT coordinates with the City of Seattle (City) for all scheduled cleanups involving WSDOT property in City limits. Dkt. #38 at 9-14. At least for the past year, and for the foreseeable future, WSDOT has agreed that the City's protocols will be followed for such cleanups, and follows the City's lead in accomplishing those processes. *Id.* In practice, this results in the City handling pre-cleanup outreach, identification, and storage of personal property, and WSDOT performing cleanup of the remaining refuse. *Id.* WSDOT argues that because it acts reasonably in removing unauthorized materials from its property, there is no Fourth Amendment violation. With respect to the Fourteenth Amendment claim, WSDOT argues that its and the City's processes contain several safeguards to prevent the erroneous deprivation of property, and therefore due process is satisfied. *Id.*

Likewise, the City of Seattle argues that Plaintiffs cannot show a likelihood of success on the merits of their constitutional claim. Dkt. #42. Specifically, it asserts that ever since adopting the current Multi-Departmental Administrative Rules ("MDARs") in 2008, the City has not only complied with "baseline" Fourth Amendment constitutional requirements, it has also steadily increased the additional protections and services that it provides. Dkt. #42 at 11-19. Per the MDARs, the City has always provided notice at least 72 hours in advance of its clean-ups. The City has also inspected all on-site materials, stored any personal property left

ORDER
PAGE - 11

behind, and posted notice that such property can be recovered.  The City submits a Declaration representing that the City's Director of Operations for the Department of Finance and Administrative Services has confirmed, "City employees follow City encampment procedures at all sites . . . ."  Dkt. #42 at 11-19.

Seattle further asserts that over time, the City has steadily added to the MDARs' baseline procedures.  Dkts. #42 at 6-9 and 11-19 and #43-#48.  For example, 72-hour notice is provided, except in emergencies, to encampments of any size, not just encampments with three or more tents, as required in the original MDARs.  *Id.*  The City now provides notice of the particular dates scheduled for any clean-up (rather than merely a 72-hour deadline for removing property), and re-notices any clean-up that is not conducted on schedule.  *Id.*  The City also provides individualized notice, both orally to any individuals present at the time and by placing stickers on each tent and structure at the site.  *Id.*  In addition, the City sends outreach staff prior to each and every clean-up in order to offer shelter alternatives to all persons at the encampment.  *Id.*  The outreach staff are present the day before the clean-up and during the entire clean-up.  Further, City staff will provide bags and containers for storage purposes and will work with anyone on-site to facilitate the storage of his or her belongings if desired.  *Id.*  The City continues to refine and strengthen its approach; some of the City's supplemental practices have been adopted within the past six months.  The City's current protocols are already among the most compassionate and respectful in Washington and of any major city in the United States.  *Id.*

The City also notes that in its continuing efforts to refine its practices in this area, the City is in the process of updating the MDARs it adopted in 2008.  *Id.*  The City initially convened a Task Force to develop recommendations and guidance for revising the MDARs.

ORDER
PAGE - 12

The Task Force included homeless advocates, neighborhood advocates, service providers, business interests, and public property managers. The ACLU Foundation of Washington was invited to join the Task Force, but it chose not to participate. The Task Force meetings were public and included the opportunity for public comment. Based on numerous recommendations from the Task Force, the City developed its proposed set of new MDARs. Dkts. #42 at 6-9 and 11-19 and #43-#48

The City of Seattle asserts that *Lavan* is inapplicable to the instant matter because that case addressed entirely different circumstances than those before the Court here. Dkt. #42 at 11-19. The issue in *Lavan* was whether the City of Los Angeles could, without any notice, remove and in all cases destroy property left on public sidewalks. *Lavan*, 693 F.3d at 1024 ("We conclude that the Fourth and Fourteenth Amendments protect homeless persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property."). The court disapproved of "summary" and "on-the-spot" destruction of belongings – a practice Los Angeles did not even attempt to defend as reasonable. *Id.* at 1031, 1032-33 (internal quotations omitted); *see also Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) ("The City will still be able to lawfully seize and detain property, as well as remove hazardous debris and other trash; issuance of the injunction would merely prevent it from *unlawfully* seizing and destroying personal property that is not abandoned without providing any meaningful notice and opportunity to be heard."). The City asserts that, in contrast, and consistent with the specific holding of *Lavan*, a city may clean up encampments consistent with the Fourth and Fourteenth Amendments so long as the city provides notice beforehand and a reasonable opportunity for retrieval of the property that is removed. Dkt. #42 at 11-19.

The City of Seattle further argues that its current MDARs provide for adequate notice and an opportunity for retrieval, consistent with applicable constitutional requirements. Dkt. #42 at 11-19. In addition, the City states that it has followed its rules in actual practice. In sum, the City asserts that because the City follows the MDARs, which are constitutionally valid; because the City is continuing its efforts to enhance the protections afforded by the MDARS; and because the record does not demonstrate the City's liability, Plaintiffs have failed to show they are likely to prevail on the merits. *Id.*

The Court agrees with the City at this time. As an initial matter, nobody disputes that the individual Plaintiffs have certain rights in their personal property. However, as the Ninth Circuit stated in *Lavan*, "'[t]he question then becomes whether the City, in seizing [Appellees'] property, acted reasonably under the Fourth Amendment.'" *Lavan*, 693 F.3d at 1030 (quoting *Lavan*, 797 F. Supp. 2d at 1013). Thus, this Court must look at whether the City's and WSDOT's actions meet the Fourth Amendment's reasonableness requirement. *See Lavan*, 693 F.3d at 1030-31 (citing to *Miranda v. City of Cornelius*, 429 F.3d at 864). A seizure is deemed unreasonable if the government's legitimate interest in the search or seizure does not outweigh the individual's interest in the property seized.

Based on the evidence in the record at this time, including the many Declarations along with their Exhibits filed by both parties, the Court cannot say that Plaintiffs have shown a likelihood of success on the merits of their constitutional claims. The City and WSDOT officials' declarations establish that the City and WSDOT have enforced the MDARs consistent with the procedural protections built into them. This is unlike *Lavan*, because there, the City of Los Angeles did not dispute the plaintiffs' allegations and admitted that it had a policy and practice of seizing and destroying homeless persons' possessions when they had not been

ORDER
PAGE - 14

abandoned. *Lavan*, 693 F.3d at 1025. The City of Los Angeles also conceded that it did not provide any notice or an opportunity to be heard to the plaintiffs either before or after seizing their property. *Id.* at 1032.

In contrast, the City of Seattle and WSDOT state that they have provided notice and followed the procedural safeguards contained in the MDARs, and have even gone beyond those safeguards in many instances. *See* Dkts. #39-#41, #43-#48, #57 and #61. On the other hand, Plaintiffs' assert that the City and WSDOT do not follow their own policies and often destroy personal property without notice to be heard and without any opportunity to retrieve the seized items. *See* Dkts. #24-#32. Yet, many of the Declarations submitted by Plaintiffs also acknowledge that notice has been provided before property is seized, although they dispute the sufficiency of such notices. *See*, *e.g.,* Dkts. #25, #27 and #32. Many of the Declarations do not identify whether property was taken and/or destroyed at any particular time, and many do not address any attempt to recover the items.[2]

The Court recognizes that "'[t]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.'" *Lavan*, 693 F.3d at 1032 (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)). The Court further recognizes that because unhoused persons' unabandoned possessions are "property" within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993); *Lavan*, 693 F.3d at 1032-33. However, unlike *Lavan*, here the City and WSDOT have not admitted that it fails to provide any notice or

---

[2] Plaintiffs have offered statistical evidence of the percentage of sweeps in which personal property is retained and catalogued. However, given the opposing explanation of the data by the City of Seattle, the Court finds Plaintiffs' purported statistics to be unreliable at this time.

ORDER
PAGE - 15

opportunity to be heard for Ms. Hooper, Ms. Osborne, or any other unhoused person, before it seizes and/or destroys their property. Rather, they have presented evidence to the contrary. While sympathetic to the circumstances in which these Plaintiffs find themselves, the Court ultimately concludes that on this record Plaintiffs have not satisfied their burden to show a high likelihood of success on the merits of their constitutional claims at this time.

### B. Irreparable Harm

Turning to the element of irreparable harm, Plaintiffs argue that absent the Court's intervention, Plaintiffs and members of the proposed class will continue to suffer irreparable harm from the Defendants' policies and practices because they violate their constitutional rights. Dkt. #23 at 21-22.

WSDOT responds that Plaintiffs cannot establish irreparable harm is likely for two reasons. Dkt. #38 at 14-15. First, neither Plaintiffs Hooper nor Osborne has put forth sufficient evidence in their declarations that they reside in an area that has been posted as an area subject to cleanup in the near future. Second, WSDOT's policy is to give at least 72 hours written notice when possible before the removal of unauthorized property stored on its facilities, and as much notice as practicable when 72 hours' notice is not practicable. In practice, WSDOT provides over one week's notice before conducting scheduled clean-up activities. *Id.*

Similarly, the City of Seattle asserts that, given the absence of any constitutional violation, the Plaintiffs cannot demonstrate cognizable harm. Dkt. #42 at 19-20. Moreover, the City contends that it continues to provide more robust procedural protections to mitigate any potential harm. *Id.* The City allows for personal property to "be recovered," for example, and summarily disposes only of property that "poses a risk to the health and safety of the community" (such as "syringes" or "garbage"), all of which "does not support a finding of a

ORDER
PAGE - 16

likelihood of irreparable harm to the Plaintiffs. Dkt. #42 at 20. Likewise, under the new MDARs, the Plaintiffs will receive individualized notice, additional outreach, and the ability to have confiscated property delivered to them anywhere in the City. *Id.*

For the reasons discussed by Defendants, the Court agrees that Plaintiffs have failed to demonstrate irreparable harm should the Court decline to enter a temporary restraining order at this time.

### C. Balance of Equities and the Public Interest

Given that this Court has determined that Plaintiffs fail to meet the first two requirements for injunctive relief, the Court need not reach the remaining elements. *State of Washington v. Trump*, __ F.3d __, 2017 U.S. App. LEXIS 2369, *21 (9th Cir. Feb. 9, 2017).

### D. Alternate Test

Under the Ninth Circuit's alternative test for injunctive relief – that a movant has shown serious questions are raised and the balance of hardships tips sharply in its favor – the Court would reach the same conclusion as stated above for the same reasons. Accordingly, the Court concludes that Plaintiffs have failed to meet either standard for injunctive relief at this time.

### IV.   CONCLUSION

The Court is not blind to the hardships faced by the unhoused Plaintiffs under the circumstances presented in this case. The Court recognizes their constitutional property rights, and makes no final determination at this time as to whether they will ultimately be successful on their claims. Indeed, the Court emphasizes that its analysis at this stage is a preliminary one. Thus, this decision reflects the state of the record at these early stages of the proceedings and the limited evidence before the Court at this time. Accordingly, having reviewed Plaintiffs' motion, the oppositions thereto, the reply in support thereof, along with the Declarations and

Exhibits submitted by the parties and the remainder of the parties, the Court hereby finds and ORDERS:

1. Plaintiffs' Motion for Temporary Restraining Order (Dkt. #23) is DENIED.

2. Plaintiff's concurrent motion for Preliminary Injunction will be scheduled for oral argument. No later than **ten (10) days from the date of this Order**, the parties shall meet and confer and submit to the Court by way of Joint Status Report a proposed briefing schedule for any supplemental briefing to be submitted by the parties and several proposed oral argument dates and times, along with a proposed Order.

DATED this 14 day of February, 2017.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 18