1

THE HONORABLE RICARDO S. MARTINEZ

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

LISA HOOPER, BRANDIE OSBORNE, KAYLA WILLIS, REAVY WASHINGTON, individually and on behalf of a class of similarly situated individuals; THE EPISCOPAL DIOCESE OF OLYMPIA; TRINITY PARISH OF SEATTLE; REAL CHANGE,

10

11

12

13

Plaintiffs,

14

vs.

15

CITY OF SEATTLE, WASHINGTON; WASHINGTON STATE DEPARTMENT OF TRANSPORTATION; ROGER MILLAR, SECRETARY OF TRANSPORTATION FOR WSDOT, in his official capacity,

16

17

18

Defendants.

No. 2:17-cv-00077-RSM

SECOND AMENDED COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

19

20

21

22

23

24

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## I.  **INTRODUCTION**

1.     Plaintiffs Lisa Hooper, Brandie Osborne, Kayla Willis, Reavy Washington, the Episcopal Diocese of Olympia, Trinity Parish of Seattle, and Real Change, by and through counsel, bring this class action challenging the ongoing policy and practice of the City of Seattle (the "City") and the Washington State Department of Transportation ("WSDOT") (together the "Defendants") of seizing and destroying the property of people who are living outside without adequate and effective notice, an opportunity to be heard, or a meaningful way to reclaim any property that was not destroyed.  This practice is commonly referred to as "sweeping" or "sweeps."[1]

2.     Each year, more and more City of Seattle residents are forced to live outside on public property.  According to the Seattle/King County Coalition on Homelessness ("SKCCH"), on a given night in January 2016, more than 2,942 Seattle residents were found trying to survive one of the coldest months of the year outdoors.  Of this population, approximately 900 had a vehicle to sleep in, leaving roughly 2,000 Seattle residents with no shelter but what they could build for themselves or find in the form of existing structures, such as under roadways.   It is estimated that even more individuals are forced to live outside on public property in 2017.

3.     Pursuant to official policies and longstanding practice sanctioned by their policymakers, Defendants have embarked upon a program of seizing and destroying the property of people living outside, in a process referred to as "sweeps," or "clean ups." Defendants conducted more than 1000 of these sweeps in the past two years alone.

4.     These sweeps target Plaintiffs and the communities in which they live.

---

[1] "Sweeping" or "sweeps" refers to Defendants' act of removing and/or destroying the property of people who live outside.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 1
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

5.      Pursuant to these policies and practices, Defendants remove and destroy unhoused peoples' property without a warrant, probable cause, adequate notice, an ability to be heard, or a meaningful opportunity for people to retrieve their possessions.

6.      Defendants' actions deprive people living outside of personal belongings that are critical to their survival, such as: clothing, tents, cooking utensils, and medication; important personal possessions, such as identification documents; tools necessary for their profession; and irreplaceable mementos, including family photographs and heirlooms.

7.      For example, Plaintiff Lisa Hooper has suffered the loss of irreplaceable family photos and mementoes, important legal paperwork, a mattress, clothing, and several shoes—leaving her without a matching pair—because of previous sweeps conducted by Defendants pursuant to a policy with no end in sight.

8.      Plaintiff Brandie Osborne has also suffered the loss of medication, cooking utensils, clothing, blankets, sleeping bags, and important documents like applications for work and housing as well as medical paperwork.

9.      Plaintiff Kayla Willis has suffered the loss of clothing, tents, blankets, and cooking utensils.

10.     Plaintiff Reavy Washington has suffered the loss of clothing, tents, a grill and stove, kitchen utensils, tools, eye glasses, electronics, and jewelry.

11.     Other individuals living outside have lost nearly everything they own but the belongings on their back as a result of Defendants' sweeps.

12.     The consequences are devastating.  Defendants' conduct leaves an already vulnerable population at imminent and significantly increased risk of harm from exposure and want.  It makes it more difficult for people living outside to break out of the cycle of homelessness, as time they could spend working or looking for employment or taking care of

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 2
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

their affairs is by necessity spent instead on replacing essential items like identification and bedding.  It also makes it harder for people living outside to keep appointments for housing programs and other services, especially when they lose legal papers and housing application forms in sweeps, causing individuals to suffer additional delay in their ability to get housing and other services.  And it takes a substantial emotional toll.

13.     Plaintiffs live in constant fear that all of their remaining possessions will be seized by Defendants, who have publicly committed to not only continuing their on-going policies and practices, but expanding their authority to engage in sweeps throughout the City without notice.

14.     Defendants' policies and practices are not only unnecessarily cruel, they are also illegal: they violate Plaintiffs' (1) right to protection from unreasonable search and seizure under the Fourth Amendment of the U.S. Constitution; (2) right to protection from invasion of homes and privacy under Article I, Section 7 of the Washington State Constitution; (3) right to procedural due process under the Fourteenth Amendment of the U.S. Constitution; and (4) right to procedural due process under Article I, Section 3 of the Washington State Constitution.

15.     Despite this pending litigation, Defendants have doubled down on their unconstitutional actions and policies.

16.     Rather than taking time to evaluate their policies and practices, or to provide necessary training for their employees, Defendants have conducted numerous sweeps throughout the City since this lawsuit was filed on January 19, 2017.

17.     These sweeps include one on January 26, 2017, in which Defendants arrived at Plaintiff Brandie Osborne's home without any notice, and gave her 30 minutes to pack up everything she owned.  Defendants told Ms. Osborne that not only were they not required to provide her any notice, but that any belongings she was not able to move immediately would

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 3
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

be considered garbage.  As a result, Ms. Osborne lost even more of her property at the hands of WSDOT and the City, such as clothing, food, tools, dishes, a fire pit and firewood, a tent, tarps, blankets, and sleeping bags.

18.     Defendants have conducted a number of other sweeps without providing adequate or effective notice of the pending sweep since this litigation was filed.  This has included failing to conduct sweeps on the day and time they were posted, giving less than 72 hours' notice prior to a sweep, providing conflicting forms of notice or information, posting retroactive notice, and neglecting to provide any notice at all prior to a sweep.

19.     During a number of the sweeps conducted after this lawsuit was filed, Defendants also failed to provide notice regarding the storage of property and instead posted notices that all property in the area was subject to destruction if not removed prior to the sweep.

20.     During multiple sweeps, Defendants also destroyed property of unhoused residents living outside by slashing tents and physically breaking belongings.

21.     On January 31, 2017, the City proposed new rules that enable Defendants to more frequently engage in sweeps, with greater discretion and fewer controls than provided for by their previous official policies.  The City drafted these proposed rules without seeking any input from Plaintiffs or their counsel.

22.     These new rules were ultimately adopted on March 15, 2017 and allegedly implemented on April 3, 2017.

23.     Defendants' new rules, coupled with their repeated and ongoing conduct even in the face of pending litigation demonstrates that they will continue to violate Plaintiffs' constitutional rights unless and until a Court intervenes. Indeed, Defendants' Replies in Opposition to Plaintiffs' Motion for a Temporary Restraining Order explicitly concede that "the City does not contend that each and every clean-up over a multi-year period has been conducted

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 4
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

perfectly," (pg. 18, City's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction).  Defendants further note that the City finds it "difficult to discern whether a given item remaining on-site is trash or intended for future use," (pg. 17, City's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction) that "Plaintiffs appear to have a fundamental disagreement with WSDOT and the City about what is trash and what is property," (pg. 13, WSDOT's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction).

24.     Additionally, WSDOT notes that it routinely disposes of "dirty clothing" and "urine soaked or infested bedding, and moldy clothing."  (pg. 10 WSDOT's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction), and that WSDOT threw away items belonging to Ms. Osborne that included "wet, dirty clothes, [and] an old pan." (pg. 8, WSDOT's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction).  The City has also clarified that it considers "an unorganized pile of bagged and unbagged wet debris, kitchen and paper waste . . . refuse, without opening each closed bag," that it will not store "soaking wet fabrics," that "the entire contents of a disorganized dry tent littered with hypodermic needles, bedding and clothing would not be stored because it would not be safe to handle soft objects with sharps in them," and that "depending upon the condition of the tent, it might be stored or it might disposed of."  (Declaration of C. Potter In Support of City's Opposition to Plaintiff's Motion for Temporary Restraining Order at ¶ 19).

25.     WSDOT has also stated that it routinely disposes of items including "bed bug ridden wet mattresses, scrap metal parts from bicycles, . . . broken wicker baskets, broken milk crates, moldy clothing, smashed corrugated boxes and box parts, soiled and ripped tarps, soiled carpet remnants, ripped plastic sheets, wet clothing, wet tents, and plastic containers filled with

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 5
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

stagnant water." (Declaration of L. Pascubillo In Support of WSDOT's Response to Plaintiff's Motion for Temporary Restraining Order ¶ 5).

26.     The fact that the belongings of Plaintiffs and others who are also unhoused are not pristinely clean or brand new from the sporting goods store; that their clothing and bedding are often wet from exposure to the elements (and may mold as a result); and that their cooking utensils are old, their tents are tattered, and many items are broken or otherwise in poor condition should not come as a surprise: they are, after all, living outside.

27.     Defendants' submissions in this case confirm what Plaintiffs have long known, that Defendants have no respect for their property rights because they view these possessions as nothing more than garbage.  The City's apparent concession that it has not conducted every sweep "perfectly" is of little consolation to those who have lost their life's possessions in a process that systematically and routinely permits sweeps that result in the summary destruction of personal property.

28.     Plaintiffs seek a declaratory judgment that Defendants' policy and practice of confiscating and/or destroying the personal property of people living outside without a warrant, probable cause, an opportunity to be heard, a meaningful opportunity to reclaim property, and/or requisite procedural due process is unlawful under the federal and state constitutions.

29.     Plaintiffs also seek appropriate injunctive relief enjoining Defendants' use of sweeps until Defendants adopt and implement procedures that respect Plaintiffs' constitutional rights.

30.     If Defendants insist upon seizing and destroying personal property of unhoused people living outside in Seattle, Plaintiffs—like all property owners in this country—have a right to adequate and effective notice and an opportunity to be heard before their property is taken by the government.  These rights are not implicated by policies and procedures that

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    provide true "clean up" services, such as regularly scheduled garbage pickups from designated

2    garbage bins (like those provided to other City residents) that do not involve the seizure and

3    destruction of personal property.

4         31.    Plaintiffs have no adequate remedy at law and are at imminent risk of subsequent

5    rights violations.  Defendants know or should know that their actions violate the constitutional

6    rights of people living outside, but have made it clear they intend to continue the unlawful

7    conduct described herein.

8    ## II.  JURISDICTION & VENUE

9         32.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

10   §§ 1331, and 1343(a)(3).  Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201-2202.

11        33.    This Court has supplemental jurisdiction over Plaintiffs' claims for violation of

12   the Washington State Constitution pursuant to 28 U.S.C. § 1367.  Venue is appropriate in this

13   District because all parties reside or are present in, and the causes of action occurred in the

14   Western District of Washington.  28 U.S.C. § 1391(b).

15   ## III.  PARTIES

16   **A.    Individual Plaintiffs**

17        34.    Plaintiff Lisa Hooper is unhoused and lives outside in Seattle, Washington.  Ms.

18   Hooper has lived outside for approximately two years, and maintains a home with her male

19   partner.  Ms. Hooper and her partner will continue to live outside for the foreseeable future.

20        35.    Defendants have conducted multiple sweeps where Ms. Hooper and her partner

21   live.  Defendants have, on a number of occasions, conducted sweeps of the area without notice.

22   Ms. Hooper has had many of her possessions confiscated and/or destroyed during Defendants'

23   sweeps.

24

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 7
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

36.     For example, during a sweep in May of 2015, Defendants gave Ms. Hooper minimal to no notice, forcing her to scramble to pack up her entire home and quickly determine which items were absolutely necessary for survival to take with her, and which she had to leave. Defendants seized and/or destroyed the property Ms. Hooper was forced to leave behind, including the only photos she had of her three daughters, her children's baby teeth that she had been saving for about 20 years, important legal paperwork, a mattress, clothing, matching shoes, antibiotics, and a family Bible that had information on her family history going many generations back, among other items.

37.     Having to repeatedly and on short or no notice move all her belongings to avoid their confiscation and destruction has imposed significant hardship upon Ms. Hooper and limits her ability to be away from her property to deal with personal affairs for fear that the property will have been seized by Defendants in her absence.

38.     Defendants' refusal to provide effective and adequate notice has left Ms. Hooper with great uncertainty as to where it is safe to live and keep her belongings.  For example, in January 2017, WSDOT and City personnel conducted a sweep of the area where Ms. Hooper and her partner live.  Defendants posted no prior notice in the area, posting only a single notice far north of where Ms. Hooper lived.  WSDOT then cleared only part of the area the notice described, and refused to provide information about whether and/or when the area she lived in would be swept.

39.     Ms. Hooper lives in constant fear that she will lose her home and everything she owns in one of Defendants' future sweeps.

40.     Ms. Hooper is even more fearful now than when the original complaint was filed that she will lose her home and everything she owns in one of Defendants' future sweeps without any notice.  Defendants' newly adopted rules enable the City to designate particular

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    areas that have been previously swept as "emphasis areas," wherein camping is completely

2    prohibited and Defendants are not required to provide *any* notice before removing people and

3    their property from the area.  Ms. Hooper's home has been subject to sweeps repeatedly in the

4    past few months.

5            41.    Plaintiff Brandie Osborne is unhoused and lives outside in Seattle, Washington.

6    For approximately one year and a half, Ms. Osborne resided up the hill from the intersection of

7    Dearborn Street and the ramp to I-5 North.  Ms. Osborne has been forced to move from there

8    and a multiple other locations in the past few months as a result of Defendants' sweeps.  Ms.

9    Osborne will continue to live outside for the foreseeable future.

10           42.    Defendants have conducted roughly four sweeps where Ms. Osborne lives.

11   Defendants have, on a number of occasions, conducted sweeps of the area without notice.  Ms.

12   Osborne has had possessions confiscated and/or destroyed during these sweeps.

13           43.    Because Ms. Osborne has had minimal to no notice of Defendants' sweeps, she

14   has had to scramble to pack up her entire home and quickly determine which items were

15   absolutely necessary for survival to take with her, and which she had to leave.  Defendants

16   seized and/or destroyed the property she was forced to leave behind, including important

17   personal property like tents, tarps, plywood, and landscaping tools; clothing, sleeping pads, and

18   blankets; a bike and Orca card, an EBT card, important paperwork like phone numbers and

19   business cards, applications for work and housing and medical paperwork as well as

20   medication; a Holy Bible, books, reading glasses, and hygiene items; pots and pans, a water

21   jug, dishes, and food items; a cell phone, flashlights, phone chargers and batteries, garbage

22   cans, and jewelry.  Ms. Osborne's tent was also damaged beyond repair after having to move it

23   so many times.

24

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 9
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

44.     Having to repeatedly move all of her belongings to avoid their confiscation and destruction has imposed significant hardship on Ms. Osborne, and limits her ability to be away from her property to deal with personal affairs for fear that the property will have been seized by Defendants in her absence.

45.     Defendants' refusal to provide effective and adequate notice has also left Ms. Osborne with great uncertainty as to where it is safe to live and keep her belongings.  For example, in December of 2016, WSDOT provided notice of a sweep that would affect the area where she lives.  Ms. Osborne, with the assistance of her neighbors and volunteers, moved most of her belongings.  WSDOT then cleared only part of the area the notice described, not including the area where Ms. Osborne lived, and refused to provide information about whether and/or when the area she lived in would itself be swept.

46.     Over the Martin Luther King holiday weekend in January 2017, Ms. Osborne saw a notice that the location of her home could be swept on January 19, 2017, and was forced to move her home again. When Ms. Osborne's partner was moving their camp however, their tent was taken.  The only other individuals present on that day, aside from Ms. Osborne and her partner, were employees and/or agents of WSDOT.

47.     Just one week later, on January 26, 2017, WSDOT showed up again at Ms. Osborne's home, this time without providing any notice.  WSDOT employees yelled at Ms. Osborne outside her tent that she had 30 minutes to move everything she owned from the area; anything she left behind would be considered garbage.  Ms. Osborne replied that it was not possible to move all of her property in 30 minutes, but was told that it did not matter.  When Ms. Osborne told WSDOT she never received notice that her home would be swept, she was told that it did not matter, and that Defendants were not required to provide notice. Ms. Osborne was able to secure help in moving a number of her belongings from a friends' mother, but was

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    still forced to leave many of her possessions behind, including a bike, clothing, food, dishes

2    and tools, a fire pit and firewood, tent, tarps, blankets and sleeping bags.  These items were

3    destroyed by WSDOT.

4          48.    Ms. Osborne lives in constant fear that she will lose her home and everything

5    she owns in one of Defendants' future sweeps.

6          49.    Ms. Osborne is even more fearful now than when the original complaint was

7    filed that she will lose her home and everything she owns in one of Defendants' future sweeps

8    without any notice.  This is because of Defendants' newly adopted rules enable the City to

9    designate particular areas that have been previously swept as "emphasis areas," wherein

10   camping is completely prohibited and Defendants are not required to provide *any* notice before

11   removing people and their property from the area.  Ms. Osborne's home has been subject to

12   sweeps repeatedly in the past few months and she has had to move to another outdoor location

13   at least three times since this original complaint was filed.

14         50.    Plaintiff Kayla Willis is unhoused and lives outside in Seattle, Washington.  Ms.

15   Willis maintains a home with her male partner.  Ms. Willis has lived outside for approximately

16   three years in the City.  Ms. Willis and her partner will continue to live outside for the

17   foreseeable future.

18         51.    Defendants have conducted approximately eight sweeps in locations where Ms.

19   Willis and her partner have lived.  Defendants have, on a number of occasions, conducted

20   sweeps of the area without adequate notice.  Ms. Willis has had many of her possessions

21   confiscated and/or destroyed during Defendants' sweeps, including clothing, tents, blankets,

22   and cooking utensils.

23         52.    Having to repeatedly and on short or inadequate notice move all her belongings

24   to avoid their confiscation and destruction has imposed significant hardship upon Ms. Willis.

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 11
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

For example, Ms. Willis has epilepsy, and the stress of having to pack everything she owns and prepare for pending sweeps frequently triggers seizures.  Ms. Willis and her partner also both have disabilities that make it difficult to move all of their property, particularly with only a few days notice or less.

53.     Defendants' refusal to provide effective and adequate notice has left Ms. Willis with great uncertainty as to where it is safe to live and keep her belongings.

54.     Ms. Willis lives in constant fear that she will lose her home and everything she owns in one of Defendants' future sweeps.

55.     Plaintiff Reavy Washington is unhoused and lives outside in Seattle, Washington.  Mr. Washington has lived outside in Seattle on and off for approximately 8 years and will continue to live outside for the foreseeable future.

56.     Defendants have conducted multiple sweeps where Mr. Washington lives.  In the past 2 months alone, Defendants have conducted 3 sweeps in the area where Mr. Washington has lived.  Defendants have, on at least one occasion, conducted a sweep of the area without adequate notice.  Mr. Washington has had many of his possessions confiscated and/or destroyed during Defendants' sweeps.

57.     For example, during a sweep in March of 2017, Mr. Washington was unable to move his tent and all of his belongings before the sweep.  Mr. Washington watched Defendants physically destroy his tent, with the belongings he was unable to move himself inside, piling it into a heap for the dumpster.  The property Defendants destroyed included Mr. Washington's grill, stove, boom-boxes, home docking station stereo, DVD player and DVDs, clothing, including work gear, tools, tents, bed, kitchen utensils, jewelry, and other miscellaneous items.

58.     Having to repeatedly (and on short or no notice) move all his belongings to avoid having them confiscated  and destroyed by Defendants has imposed significant hardship upon

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Mr. Washington and has limited his ability to be away from his property to deal with personal affairs for fear that the property will have been seized by Defendants in his absence.

59.     Mr. Washington is temporarily residing in an area that the City has sanctioned for camping, however he remains subject to Defendants' ongoing sweeps and fears building his home or storing his belongings elsewhere on public property because of Defendants' ongoing sweeps.  Mr. Washington was not residing in an area that the City has sanctioned for camping until recently.  In addition to the sweeps that Mr. Washington has already been subject to, Mr. Washington will continue to be subject to Defendants' sweeps to the extent that the City changes the status or location of sanctioned encampments, to the extent that Mr. Washington is compelled to live somewhere else, or to the extent Mr. Washington decides to move to a different location on public property.

60.     Plaintiffs bring this suit on behalf of themselves and all other similarly situated unhoused persons who live outside.[2]

**B.     Organizational Plaintiffs**

61.     Plaintiff Diocese of Olympia is a diocese of The Episcopal Church in Washington State.  It is comprised of "more than 26,000 Episcopalians in more than 100 worshiping communities throughout Western Washington."  Diocese congregations include numerous members who are unhoused.  The mission of the Diocese of Olympia is to "build strong communities of faith."  To accomplish its mission, among other things, the Diocese of Olympia assists congregations with their development and work, including strengthening the stewardship of available resources.  For example, the Diocese offers training, grants, resources, and other programs to its member churches.

---

[2] "Unhoused" refers to all individuals who lack fixed, stable, or adequate shelter or housing.  While the term "homeless" is often utilized to refer to this population, we use the term "unhoused" because people who lack permanent or stable housing still have homes in which they sleep and go about their private affairs.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 13
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1 62. There are a number of churches in the City of Seattle that are members of the

2 Episcopal Diocese, including St. Luke's Episcopal Church and Trinity Parish of Seattle.  Many

3 of these churches, as an integral part of their mission and ministry, provide services to unhoused

4 people in Seattle.

5 63. For example, St. Luke's Episcopal Church in Ballard operates a Meals Ministry

6 called Edible Hope, wherein the church and its congregation serve a hot breakfast five days a

7 week to approximately 150-180 people each day, 90 to 95 percent of whom are homeless.  The

8 church also co-sponsors a program called the Bridge Drop In which offers a number of drop in

9 services to unhoused individuals, including counseling, and stations for people to charge their

10 electronics, and operates a shelter on site.

11 64. The confiscation and destruction of the belongings of people living outside has

12 affected the church's operation in a number of ways.  Since Defendants have increased their

13 use of sweeps, the church has had significantly more unhoused people needing its meal and

14 Bridge Drop In services.  This increased demand has put additional burden on the church's

15 facilities, and required significant additional church resources.  The church is also affected by

16 Defendants' actions through its membership: approximately 20 percent of the church's

17 congregation is unhoused.

18 65. Plaintiff Trinity Parish of Seattle is also a member of the Diocese of Olympia.

19 As a part of its mission, Trinity Parish offers a number of services for unhoused individuals in

20 Seattle, including a thrift shop in First Hill.

21 66. Trinity Parish operates the Thrift Shop, which receives donations from

22 community members and also purchases many of the items it sells and/or gives away, as well

23 as contracts with other entities to meet the needs of the Thrift shop's clientele.  In addition to

24 selling items, the Thrift Shop operates a voucher program for the store wherein people can get

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 14
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

clothing and other necessities they might need, like blankets, coats, sleeping bags, and socks to survive the cold weather for free.  Unhoused residents who live outside throughout the City rely upon the Thrift Shop to meet their basic needs.  The Thrift Shop hands out approximately 80 to 100 vouchers per week to individuals, many of whom are unhoused and living outside.  In recent years, it has been more difficult for the Thrift Shop to keep up with the number of individuals who rely on it, and the Thrift Shop frequently runs low or is unable to keep up with the items many unhoused community residents rely upon, such as blankets, sleeping bags, and socks.  The demand for these types of items has increased in tandem with the City and WSDOT's increased used of sweeps.  The Thrift Shop has seen numerous individuals who come in over the last couple of years who have lost everything as a result of Defendants' sweeps.  The Thrift Shop can occasionally provide emergency vouchers for individuals, or clothing items and necessities, but is often unable to meet the increased demand for such items.  This strain on resources is made all the more difficult by the fact that the items that the Thrift Shop is able to provide to unhoused individuals are frequently seized and destroyed by Defendants. The Thrift Shop has had countless individuals return to their shop after having been provided with clothing or other items who say they have lost everything in a sweep.

68.    Plaintiff Real Change exists to provide opportunity and a voice for low-income and unhoused people while taking action for economic, social and racial justice.  Tim Harris founded Real Change in 1994 and has served as its director since.  Real Change's mission is to offer immediate employment options for the poor and unhoused and challenge the structures that create poverty.  Real Change publishes a weekly newspaper of the same name that provides employment to about 800 poor and unhoused people annually, who sell the papers throughout the greater Seattle area.  At any given time, about half of Real Change's vendors are unhoused, and one-third of Real Change's vendors live outside, many in greenbelts and other

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    encampments throughout the City.  The employment that Real Change provides to unhoused

2    people, including those living outside, gives them the income they need to buy food, medicines,

3    clothes, sleeping bags, tents, and other necessaries.

4        68.    Many of the unhoused vendors living outside who work for Real Change have

5    been victimized by Defendants' sweeps, which have seized and destroyed valuables like

6    sleeping bags, medicines, and clothing—items that were purchased with the income they earned

7    as Real Change newspaper vendors.  City and WSDOT employees have also seized and

8    destroyed irreplaceable mementos and photographs belonging to Real Change vendors,

9    essential identification papers, and the Real Change newspapers that provide the basis of their

10   income.

11       69.    Defendants' actions have severely disrupted the lives of Real Change vendors,

12   who are unable to sell papers and earn an income after their property is seized and destroyed

13   because they must instead devote their time to replacing lost articles.  As a result, some vendors

14   have become unable to work for Real Change, which reduces the organization's presence on

15   the streets and negatively impacts its fulfillment of its mission, and deprives the vendors of

16   much needed income.

17       70.    To allay the disruption and dislocation that Real Change vendors have suffered

18   and will continue to suffer as a result of Defendants' sweeps, Real Change staff collects

19   replacement sleeping bags, coats, and other necessities to give to those Real Change vendors

20   whose property has been seized by Defendants.  Real Change staff also helps those impacted

21   by the sweeps by connecting them to social service organizations that can help them replace

22   lost identification and other essential paperwork.  Real Change also assists its unhoused vendors

23   living outside who are caught up in sweeps by providing them access to community space where

24

25

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

they receive emotional and physical support from other vendors, and to computers where they can begin the process of replacing their identification and other documents.

71.     Real Change has been impacted by Defendants' actions both by and through its vendors and because it has had to divert organizational resources as a result of Defendants' sweeps.

## C.     Defendants

72.     Defendant City of Seattle is a political subdivision and municipal corporation organized under the laws of the State of Washington.  The City is a legal entity with the capacity to sue and be sued.  The City of Seattle is sued in its own right and on the basis of the acts or omissions of its officials, agents, and employees who were following the City's policies.

73.     Defendant Washington State Department of Transportation is an agency and instrumentality of the State of Washington.

74.     Defendant Roger Millar is the Secretary of Transportation for WSDOT. Defendant Millar is responsible for implementing and carrying out WSDOT's programs and policies and is joined to this action in his official capacity only.

## IV.   CLASS ACTION ALLEGATIONS

75.     Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), the named Plaintiffs bring this action individually and on behalf of all other persons similarly situated. The proposed Plaintiff Class consists of

> All unhoused persons who live outside within the City of Seattle, Washington and who keep their belongings on public property.

76.     The requirements of Rule 23(a) are met because the members of the proposed Plaintiff Class are so numerous that joinder is impracticable; there are questions of law and fact common to all members of the proposed Plaintiff Class; the claims of the named Plaintiffs are

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 17
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

typical of those of the proposed class members; and the named Plaintiffs will fairly and adequately protect the interests of the proposed Plaintiff Class.

77.     The defined class is so numerous that joinder of all plaintiffs is impracticable. While it is impossible to know the exact number of people living outside in the City of Seattle, SKCCH found that on a given night, in January 2016, at least 2,000 individuals were sleeping outside within the City limits.  Even more individuals cycle through emergency and temporary shelters and may find themselves temporarily living outside.  Further, in part due to Defendants' practices and policies, the population of people living outside is transient, making it difficult to find and identify all class members individually.

78.     There are questions of law and fact common to the class. These include:

a.   Whether Defendants have a practice and policy of seizing and destroying the personal property of people living outside without a warrant, probable cause, adequate notice, an opportunity to have a meaningful pre- or post-deprivation hearing, or an opportunity to retrieve vital personal property before its seizure or destruction;

b.   Whether Defendants' custom, policy, or practice violates Plaintiffs' constitutional rights against unreasonable search and seizures under the Fourth Amendment of the U.S. Constitution;

c.   Whether Defendants' custom, policy, or practice violates class members' right to privacy under Article I, Section 7 of the Washington State Constitution;

d.   Whether Defendants' custom, policy, or practice violates class members' constitutional rights to procedural due process under the Fourteenth Amendment of U.S. Constitution; and

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 18
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

e.  Whether Defendants' custom, policy, or practice violates class members' constitutional rights to procedural due process under Article I, Section 3 of the Washington State Constitution.

79.     The claims of the named Plaintiffs are typical of the claims of the Class. The named Plaintiffs' claims arise from the same conduct—Defendants' sweeps—that gives rise to the absent members' claims, and the declaratory and injunctive relief requested applies equally to all members of the Class.

80.     The named Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs seek to ensure that Defendants respect the constitutional rights of all people who live outside and/or maintain their belongings on public property. The relief they seek will benefit all members of the class. The named Plaintiffs have no interests antagonistic to the interests of the Class.

81.     Plaintiffs are represented by the ACLU of Washington, which has extensive experience in civil-rights and class-action litigation and has sufficient resources to diligently prosecute the claims of the class.  Plaintiffs are also represented by the law firm of Corr Cronin Michelson Baumgardner Fogg & Moore LLP.

82.     Class certification is proper under Rule 23(b)(2). Defendants have acted in an unlawful manner generally applicable to all proposed Plaintiff Class members by conducting sweeps of areas where people living outside reside without a warrant, probable cause, adequate and effective notice, an opportunity to be heard, or a meaningful opportunity to retrieve belongings.  Defendants' unlawful acts have caused irreparable injury to Plaintiffs and the Class including but not limited to the loss of property and emotional damage, and placed Plaintiffs and the Class at imminent risk of further such injury.  Injunctive and declaratory relief with respect to the entire class is therefore appropriate.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

## V.   FACTUAL ALLEGATIONS

2

### A.   The City's Homeless Population

3   83.   On November 2, 2015, the City of Seattle Mayor, Edward Murray, declared a

4   State of Emergency ("Declaration") on homelessness, seeking outside assistance to deal with

5   the alarming number of Seattle residents living without fixed, regular, or adequate housing.

6   Since the Mayor's Declaration, the number of people living outside in the City has only

7   increased.

8   84.   On January 29, 2016, SKCCH counted approximately 2,942 Seattle residents

9   sleeping and living outside.  An estimated 914 of these individuals were found trying to survive

10   the harsh January weather in a car or truck.  Shelter for the remaining 2,028 consisted of that

11   which they built for themselves or could find in the form of existing structures such as under

12   roadways.  These numbers are always assumed to be an undercount, as they do not include

13   those who have taken great care to stay out of sight, as well those living in encampments

14   SKCCH deemed unsuitable for volunteers to count and other spaces volunteers simply did not

15   get to.

16   85.   The numbers of unhoused individuals and Seattle residents sleeping and living

17   outside are expected to be even higher in 2017.  Another count was conducted on January 27,

18   2017, however the results of this count will not be released until the spring.

19   86.   Unhoused Seattle residents who live outside have homes.  They look different

20   than brick and mortar houses but serve the same purposes.  They are often made of tents, tarps,

21   blankets, poles, and other materials to create safe, dry, insulated, and private shelter.  And, like

22   everyone else's homes, they contain most if not all of the owner's possessions.   These

23   belongings are often critical to survival or of particular psychological value, including

24   medication, hearing aids, respirators, wheelchairs, and canes; blankets, a sleeping bag, or

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 20
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

clothing to stay warm; tents or tarps to provide shelter; cookware, eating utensils, and food; identification, immigration, or court documents; bikes or other modes of transportation; work tools; schoolbooks and materials; and family photos and mementos.

87.     People living outside frequently build their homes on public property and in areas that provide some shelter from the elements, such as under bridges or roadways, and offer some privacy from the public to keep themselves and their possessions safe.  Many live near and among other people, in communities, much as those who live in houses do.   These communities (often referred to as encampments) offer an increased sense of safety, community, and stability.  In fact, individuals living outside frequently stay in their place of residency for many months, or even years.

88.     These communities also provide the unhoused with a place to leave their belongings while they go about their daily lives.  Like all members of society, people living outside have personal and business affairs to attend to during the day, including working or searching for employment; attending school; visiting lawyers, doctors, social workers, or other service providers; and obtaining food, clean water, and other necessities of survival.  Having a stable place to live and store belongings makes it easier for people living outside to find a job and obtain employment, and meet with service providers to take the requisite steps to secure more permanent housing.

89.     Like all people, those living outside also generate waste and garbage.  The City provides containers for disposal, regularly scheduled garbage pickup, and a sewer system for those living in houses, but people living outside often have no option other than to place their garbage near their homes.  In areas where multiple people live, this garbage accumulates more quickly.  Many residents try to keep the area they live clean—including keeping their garbage in discreet piles away from their homes, or disposing of it in garbage bins or cans they are able

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

to secure.  Defendants have taken these items during their sweeps.  Residents have additionally asked the City for assistance in these areas—requesting garbage pick-up and assistance in dealing with vermin—to no avail.

**B.     Defendants Have An Ongoing Policy and Practice of Sweeping Unhoused People and Their Possessions from Public Property**

90.     As an integral part of its strategy to address homelessness, Defendants have a longstanding and ongoing policy and practice of conducting sweeps of people living outside. Defendants often refer to this conduct as "cleanups" of "unauthorized," "unsanctioned," or "illegal" encampments.  Defendants claim the sweeps are necessary to ensure that public property is used as it was intended to be used, and/or that sweeps are necessary for the public health and safety of both Seattle's housed and unhoused residents.  Defendants have additionally asserted that these sweeps will help connect people living outside with the services they need to get off the streets.

91.     The reality is that these sweeps are conducted in a manner that violates Plaintiffs' constitutional rights and causes them irreparable harm.

92.     Defendants' sweeps target only areas in which unhoused people have built their homes and maintain their possessions, not any public property where garbage, waste, or hazardous materials have accumulated.

93.     In fact, housed Seattle residents are encouraged to report unauthorized encampments to the City, either online, via phone, or through the City's "Find It, Fix It" phone app.  WSDOT additionally receives and responds to complaints regarding use of its public property by unhoused individuals.

94.     Defendants are deeply committed to conducting these sweeps, sharply increasing the number of sweeps conducted in the last several years. In 2012, Defendants conducted 80 sweeps of people living outside and their belongings; in 2014, Defendants

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 22
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

conducted 351 sweeps, exceeding any prior year on record. Defendants' use of sweeps has only continued to grow—in 2015, Defendants conducted more than 500 sweeps. Since the City's Declaration on November 2, 2015, Defendants have conducted approximately 600 sweeps, averaging nearly eleven a week. Defendants have conducted numerous sweeps since this lawsuit was filed.

95.     Defendants have devoted significant money, resources, and time to planning and conducting these sweeps. Approximately one third of the more than $7 million the City secured as a result of its State of Emergency Declaration was spent removing the homes of people living outside and seizing and destroying their property. WSDOT has also devoted considerable resources on sweeps, noting it spends approximately $250,000 a year removing unhoused people's property in recent years and calling its activities "evictions."

96.     The sweeps are carried out by the City and/or WSDOT personnel, overseen by City and/or WSDOT personnel, and conducted pursuant to policies approved by Defendants' most senior decision makers.

**C.     Defendants' Official Policies Governing Sweeps are Unconstitutional**

97.     In 2008, shortly after a WSDOT contractor killed a man with a brush cleaning tractor during a sweep, Defendants adopted official policies and guidelines to govern sweeps of areas where people live outside on public property. The City promulgated the Multi-Departmental Administrative Rules 08-01 ("MDAR"), and WSDOT adopted the "Guidelines to Address Illegal Encampments" ("WSDOT Guidelines").

98.     Both the MDAR and the WSDOT Guidelines are still in effect and constitute Defendants' only known official published policies pertaining directly to sweeps.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

99.     Although Defendants may have modified some of their regulations, these modifications have not been formally adopted, are not enforceable, and are subject to inconsistent implementation at best.

100.    Although the MDAR and WSDOT Guidelines purport to offer more procedural safeguards than previously existed, they were largely intended to address the patchwork system of rules and agencies previously responsible for the sweeps, and do not ensure that sweeps are conducted in compliance with the constitution.

101.    Even if Defendants' sweeps were conducted fully in accordance with both the MDAR and the WSDOT Guidelines, they would still be unconstitutional.

**1.      Defendants' Official Policies Fail to Provide for Adequate and Effective Notice**

102.    Both the MDAR and the WSDOT Guidelines lack sufficient requirements for notice to protect the rights of unhoused residents living outside in Seattle.  Although both require 72-hour notice prior to the removal of property and storage of such property for 60 days (MDAR) or 70 days (WSDOT Guidelines), the requirements are so filled with exceptions and exclusions as to make them meaningless.  The requirements exempt many, if not most, people living outside from even the most minimal of notice protections.

103.    For example, the notice requirements under the MDAR apply only to "encampments," defined as three or more or more unauthorized structures within an identifiable area or within 300 feet of another encampment.  This means that under its own rules, the City does not have to provide any notice to individuals camping alone or in pairs or to those who do not live in structures (like tents or lean-tos) before seizing and destroying all of their possessions.

104.    The notice requirements of the MDAR additionally do not apply to "recurring encampments," which are sites where an encampment has been observed three or more times

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 24
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

within any 60 day period.  This exception essentially excludes all long-term encampments from any notice requirement before all of the residents' property is seized and destroyed, as long as notice had at some point since 2008 been posted for the encampment.  This exception applies even if none of the current residents lived there within the prior 60 days, or were otherwise unaware that a notice for the area had been posted at some point within the last 8 years.

105.    In these situations, the City's own written policy also does not require it to provide any storage of any property seized during the sweep unless the property has the name of the owner on it, and is valued at over $100.  The determination of value is made on the spot by Defendants' employees and is not appealable.  This provision authorizes the City to immediately remove and discard any other property on site.

106.    The exceptions to Defendants' rules on their face make it impossible for people living outside to safely live and store their belongings without constant risk that everything will be taken from them with no notice.

107.    Defendants have conducted over 1000 sweeps in the City in the past two years alone in neighborhoods across Seattle.  If an unhoused person living outside happens to have their home in or within 300 feet one of those encampments, they are not entitled to any notice under the MDAR before their property is taken and destroyed.  But neither can an individual move their home away from an encampment to protect their property from seizure because the MDAR does not require notice or storage for property not within an encampment.

108.    The WSDOT Guidelines include just as many exceptions to the notice requirement, allowing WSDOT to justify the immediate removal of property where it is not "practical" or "feasible" to post notice because of "[c]rew scheduling, emergency repairs and removal of nuisances," or other situations "where the maintenance activity cannot wait or be predicted."  In addition, the Guidelines specify that "[s]ites where maintenance occurs on a

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

frequent but random basis will be posted 'No Trespassing,'" implying that in such cases, no 72-hour notices will be posted.  The Guidelines also exclude recurring encampments from notice protections, providing that previously cleared encampment sites will be revisited by WSDOT and, if encampments are again found, "No Trespassing" signs will be posted "and removal efforts may proceed without 72 hour notification."

109.     Further, both the MDAR and the WSDOT Guidelines lack notice requirements to ensure that notice is actually effective.

110.     The City's policymakers have themselves noted that the notices are difficult to understand; one councilmember stated, "I can barely understand these postings, and I have a law degree."

111.     Neither the MDAR nor the WSDOT Guidelines take into account people with limited English proficiency, limited literacy, or disabilities (such as blindness).

112.     Neither the MDAR nor the WSDOT Guidelines require Defendants to actually conduct the sweep on any particular date or time, including that which is stated in the notice; or to update the notice if they cancel, prolong, put off the sweep, or limit it to a different area than posted.

113.     Neither the MDAR nor the WSDOT Guidelines provide for any training to Defendants' employees and staff as to what constitutes constitutionally adequate and effective notice or how to provide such notice.

114.     In fact, both the MDAR and the Guidelines explicitly contemplate uneven and unpredictable enforcement.  For example, the Guidelines are not binding on WSDOT crews:

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

> These Guidelines form the basis for WSDOT work on state-owned right of way, and will be revised as necessary to meet the current situation and to reflect the available resources, including budget and staffing. Each Region may exercise its discretion to deviate from these Guidelines if the Region determines that coordination with a local jurisdiction on a specific clean-up activity is the best course of action under the circumstances. However, the activity shall be at least as effective as the provisions contained in these Guidelines.

Similarly, the implementation and enforcement of the MDAR are solely at the discretion of the Executive, enabling vast deviation from the rules without consequence.

115. These various deficiencies, when coupled with Defendants' actual practice and policy discussed *infra*, make it impossible to predict when a sweep will occur and renders any notices that are posted meaningless.

### 2. Defendants' Official Policies Fail to Provide Constitutionally Required Due Process

116. The MDAR and WSDOT Guidelines similarly lack provisions to ensure pre- or post-deprivation due process. Once a sweep has begun, the MDAR and WSDOT Guidelines only require Defendants to store property that Defendants unilaterally determine fits within an enumerated list or are of a particular value, enabling the destruction of countless items that are necessary for unsheltered people's survival and daily activities, or are otherwise of significant personal value.

117. Although the MDAR requires the storage of personal property, personal property is limited to items which have "apparent utility," are defined by example, or "have a reasonable value of more than $25." The MDAR does not consider building materials to be personal property, nor items that are "hazardous," which can include items that are wet or muddy because they are kept outside.

118. The WSDOT Guidelines similarly define personal property by example, and provide minimal criteria for determining whether an item should be stored.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

119.   As a result, City and WSDOT personnel have almost complete discretion to determine whether an item should be stored, regardless of its worth, necessity, or significance to its owner.

120.   Even if property is stored, neither regulation ensures that people have any meaningful opportunity to retrieve their seized property.  Neither contains requirements for property storage that assure storage facilities are in accessible locations or open at regular hours and neither requires Defendants to adequately notify owners as to how to reclaim their belongings.

121.   Neither the MDAR nor the Guidelines contemplate that compensation will be paid to people to replace property seized and/or destroyed during the sweeps.

122.   Neither the MDAR nor the Guidelines require adequate training for Defendants' personnel on the procedural due process rights implicated by government seizure of personal property. Defendants' Newly Proposed Official Policies Do Nothing to Ensure Defendants Will Conduct Constitutional Sweeps in the Future

123.   On January 31, 2017, the City proposed a new set of rules that would modify the MDAR 08-01.  These rules, entitled the Financial Administrative Services Encampment and the Multi Departmental Administrative Rules Regarding Unauthorized Camping on City Properties; Enforcement Procedures; and Removal of Unauthorized Property (the "MDAR 17-01") not only fail to address deficiencies in existing rules, but in many ways are even worse.

124.   In their motion for a Temporary Restraining Order and submission of an amended complaint, Plaintiffs articulated a number of constitutional concerns with the newly proposed rules.  Without notifying Plaintiffs, on March 15, 2017, the City adopted the MDAR 17-01, with an effective date of April 3, 2017.  The adopted rules contain nearly all of the same constitutional inadequacies as those proposed on January 31, 2017.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 28
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

125.     In fact, as the rules themselves state, the MDARs are not intended to provide constitutional protections for individuals living outside; rather, the general purpose of the rules is to "establish uniform rules and procedures for addressing encampments" as part of the City's "Encampment Abatement Program."  Nowhere in MDAR 17-01 is the stated intent to protect the constitutional rights of unhoused individuals mentioned.

### 3.     The MDAR 17-01 Enable Defendants to Sweep Virtually Any Area Without Adequate and Effective Notice

126.     First, the new rules enable the City to remove without notice the belongings of virtually any unhoused person on City-owned property or City-controlled property, including many of the areas where unhoused people currently live.

127.     The City would be allowed to immediately and without notice remove encampments where unhoused people pose a "hazard," defined as situations in which the City unilaterally determines people are "at risk of injury or death beyond that caused by increased exposure to the elements; or their presence creates a risk of injury or death to others, including but not limited encampments at highway shoulders and off-ramps, areas exposed to moving vehicles, area that can only be accessed by crossing driving lands outside of a legal crosswalk, and landslide-prone areas."  This definition encompasses a significant number of existing encampments within the City.

128.     The City is additionally allowed, pursuant to the new MDARs, to immediately and without notice remove encampments that are considered obstructions, defined as "people, tents, personal property, garbage, debris or other objects related to an encampment that: are in a City park or on a public sidewalk; interfere with the pedestrian or transportation purposes of public rights-of-way; or [the City unilaterally determines] interfere with areas that are necessary for or essential the intended use of a public property or facility."  This definition similarly encompasses a significant number of existing encampments within the City. These two

**CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP** 1001 Fourth Avenue, Suite 3900 Seattle, Washington 98154-1051 Tel (206) 625-8600 Fax (206) 625-0900

exceptions to any notice requirements on their own, and in conjunction with each other, would allow the City to sweep virtually any encampment without notice.

129.    Further, Defendants contend that virtually all unauthorized encampments on public property impede the normal use of the area and are inherently dangerous.  There is no reason to believe Defendants will not continue to use these justifications to sweep unhoused people from public grounds, immediately and without notice seizing and destroying their property.

130.    The rules would also prevent Defendants from taking into account the particular needs of the unhoused population by prohibiting the City from providing notice to individuals living outside more than a week in advance.

**4.      The MDAR 17-01 Forces Unhoused Individuals to Areas Dangerous for Camping or Subject to Immediate Removal**

131.    The rules additionally allow the City to declare "emphasis areas" wherein camping is prohibited at all times.  The rules provide no criteria for what can constitute an emphasis area: one can be of any size and anywhere within the City limits, as long as it is somewhere an unauthorized encampment has previously existed and been swept.

132.    The emphasis areas by definition can only be created where people already live, and coupled with Defendants' conduct and frequent sweeps of particular areas, will likely be where many if not most unhoused people currently live.

133.    These rules would have a tremendous impact on people living outside, many of whom have been living in the same or a neighboring location for months, if not years, and will be left with nowhere safe to go and store their belongings.  In fact, the rules would prohibit camping from otherwise reasonable places, pushing individuals to public spaces that in turn may be unsuitable or unsafe for camping, and thus further subject to immediate removal per the City's rules.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

134.    According to the City's website, as of April 21, 2017, the City has designated 6 areas as emphasis areas thus far.  Some of these areas encompass miles of square footage, and there is nothing stopping the City from expanding each emphasis area.  *See* http://www.seattle.gov/homelessness/unauthorized-encampments/emphasis-map.    In fact, according to the City's own criteria the City could close virtually all otherwise suitable areas in the City for camping by unhoused Seattle residents.

135.    The rules still fail to provide an opportunity for Plaintiffs to contest the seizure and destruction of their property; eliminating the prior existing requirement in the MDAR 08-01 that unhoused people will be allowed to return to the site to pack up their belongings.

136.    The proposed MDAR 17-01 additionally fails to provide for any training in conducting sweeps that respect the constitutional rights of people living outside, despite Defendants' own recognition that they have difficulty determining what items are property verses trash, and would additionally have difficulty in determining whether an encampment posed an immediate public health or safety hazard (even though the new MDARs would require Defendants to make both determinations).

137.    Finally, the enforcement of the new rules remains solely at the discretion of the executive, and aside from brief mention that Defendants may collaborate with one another to conduct sweeps, provide no requirements for how that coordination will occur or to ensure sweeps are done constitutionally.

138.    Multiple organizations and agencies submitted similar and additional concerns on the MDAR 17-01.  For example, as SKCCH noted in its public comment on the MDAR 17-01, "[s]ince 2008, when the City of Seattle created its first MDARs, the rules as written have been followed inconsistently if at all, sometimes ignored, subject to multiple and various and frequently arbitrary interpretations, and generally proven to be a poor tool for creating a city-

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 31
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

wide policy that responds to homelessness. They will never address the fundamental crisis that leads to thousands of people being forced to seek rest and temporary cover from the elements in doorways, on loading docks, in parks, under bridges, and on sidewalks."

**D.**   **Defendants' Actual Practice of Conducting Sweeps Violates Both Their Own Rules and the U.S. and Washington State Constitutions**

139.   Not only are Defendants' official policies and proposed rules unconstitutional as written, but Defendants have conducted and approved of longstanding and ongoing practices that violate even the most basic portions of their own rules, along with the U.S. and Washington State constitutions.

140.   Even if Defendants were to adopt official policies and procedures that comply with the constitutional rights of Seattle residents living outside, there is no guarantee that Defendants would follow them absent a court order.

141.   For decades—and in the 8 years since the MDAR and WSDOT Guidelines were adopted—Defendants have conducted sweeps sporadically, unpredictably, and with utter disregard of even their own (wholly inadequate) regulations.  In the hundreds if not thousands of sweeps conducted by Defendants across the City in recent years, they have failed to follow any consistent procedure with regards to notice to people living outside of impending sweeps, the disposal or storage of seized property, or the opportunity for people to reclaim their belongings.

142.   Although each sweep is different, the following policy and practice has been implemented on multiple occasions since November 2, 2015 and is ongoing:

143.   Prior to conducting a sweep, Defendants target areas where people living outside have set up homes and communities.  Defendants frequently refer to these sweeps as "clean ups"—implying that their goal is to merely clear the area of trash, debris, waste, and/or other hazardous materials—but target only areas where unhoused people have set up their homes.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

144.   Although Defendants' target particular areas, knowing well in advance where a sweep will be conducted, their officially sanctioned practices are wholly ineffective at providing constitutionally adequate notice before a sweep occurs.

145.   Even when Defendants do provide some form of notice, it is typically inadequate, inconsistent, inaccurate, inaccessible, and/or misleading—rendering every notice constructively ineffective.

146.   Notice of a sweep is often provided less than 72 hours in advance, and sometimes even after the fact, depriving people living in the area of any meaningful opportunity to make other arrangements for their belongings.

147.   Notice is frequently only posted in inconspicuous areas that people living outside do not actually walk past or cannot easily see.

148.   Notice frequently neglects to specify exactly where a sweep will occur—listing merely a single street name with no cross street boundaries or other descriptors.

149.   Although notice is sometimes attached to individual tents, it is just as often posted to trees, fences, or other structures on the border of an area to be swept.  This inconsistency leaves unhoused people with no idea of the type of notice to expect, if any, before their property will be seized and destroyed by Defendants.

150.   Many of the notices merely state that property will be seized after 72 hours, without specifying a date or time.

151.   Regardless of the dates on a posted notice, sweeps are often conducted at widely varying intervals after the notices are posted.

152.   By way of example, this photo was taken of a notice posted on a tree, allegedly on December 27, 2016.  It offers no description of the actual area to be swept, nor a time when it was posted.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22
23
24
25

153.   Even signs that do provide more specific information, such as a date and time, often provide inconsistent information, such as days of the week that do not correspond to the dates listed.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 34
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1        154.    By way of example, this photo was taken of a notice allegedly provided before

2  a sweep in September of 2016.



155.    Sweeps are routinely conducted at different dates and times than those indicated
on the notice.

156.    Thus, even when Defendants have provided some sort of notice, residents do not
receive actual and effective notice as required by the Constitution because they still do not know
whether or when a sweep will actually occur.  Defendants have functionally deprived Plaintiffs
of notice altogether.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

157.   Defendants make minimal to no accommodations to reach people who cannot read English—people who are also constitutionally entitled to notice.   Notice is only occasionally provided in Spanish (WSDOT provided notices generally include both; City provided notices are frequently in English only) and is generally only given in written format. People who do not speak English or Spanish, who are blind, who cannot read, and who may have other cognitive disabilities or mental illnesses that make written notice difficult to fully comprehend are deprived of notice.

158.   Further, because minimal justification is proffered by Defendants prior to conducting a sweep, it is impossible for Plaintiffs even to guess whether their homes will be targeted.   Defendants have conducted sweeps in clean and well-maintained encampments, as well as encampments of the type they promised would not be swept.   Some encampments have been swept multiple times; others' homes have presumably never been touched.

159.   Forcing people to guess whether and/or when a seizure and destruction of property might occur does not constitute constitutionally adequate provision of notice.

160.   Plaintiffs' constitutional rights are implicated because Defendants' "clean up" strategy does not entail merely disposing of trash, debris, waste, and/or hazardous materials, or taking affirmative government action to resolve the safety or public health risk allegedly posed by the residents, such as by providing portable restrooms or garbage disposal services.

161.   Instead, Defendants' "clean up" strategy is to seize and destroy the possessions of people who live outside.

162.   Defendants often clear entire sites, indiscriminately removing the visible property and personal belongings either by hand or with heavy machinery like bulldozers and backhoes.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

163.    When a bulldozer or backhoe is used, the property is immediately destroyed.  By way of example, the picture below was taken on September 14, 2016 at one of Defendants' sweeps conducted at the location where Plaintiff Hooper lives.



164.    In addition to using heavy machinery, Defendants sometimes physically destroy property on site, including slashing tents and tarps, and smashing property before removing it.

165.    Defendants throw away things that they unilaterally determine to be garbage or of insufficient value to be stored.  Often these items will be taken offsite for disposal.

166.    Defendants also frequently gather up all items—mixing actual garbage with personal belongings—and just leave them in a pile.

167.    Sometimes Defendants only shift the actual garbage and waste to another area rather than removing it.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 37
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

168.   Defendants conduct these sweeps without warrants to seize and destroy property, or permission from the property owners.

169.   Defendants seize and destroy property regardless of whether the owner is present.

170.   Defendants frequently seize property that they know is not abandoned but rather left unattended momentarily while the person living outside attends to other activities or responsibilities.

171.   Many residents ask their neighbors to watch over their belongings when they momentarily step away, but even this will not save their property from destruction.  Defendants inform residents that they are not allowed to pack up or save anyone else's belongings once a sweep has begun.

172.   Even an owner's presence may not save the property from destruction.  People have literally wept and begged Defendants not to seize and destroy their property as Defendants seize and destroy it, to no avail.

173.   People living outside are frequently forced to scramble to gather as many of their belongings as possible to prevent the destruction of all of their property.  Defendants seize and often destroy whatever is left, even when they are informed that the owners will return for their items.

174.   Defendants routinely and as an officially sanctioned practice ignore their own policies and procedures for determining whether an item should be held in storage for the owner.

175.   Defendants deny Plaintiffs any opportunity, either before or after the fact, to contest the confiscation or destruction of their property before an impartial decision maker.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

176.   Property that is disposed of immediately is impossible to retrieve - often crushed inside a garbage truck.

177.   Property that is comingled by Defendants with actual garbage, debris, or waste is also immediately destroyed from being soiled.

178.   Property that is stored is destroyed after 60 days and impossible to retrieve because Defendants fail to observe appropriate procedures regarding storage of personal property.

179.   For example, Defendants fail to notify people whether their property will be stored, where it will be stored, for how long, or how the property may be retrieved.  WSDOT's posted notices state only: "THIS IS NOT AN AUTHORIZED AREA FOR STORAGE OR SHELTER.  All material will be disposed of in 72 hours."

180.   The City of Seattle's notices regarding pending sweeps similarly fail to provide any information regarding storage, and both the written notice they do provide coupled with their conduct suggests to individuals living outside that all of their property will be destroyed, not stored.  By way of example, the below photo is of a notice provided to unhoused individuals prior to a sweep conducted on February 10, 2017.  The posting merely states that on February 10, 2017, all property left in the area will be thrown away.

///

///

///

///

///

///

///

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 39
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15       181.     On the rare occasion they do provide information regarding storage, Defendants

16 generally only give a phone number, which a person living outside must call to get specific

17 information.  Those living outside who do not have a phone or money to pay for a phone call

18 (or those whose phone and/or money was taken during the sweep) are left without recourse, as

19 are those who cannot read the notice.

20       182.     Aside from sporadic written notices, Defendants offer zero to minimal

21 information regarding the actual property retrieval process following a sweep.  WSDOT and

22 City employees answering the phone are unwilling or unable to say where items are stored or

23 when they can be picked up.  On at least one occasion, a City employee answering the telephone

24 at the number listed on the notices posted at a sweep site was unable to identify where stored

25

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

belongings are kept.  For example, over a period of 15 months, the City only had inventory records for approximately 7 percent of the sweeps it conducted.

183.    Defendants routinely fail to inventory or otherwise keep track of items that are confiscated or destroyed, leaving people with no way of knowing whether their property was even kept.

184.    Defendants impose other barriers to property retrieval as well.  People living outside must find a way to not only get to the facility where items are being stored, but figure out a method to transport any items stored at the facility back to their current place of residence. The facility where items deemed worthy of storage are kept is at 4200 Airport Way South, approximately an hour walk from downtown Seattle, making it difficult to access without a car from many Seattle neighborhoods, and far away from where a lot of people living outside reside.  It becomes even harder to access if Defendants took or destroyed a method of transportation, like a bicycle or bus pass.

185.    The storage facility additionally has limited operating hours, rendering it impractical or impossible for Plaintiffs and other people living outside to retrieve their property, even if they are able to discover whether and where the property is being stored.

186.    In the lucky event someone is able to confirm that their property is being stored and can make it to the facility during operating hours, Defendants may require them to show government identification and describe all the seized belongings.  Neither requirement may seem overly onerous on its face, unless the identification is precisely the item that was seized, and until one considers the difficulty of detailing all of one's worldly possessions.

187.    As a result, one worker at the City's storage facility estimates that only 1 or 2 percent of the materials stored are ever picked up, with the rest eventually thrown out. The worker additionally noted that "Obviously, for people that don't have anything, this stuff here

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

[at the storage facility] is their everything." He concluded, "That's very difficult – to throw things away that probably mean something to people is probably the toughest part [of his job]."

188.    Plaintiffs are informed and believe and on such basis allege that at all times relevant to this action, each of the individuals who seized and destroyed their property were the agents, and/or employees of the Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer, WSDOT or the City.

**E.    Defendants Know Or Should Know That Their Conduct is Unconstitutional and Refuse to Remedy It**

189.    Defendants have been on notice for years that their policy and practice of evicting people living outside from their homes, and intentionally taking and destroying their property violates the U.S. and state constitutions.  They nevertheless persist in violating Plaintiffs' rights.

190.    State and local advocates and organizations have repeatedly warned Defendants of the unconstitutional nature of their conduct.  For example, after a meeting with the City in November of 2015, Columbia Legal Services and the ACLU wrote a letter to the City expressing their concerns that Defendants' current practice and policy violated the Fourth and Fourteenth Amendments of the U.S. Constitution, as well as Washington State law, reminding the City that "[s]weeps conducted with adequate notice to the people living in the identified locations and/or without adequate procedures to safeguard their property violate civil and property rights guaranteed by the constitution."

191.    Defendants' policies and practices have also been condemned by a number of courts.  Most recently, the Ninth Circuit made it explicitly clear that the government cannot "seize and destroy with impunity the worldly possessions of a vulnerable group in our society." *Lavan v. City of Los Angeles*, 693 F.3d 1022, at 1033 (9th Cir. 2012).  The Court further

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   underscored that "[a]s [the courts] have repeatedly made clear, the government may not take

2   property like a thief in the night; rather it must announce its intentions and give the property

3   owner a chance to argue against the taking.  This simple rule holds regardless of whether the

4   property in question is an Escalade, or [a temporary shelter], a Cadillac, or a cart."  *Id.* at 1032

5   (internal citations omitted).

6       192.    The media has amply documented the illegality of the sweeps.  For example, a

7   *Seattle Times* report observed that "sweeps of encampments have been plagued by

8   disorganization and miscommunication that has often resulted in homeless residents losing their

9   possessions." The report further noted that outreach workers were often not available, showing

10  up after a sweep had taken place or not at all, due to miscommunications between cleanup crews

11  and outreach staff.

12      193.    Even the City's own departments have warned Defendants that their policies and

13  practices are ineffective, inconsistent, and deprive people living outside of effective notice, an

14  opportunity to be heard, or a meaningful opportunity to retrieve their property.

15      194.    For example, on August 31, 2016 the City implemented a Task Force to study

16  the sweeps.  Although the Task Force found Defendants' "approach has negatively impacted

17  homeless individuals and neighborhoods," it proffered no solutions.

18      195.    In September 2016, the City hired the Seattle Office of Civil Rights ("OCR") to

19  monitor the sweeps.  Monitors regularly reported back to Defendants that the sweeps were

20  traumatizing to observe and that Defendants failed to give appropriate notice of the sweeps.

21  One note from OCR observes "WSDOT a hott [sic] mess!"

22      196.    The Seattle Human Rights Commission also wrote to the Mayor and the City in

23  September 2016, noting that Defendants are "inconsistent in . . . removal and notification

24

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 43
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

procedures," "forcibly displac[ing] individuals from their homes and disconnect[ing] them from their personal property."

197.    Defendants have ignored these concerns.  For example, despite the "positive impact" the City admits OCR monitors have had, it has transferred on-the-ground oversight of its sweeps to the City's office of Finance and Administrative Services (FAS), with the explicit goal of "operationaliz[ing] and routiniz[ing]" sweeps.

198.    As recently as December 23, 2016, the Seattle Human Rights Commission additionally expressed concern with this switch, writing that "[t]he continued presence of OCR (Office of Civil Rights) monitors is vital to ensuring that encampment sweeps do not further violate encampment residents' civil rights."  The City responded that FAS has demonstrated it performs robust and responsible management of the City's encampment clean-up efforts.

199.    Yet on the day the letter was issued (January 4, 2017), Defendants conducted a sweep without providing residents adequate and effective notice, and despite being informed notice had not been provided, only stopped the sweep after an hour of operating heavy equipment.  Defendants' pattern and practice of behavior coupled with statements by official policymakers and written procedures make clear they will persist in using sweeps without the required constitutional protections, making Plaintiffs only recourse this Court.

200.    In fact, Defendants have additionally proposed rules that would grant themselves even greater authority to conduct sweeps without notice, and immediately and/or permanently remove unhoused people living outside from public property.

201.    In fact, when Ms. Osborne was swept on January 26, she was told that Defendants were not required to give notice pursuant to the mayor's "new executive order."

202.    Further, rather than halting the sweeps to consider the constitutional violations inherent in their policies and practices, Defendants have continued with their use of sweeps

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 44
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    unfettered.  Numerous sweeps have been conducted since the filing of this lawsuit, a number

2    of which either occurred without notice, and/or resulted in the immediate and summary

3    destruction of all property onsite.

4         203.    Defendants' ongoing policy and practice has continued even after this lawsuit

5    was filed. For example, on February 10, 2017, Defendants used a box cutter to slash the tent of

6    an unhoused individual living outside when conducting a sweep of the Ballard Locks.  On

7    February 13, 2017, Defendants slashed the tents of unhoused residents living in the area, threw

8    belongings down the hill into the mud, and physically broke property when conducting a sweep

9    on Galer and Eastlake.  Defendants posted a notice for a sweep of the Ballard Locks on February

10   10, 2017, but according to their own declarations continued the sweep days later without posting

11   a multi-day notice.  Defendants similarly posted a notice for a sweep under the Ballard Bridge

12   and Emerson Overpass for February 27, 2017 but did not show up until February 28, 2017.  No

13   notice was reposted.   Around 10:00 am on February 28, 2017, Defendants conducted

14   approximately 10 minutes of clean-up before stopping.  The remainder of time was spent sitting

15   in a truck, walking around or standing in the area, or talking to individuals who had come to

16   observe the sweep.  Defendants offered conflicting information as to whether an un-abandoned

17   tent full of belongings would be taken and when the sweep would actually occur or be

18   completed.  Information regarding if and/or when the area would actually be swept was not

19   provided until March 9, 2017.

20        204.    Defendants have also swept an area called the "Field" or "Field of Dreams" on

21   Airport Way S. and Royal Brougham, where at least 50-60 residents lived.  Since the Jungle

22   was cleared in the Fall of 2016, Defendants told unhoused individuals that the Field would not

23   be swept, at least until the City's new Navigation Center was established.  The Navigation

24   Center has not opened yet.  Defendants cleared the area on March 7, 2017, slashing numerous

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 45
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

tents and summarily destroying the property of many unhoused residents.  This site is now one of the City's emphasis areas.

205.    Since the City's new rules have been adopted, Defendants have continued to conduct sweeps without adequate and effective notice and destroy property of unhoused residents.

206.    Whether pursuant to the MDARs , or pursuant to Defendants' longstanding and ongoing policy and practice of immediately seizing and destroying the property of people living outside, it is clear this conduct will continue absent court intervention.

## F.    Plaintiffs Have Suffered and are at Continued Imminent Risk of Suffering Irreparable Harm as a Result of Defendants' Actions

207.    As a direct and proximate result of Defendants' unconstitutional practices and policies, Plaintiffs have suffered and will continue to suffer serious irreparable harm, including but not limited to the destruction of personal property.  Defendants' actions have resulted in the loss of essential personal property for many residents living outside including but not limited to medication, respirators, wheelchairs, canes, blankets, sleeping bags, clothing, tents, tarps, cookware, eating utensils, food, identification, immigration and court documents, and irreplaceable family heirlooms.  The loss of these items is not only an emotional blow, as it would be to anyone, but also threatens the physical safety, health, and well-being of people living outside—particularly in the inclement weather of the Seattle winter.  In many cases, Defendants' actions have deprived people living outside of everything they own.

208.    Defendants' actions deprive people of the few possessions they have, forcing them to survive days or weeks after a sweep without medication, shelter, sufficient food, essential hygiene items, and transportation.  Many people lack the resources to replace items destroyed by Defendants.  In the event a person is able to replace items, it takes significant time.

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 46
(2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

It can take local outreach organizations a year to get someone an ID, and when that ID is taken or destroyed in a sweep, it can take another year to get a replacement.

209.    The sweeps create massive disruption in people's lives; rather than trying to break out of the cycle of homelessness, Defendants' actions force people living outside to spend their time and resources replacing what has been destroyed.  Time that could be spent looking for housing, employment, or accessing medical care is now spent replacing belongings and documents necessary for survival.  That burden is further exacerbated by Plaintiffs' fear that what remaining possessions they have cannot ever be left unattended.

210.    Defendants' actions also have a severe emotional impact.  Much like those whose houses have been destroyed by natural disasters or violated by burglars, people who have their homes swept report feeling degraded, scared, destabilized, anxious, angry, and traumatized.  Those feelings are amplified by the knowledge that the loss was the result of state action sanctioned and approved of by Defendants pursuant to an active and on-going policy without foreseeable end.

211.    Even individuals who have not yet been swept by Defendants, but live outside are impacted by Defendants' ongoing and unconstitutional sweeps.  Individuals are unable to work or leave their belongings, and their mental and physical disabilities have been exacerbated by repeatedly moving all of their belongings and living in constant fear of the pending seizure and destruction of their property without notice.

212.    In addition to the injuries Defendants' policies and practices inflict on individuals, Defendants have directly and proximately increased the burden on the facilities and services provided by organizations such as the Episcopal Diocese and its member churches and Real Change.  Defendants' unlawful actions have additionally also caused irreparable harm to members of both organizations.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

213.   The losses and injuries that Plaintiffs have suffered and are at imminent risk of suffering cannot be adequately compensated by monetary damages.

214.   Plaintiffs seek a declaratory judgment that Defendants' policy and practice of confiscating and/or destroying the personal property of people living outside without a warrant, without probable cause, without a meaningful opportunity to reclaim property, and/or without requisite procedural due process is unlawful under the federal and state constitutions.

215.   Plaintiffs further seek appropriate injunctive relief enjoining Defendants' use of sweeps unless and until Defendants have adopted and implemented policies and procedure that ensure that the constitutional rights of people living outside are not violated by the sweeps.

## VI.   CAUSES OF ACTION

### FIRST CLAIM
**Right to Be Secure From Unreasonable Seizures**
**Fourth Amendment of the U.S. Constitution**

216.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

217.   Defendants' policy, pattern, and/or custom of seizing the individual Plaintiffs' property without a valid warrant or probable cause is unreasonable and contrary to the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

### SECOND CLAIM
**Right to Privacy and Protection From Invasion of Home**
**Article I, Section 7 of the Washington State Constitution**

218.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

219.   Defendants' policy, pattern, and/or custom of seizing the individual Plaintiffs' property without a valid warrant are unlawful disturbances of the individual Plaintiffs' private

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

affairs and invasions of their homes, contrary to Article I, Section 7 of the Washington Constitution.

### THIRD CLAIM
### Right to Due Process of Law
### Fourteenth Amendment of the U.S. Constitution

220.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

221.    Defendants' policy, pattern, and/or custom of seizing and destroying the individual Plaintiffs' property without adequate notice and opportunity to be heard prior to destruction of their property violates the individual Plaintiffs' right to due process of law protected by the Fourteenth Amendment to the U.S. Constitution.

### FOURTH CLAIM
### Right to Due Process of Law
### Article I, Section 3 of the Washington Constitution

222.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

223.    Defendants' policy, pattern, and/or custom of seizing and destroying the individual Plaintiffs' property without adequate notice and opportunity to be heard prior to destruction of their property violates the individual Plaintiffs' right to due process of law protected by Article I, Section 3 of the Washington Constitution.

///

///

///

///

///

///

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

## VII.  PRAYER FOR RELIEF

2     WHEREFORE, Plaintiffs pray for relief as follows:

3     1.      For declaratory and injunctive relief as the court deems appropriate.

4     2.      For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

5     3.      For such further relief as is just and appropriate.

6     DATED this 23rd day of May, 2017.

7
                                        CORR CRONIN MICHELSON
8                                       BAUMGARDNER FOGG & MOORE LLP

9                                        *s/ Todd T. Williams*
                                        Blake Marks-Dias, WSBA No. 28169
10                                      Todd T. Williams, WSBA No. 45032
                                        Eric A. Lindberg, WSBA No. 43596
11                                      1001 Fourth Avenue, Suite 3900
                                        Seattle, Washington 98154-1051
12                                      Telephone: (206) 625-8600
                                        Email: bmarksdias@corrcronin.com
13                                              twilliams@corrcronin.com
                                                elindberg@corrcronin.com
14
                                        AMERICAN CIVIL LIBERTIES UNION
15                                      OF WASHINGTON FOUNDATION

16                                       *s/ Emily Chiang*
                                        Emily Chiang, WSBA No. 50517
17                                      Nancy Talner, WSBA No. 11196
                                        Breanne Schuster, WSBA No. 49993
18                                      901 Fifth Avenue, Suite 630
                                        Seattle, Washington 98164
19                                      Telephone: (206) 624-2184
                                        Email: echiang@aclu-wa.org
20                                              talner@aclu-wa.org
                                                bschuster@aclu-wa.org
21
                                        *Attorneys for Plaintiffs*
22

23

24

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR                    **CORR CRONIN MICHELSON**
DECLARATORY AND INJUNCTIVE RELIEF - 50                      **BAUMGARDNER FOGG & MOORE LLP**
(2:17-cv-00077-RSM)                                          1001 Fourth Avenue, Suite 3900
                                                            Seattle, Washington 98154-1051
                                                            Tel (206) 625-8600
                                                            Fax (206) 625-0900

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on **May 23, 2017**, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system, which will send notification of such filing to the

4

following:

5

| **Attorneys for Defendant City of Seattle:** | **Attorneys for Defendants Washington State Department of Transportation and Roger Millar, Secretary of Transportation for WSDOT:** |
|---|---|
| Matthew J. Segal, WSBA No. 29797<br>Gregory J. Wong, WSBA No. 39329<br>Taki V. Flevaris, WSBA No. 42555<br>PACIFICA LAW GROUP LLP<br>1191 2nd Avenue, Suite 2000<br>Seattle, WA 98101<br>matthew.segal@pacificalawgroup.com<br>greg.wong@pacificalawgroup.com<br>taki.flevaris@pacificalawgroup.com | Alicia O. Young, WSBA No. 35553<br>Assistant Attorney General<br>ATTORNEY GENERAL OF<br>WASHINGTON<br>P.O. Box 40126<br>Olympia, WA 98504-0126<br>AliciaO@atg.wa.gov |
| Patrick Downs, WSBA No. 25276<br>Andrew T. Myerberg, WSBA No. 47746<br>Gregory C. Narver, WSBA No. 18127<br>Carlton W.M. Seu, WSBA No. 26830<br>Gary T. Smith, WSBA No. 29718<br>SEATTLE CITY ATTORNEY<br>701 Fifth Avenue, Suite 2050<br>Seattle, WA 98104-70197<br>patrick.downs@seattle.gov<br>andrew.myerberg@seattle.gov<br>gregory.narver@seattle.gov<br>carlton.seu@seattle.gov<br>gary.smith@seattle.gov | Matthew D. Huot, WSBA No. 40606<br>Assistant Attorney General<br>ATTORNEY GENERAL OF<br>WASHINGTON<br>P.O. Box 40113<br>Olympia, WA 98504-0113<br>MattH4@atg.wa.gov |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP

21

22

 *s/ Todd T. Williams*
Todd T. Williams, WSBA No. 45032

23

1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051

24

Telephone: (206) 625-8600
Email: twilliams@corrcronin.com

25

SECOND AMENDED COMPLAINT—CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE RELIEF - 51
(2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900