THE HONORABLE RICARDO S. MARTINEZ

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

| | |
|---|---|
| LISA HOOPER, BRANDIE OSBORNE, KAYLA WILLIS, REAVY WASHINGTON, individually and on behalf of a class of similarly situated individuals; EPISCOPAL DIOCESE OF OLYMPIA, REAL CHANGE, TRINITY PARISH OF SEATTLE, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF SEATTLE, WASHINGTON; WASHINGTON STATE DEPARTMENT OF TRANSPORTATION; ROGER MILLAR, SECRETARY OF TRANSPORTATION FOR WSDOT, in his official capacity, <br><br> Defendants. | No. 2:17-cv-00077-RSM <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **NOTE ON MOTION CALENDAR: SEPTEMBER 7, 2017** <br><br> **ORAL ARGUMENT REQUESTED** |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## TABLE OF CONTENTS

I.      INTRODUCTION....................................................................................................1

II.     A PRELIMINARY INJUNCTION IS NECESSARY AND APPROPRIATE..............2

      A.      Plaintiffs are Likely to Succeed on Their Claim That Defendants'
            Sweeps Policy and Practice Violates the Federal and Washington
            State Constitutions...............................................................................3

            1.     Defendants Seize Plaintiffs' Property and Invade their Homes
                 in Violation of the Fourth Amendment of U.S. Constitution
                 and Article I, Section 7 of the Washington State Constitution..............3

                 i.      The City's amended rules allow Defendants
                     to summarily destroy Plaintiffs' property in
                     violation of the State and Federal
                     Constitution...............................................................3

                 ii.     Defendants' practices of sweeping encampments
                     cause the summary destruction of Plaintiffs'
                     property in violation of the State and Federal
                     Constitution...............................................................8

                 iii.    Defendants' purported reasons for destroying
                     property fail to pass constitutional muster...............................11

             2.     Plaintiffs Continue to Suffer Deprivations of Their Property
                 without Due Process in Violation of the Fourteenth
                 Amendment of the U.S. Constitution and Article I,
                 Section 3 of the Washington State Constitution...................................12

                 i.      The destruction of property, without any method to
                     challenge the destruction violates the 14th
                     Amendment and Article I, Section 3.........................................13

                 ii.     Defendants' Encampment Rules governing emphasis
                     areas, imminent hazards, and purported obstructions
                     deny plaintiffs any due process whatsoever...............................14

                 iii.    Defendants' practices of providing notice prior
                     to sweeps fail to meet minimum due process
                     standards...................................................................18

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - i
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

iv.    Defendants' inept and inaccessible storage
       measures deprive Plaintiffs of their property
       without due process..................................................................22

v.     Defendants' purported reasons for not providing
       adequate notice fail to pass constitutional muster.....................24

B.   Class Members Have Suffered and Will Continue to Suffer
     Irreparable Harm in the Absence of Relief...........................................25

C.   The Balance of Equities Is in Plaintiffs' Favor....................................29

D.   A Preliminary Injunction Is In the Public Interest...............................30

III.   CONCLUSION.........................................................................................31

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

<u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>

3

4

*Lavan v. City of Los Angeles,*
   693 F.3d 1022 (9th Cir. 2012)...................................................................2, 12, 13, 22, 29, 30

5

*Mitchell v. City of Los Angeles,*
   2:16-cv-01750 SJO-JPR (C.D. Cal. April 13, 2016)..................................2, 29, 30

6

7

*Winter v. Natural Res. Defense Council, Inc.,*
   555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).........................................3

8

9

*Shell Offshore v. Greenpeace, Inc.,*
   709 F.3d 1281 (9th Cir. 2013)...................................................................3

10

*Pottinger v. City of Miami,*
   810 F.Supp. 1551 (S.D. Fla. 1992).............................................................22

11

12

*Kincaid v. City of Fresno,*
   No. 1:06-cv-1445 OWW SMS, 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006)...................30

13

*Klein v. City of Laguna Beach,*
   381 F. App'x 723 (9th Cir. 2010)..............................................................30

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - iii
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## I.    INTRODUCTION

For years, Defendants City of Seattle (the "City") and the Washington State Department of Transportation ("WSDOT") have relentlessly conducted sweeps of unhoused communities, forcibly displacing Seattle residents, who often have nowhere else to go, and destroying their homes and personal property in the process.  Since this lawsuit was filed on January 19, 2017, Defendants have continued this unconstitutional practice unabated.

Accompanying this motion are 30 declarations and more than 70 exhibits that demonstrate the following:

- The City and WSDOT[1] continue to conduct sweeps of unhoused individuals on public property, now with even greater intensity under the City's Emergency Operations Command Structure.  Between February 22, 2017 and May 1, 2017, Defendants conducted nearly one sweep each day.

- The City's amended rules governing encampment sweeps eliminate notice requirements for virtually everywhere in the City and give City workers unfettered discretion in determining what property to save.

- Between February 22, 2017 and May 1, 2017, more than 55 percent of Defendants' sweeps were conducted under the guise of being "obstructions" or "hazards"—and were therefore exempt from any notice requirements under the City's rules.

- In nearly 30 percent of sweeps conducted between February 22, 2017 and May 1, 2017, Defendants did not store any items.

---

[1] According to WSDOT, it "coordinates with the City of Seattle (City) for all scheduled cleanups involving WSDOT property in City limits."  ECF 38 at 5 (citing McBride Decl. ¶ 5).  Further, "[a]t least for the past year, and for the foreseeable future, WSDOT has agreed that the City's protocols will be followed for such clean-ups, and follows the City's lead in accomplishing those processes."  *Id*.  But WSDOT still conducts sweeps on its own where it cannot secure cooperation from the City before it wishes to conduct the sweep.  *See* L. Pascubillo Dep. at 22:25-23:5 attached as Exhibit A to the Declaration of B. Schuster.  And the City acknowledges that in the past WSDOT has failed to follow the MDARs regarding safeguarding personal property.  A. Drake-Ericson Dep. at 83:17-86:16 attached as Exhibit B to the Declaration of B. Schuster (describing WSDOT "sliding people's personal property down a steep slope.").

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

- Plaintiffs and members of the proposed class have had indispensable personal property seized and destroyed on an almost daily basis as a result of Defendants' conduct. According to Defendants' own documentation, they immediately destroy at least some property of unhoused individuals during the majority of sweeps they conduct.

- Defendants have an ongoing pattern and practice of disregarding their own rules. The City's own Office of Civil Rights ("OCR") reported that only about two-thirds of the more than 50 sweeps at which OCR was present were "in compliance" with the City's rules in 2016.

- Because Defendants' have given themselves unfettered discretion to seize and destroy property without notice—and in addition fail to follow even their own written policies— Plaintiffs are wholly unprotected by Defendants' written notice and storage procedures.

- There is no legitimate reason, whether for health or public safety, to seize the property of unhoused individuals, much less to immediately destroy it.

A Preliminary Injunction is necessary to prevent ongoing imminent and irreparable harm to Plaintiffs and members of the proposed class ("Plaintiffs"). Defendants have made it clear through their actions and statements that they will continue to engage in the seizure and destruction of property without adequate notice or an opportunity to be heard absent a Court Order. Plaintiffs seek only what the Ninth Circuit directs: an order prohibiting Defendants from seizing and summarily destroying homeless people's property without probable cause and constitutionally adequate notice. *See Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012). The order (which is nearly identical to the injunction affirmed in *Lavan* and the injunction issued in *Mitchell v. City of Los Angeles*, 2:16-cv-01750-SJO-JPR (C.D. Cal. April 13, 2016)) will not impair Defendants' ability to protect the public or perform necessary duties. It will simply make sure that Defendants do not trample Plaintiffs' constitutional rights.

## II.     A PRELIMINARY INJUNCTION IS NECESSARY AND APPROPRIATE

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 21, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008).  Plaintiffs are not required to show that they *will* succeed on the merits, only that they are "likely" to prevail.  At a minimum, they must show "serious questions going to the merits[,]" that "the balance of hardships tips sharply in [their] favor," and the other two *Winter* factors are satisfied.  *Shell Offshore v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (internal quotation marks omitted).  All four factors are met here.[2]

### A. Plaintiffs are Likely to Succeed on Their Claim That Defendants' Sweeps Policy and Practice Violates the Federal and Washington State Constitutions

As the evidence submitted with this motion demonstrates,[3] Defendants have an ongoing policy and practice of seizing and destroying Plaintiffs' property without adequate notice, an opportunity to be heard, or a meaningful way to reclaim their belongings.

### 1. Defendants Seize Plaintiffs' Property and Invade their Homes in Violation of the Fourth Amendment of U.S. Constitution and Article I, Section 7 of the Washington State Constitution

There is no dispute that unhoused individuals have a property interest in their tents, blankets, tarps, clothing, medication, personal papers, and other items—and that this property interest enjoys constitutional protection.[4]  The only question is whether Defendants' sweeps result in the unconstitutional destruction of Plaintiffs' property.  They do.

### i. The City's amended rules allow Defendants to summarily destroy Plaintiffs' property in violation of the State and Federal Constitution

Although Defendants have a written policy providing for property storage after a sweep, the policy is vague and leaves the determination of what constitutes storable personal property

---

[2] To avoid repetition, Plaintiffs hereby incorporate all of the legal authority and argument contained in their Motion for a TRO (ECF 23) and Reply in Support of Motion for TRO (ECF 50).

[3] These exhibits and declarations are in addition to the 13 declarations submitted to the Court accompanying Defendants' Motion for a TRO. *See* ECF 24-33 and 51-54.

[4] *See*, *e.g.*, ECF 23 at 13-14, which was not disputed by Defendants in their opposition to the Motion for Temporary Restraining Order.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

to the subjective judgment of City personnel.  The evidence further demonstrates that the policy is not understood by City personnel, is applied inconsistently, and results in the destruction of important personal property.

According to their amended rules,[5] Defendants should store any item that "is reasonably recognizable as belonging to a person; has apparent utility in its present condition and circumstances; and is not hazardous."[6]  Hazardous is defined as "an item that reasonably appears to pose a health or safety risk to members of the public or to City employees or to other authorized personnel. Hazardous items may include blankets, clothing, sleeping bags, or other items depending upon their condition and site conditions."[7]

On its face, the definition is vague and provides impermissible discretion.  City employees governed by the rules agree.  For example, Jeff Horan is the City's "primary" Field Coordinator who is present at sweeps "on average three times a week" and is responsible for determining what constitutes personal property.[8]  When Mr. Horan was asked about the meaning of the amended rule which defines personal property as having "apparent utility in its present condition," he stated, "[t]hat's kind of vague.  I mean, I don't know how to answer that to be honest with you."[9]

---

[5] On April 3, 2017, an amended version of the City's rules regarding the removal of homeless encampments became effective.  These rules are labeled FAS 17-01 and MDAR 17-01.  These rules are attached as Exhibits C and D to the Declaration of B. Schuster.  They will be referred to here as the "amended rules."

[6] FAS 17-01, Rule 3.5, attached as Exhibit C to the Declaration of B. Schuster.

[7] MDAR 17-01 ¶ 3.12, attached as Exhibit D to the Declaration of B. Schuster.

[8] Deposition of A. Drake-Ericson at 50:17-19, attached as Exhibit B to the Declaration of B. Schuster.

[9] Deposition of J. Horan at 101; attached as Exhibit E to the Declaration of B. Schuster.  Counsel for Defendants attempted to salvage the record on re-direct by suggesting to Mr. Horan that he was actually referring to the question as "vague" and not the amended rule.  *See* Horan Dep. at 230.  A fair reading of the questions leading up to Mr. Horan's testimony makes clear that Mr. Horan understood the question that was asked and was indeed referring to the rule as "vague."

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

City employees engaged in determining what is personal property receive minimal training. Mr. Horan, for example, testified that he had not received any formal training on constitutional rights.[10] His training when he was hired in 2016 consisted of talking about the MDARs with his supervisor, and some in-field training where he could observe sweeps. None of this training was documented.[11] Although Mr. Horan received a powerpoint training on the new MDARs after they went into effect, the training did not clarify the definition of "personal property"—as evidenced by his statement that the rule was "vague."[12]

The rule's vagueness is also reflected in the City's Office of Civil Rights Report for 2016, which put the City on notice of a "lack of understanding of procedures by City staff" and a "lack of clarity on what items should be stored."[13] The OCR report notes that staff from the City's Finance and Administrative Services (FAS) "did not agree with monitors on what should be stored" and that "[a]t a later date, when the FAS staff person began to throw items away, OCR monitors began bringing a copy of the protocol so they could remind FAS staff of what was required."[14] The OCR report goes on to state:

> Under the storage protocol, FAS does not store items (including sleeping bags and blankets) that have been "soiled with chemicals, biological or other hazardous materials." **In practice, FAS staff onsite at removals stated they would not store any "soft items."** In one instance, outreach workers informed monitors that tents without dry rot or drug paraphernalia had been thrown away (while out of sight of the monitors). When monitors asked the FAS staff person about it, he replied the tents

---

[10] Deposition of J. Horan at 25:8-18; attached as Exhibit E to the Declaration of B. Schuster.

[11] Deposition of J. Horan at 27-29, 32; attached as Exhibit E to the Declaration of B. Schuster.

[12] The WSDOT employee in charge of encampment removals admits that until February 2017 he did not even know that WSDOT had a policy on encampment removals (L. Pascubillo Dep. at 74:11-24 attached as Exhibit A to the Declaration of B. Schuster). In any event, the policy does not appear to have been followed as the notices that were previously used by WSDOT failed to meet even its own requirements for advising residents of where any property was stored. (L. Pascubillo Dep. at 79:19–81:18 attached as Exhibit A to the Declaration of B. Schuster).

[13] Exhibit 11 to C. Connelly deposition, attached as Exhibit F to the Declaration of B. Schuster.

[14] *Id.*

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

weren't in good enough condition to keep.  OCR monitors relayed that **having one staff person make this determination allowed for too much subjectivity in the process**.[15]

In practice, Defendants use the ambiguous definitions of "property" and "hazardous" to refuse to store the vast majority of belongings at a site.  For example, Defendants refuse to store belongings that are wet.[16]  As Mr. Horan describes, these rules mean that when it is raining, the City does not store anything that is exposed:

> Q.· · So basically that means that anything that's wet just doesn't get stored; is that right?
> A.· · If things are wet, we aren't able to.
> . . .
> Q.· · But a tent, could you store that if it's wet?
> A.· · Within reason it could, if it could dry, yes.
> . . .
> Q· · Does the City make any effort to dry materials that it finds to be wet before storing them?
> A.· · Not storing.· We can't really…
> . . .
> Q.· · Will you agree that when it rains, tents often get wet in Seattle?
> A.· · Yes.
> . . .
> Q.· · And so if you come across clothes that are wet because they've been in the rain, you can't store those; isn't that correct?
> A.· · Yes.
> Q.· · And if you come across a tent that's been wet because it's been in the rain, you can't store that; correct?
> A.· · For the most part.· I mean, if it's soaking wet, no.[17]

---

[15] *Id*. (emphasis added).

[16] Declaration of Cory Potts ¶ 9 & Exhibit 4 (wherein Julie Moore, Public Information Officer for the City explains that the City will not store wet items); Declaration of O. Mansker-Stoker ¶ 15;  ("A City worker told me that the City can't store items that are wet.  The result of this rule is that hundreds of wet items get left behind."); Declaration of J. Grant ¶¶ 17, 22, and 26 ("From my vantage point, and I could see the entire encampment, the City was throwing anything left behind in the garbage.  Whether it was a functional tent, or a backpack.  If it was wet, it was going in the trash.").

[17] Horan Dep. at 127-134 (objections omitted) (attached as Exhibit E to the Declaration of B. Schuster).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Monitors from the Office of Civil Rights notified FAS personnel of concerns with Defendants' practice of discarding any property that was subjectively determined to be wet or potentially moist[18]—but Defendants have continued to destroy this property anyway.

The City also refuses to store items that City workers subjectively determine to be muddy[19] or in less-than-perfect condition.  Mr. Horan testified that he declared a tent with only two small visible tears to be "damaged beyond repair" such that it was not storable.[20]  Also subject to disposal are homes or belongings that are *near* drug paraphernalia (even if no drugs are present),[21] that are by garbage, that smell like urine, or that are suspected to have touched urine.[22]

These criteria render virtually every unhoused persons' property potentially unstorable. It rained in Seattle on nearly 70 percent of all days between October 2016 and March 2017.[23] The amount of rainfall this winter set a 122-year record[24] and Pacific Northwest winters are only expected to get wetter with a changing climate.[25] And because Defendants frequently

---

[18] Connelly Dep. 48:14–25, *id.* at 54:12–17; *id.* at 95:22–96:10 (attached as Exhibit G to the Declaration of B. Schuster).

[19] Declaration of C. Potts ¶ 9 and Exhibit 4 attached to the declaration of C. Potts wherein Julie Moore also explains that only furniture that is not muddy will be stored; Declaration of J. Grant ¶ 22.

[20] Deposition of J. Horan at 198-200; attached as Exhibit E to the Declaration of B. Schuster; Exhibit 4 to Horan Dep. attached as Exhibit H to the Declaration of B. Schuster.

[21] *See* Ericson Dep Exhibit 8 at COS_028300, attached as Exhibit I to the Declaration of B. Schuster; Connelly Dep. 52:3–23 (describing the subjectivity of determining whether or not to preserve any property if drug paraphernalia was visible) (attached as Exhibit G to the Declaration of B. Schuster).

[22] Deposition of J. Horan at 111-113; attached as Exhibit E to the Declaration of B. Schuster.

[23] *See* "Seattle has had almost no sunny days since October" March 28, 2017, *available at* http://www.seattlepi.com/local/weather/article/Seattle-has-had-almost-no-sunny-days-since-October-11034669.php (citing data from the National Weather Service).

[24] http://www.seattletimes.com/seattle-news/weather/seattle-just-broke-a-122-year-old-record-for-rain-because-of-course-it-did/

[25] *See* City of Seattle, Seattle Public Utilities, "Projected Climate Changes", *available at* http://www.seattle.gov/Util/EnvironmentConservation/ClimateChangeProgram/ProjectedChanges/index.htm.

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 7
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

conduct sweeps when it is raining, their rules permit them immediately to destroy any tents or structures.[26]  And then, because Defendants often destroy tents or structures before safeguarding the property inside, these belongings are exposed to the rain and also subject to immediate destruction.[27]  Many unhoused individuals put their homes on the ground, meaning they are often soiled or muddy—and thereby subject to destruction.[28]  It is also not abnormal for people who lack access to bathrooms to urinate in bottles or plastic containers, which may result in the smell of urine near their home—and thereby subject their belongings to destruction.  Wear and tear on belongings is also normal, particularly when one is forced to move repeatedly and lacks a moving truck or boxes.  Yet, this justification is also used by the City to justify the immediate destruction of Plaintiffs' property during a sweep.

      ii.    **Defendants' practices of sweeping encampments cause the summary destruction of Plaintiffs' property in violation of the State and Federal Constitution**

Defendants' destruction of unhoused persons' property extends even further than their own rules permit.  Defendants have explicitly refused to store numerous other items that are not mentioned in their rules, including but not limited to items that do not fit in the designated

---

[26] Horan Dep. at 127-134 (attached as Exhibit E to the Declaration of B. Schuster).

[27] *See e.g.* Exhibits 9-11 attached to the Declaration of C. Cirillo; Exhibits 13-16, attached to the declaration of R. Lahiri; Exhibits 31-33, attached to the Declaration of S. Stephens; and Exhibits J-R attached to the Declaration of B. Schuster, which show the summary destruction of tents and structures.  *See also* the Declarations of O. Mansker-Stoker ¶ 15; A. Roberts ¶ 31-33; Declaration of J. Grant ¶ 26-27.

[28] Under the amended rules, Defendants do not consider building materials that are used to erect shelters "property" and therefore immediately destroy these items in sweeps.  FAS 17-01 at 3.5, attached as Exhibit C to the Declaration of B. Schuster.  Further, unhoused individuals' requests to the City for wood chips, gravel, or other assistance to prevent their belongings from becoming soiled or muddy have been denied.  *See* Declaration of J. Grant ¶ 16-17; Declaration of R. Washington ¶ 10.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 8
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

storage bins,[29] items that are "too expensive,"[30] and items that an individual did not pack up themselves.[31] If a person is unable to move those items—which happens frequently due to Defendants' refusal to provide adequate and effective notice—they are destroyed by Defendants on the spot.

Whether pursuant to their own policies, or in violation thereof, Defendants' sweeps consistently result in the destruction of unhoused individuals' property. According to the City's spreadsheet of sweeps conducted between February 22, 2017 and May 1, 2017, Defendants did not store any property in nearly 30 percent of sweeps they conducted.[32] Although this spreadsheet does not detail exactly what happens to property, the documentation the City has made publicly available online indicates the City destroys property in the majority of sweeps it conducts.[33] This is supported by the testimony of the WSDOT employee in charge of homeless

---

[29] Declaration of Garth Carroll ¶ 6; ("I had some brand new cabinets I wanted to store and other larger belongings. I was told that they were too big and that when they were offering storage for belongings, they meant things like a tent or sleeping bag."); Declaration of R. Washington ¶ 10 ("However it [the City] would not store things not in a bin. Meaning everything you wanted stored had to wrapped in plastic and fit in the bin. If something couldn't fit in the bin, it wouldn't be stored.")

[30] Declaration of Phillip Pitts ¶ 10 ("I have been told by the City they don't want to store things that expensive because they don't want to be liable for those items.").

[31] Declaration of R. Washington ¶ 20 ("The City only stores property if you packed it up in a tote yourself."); Declaration of T. Peila ¶ 10 ("I called the Customer Service Bureau line on Thursday, April 13, 2017 to see if any of my belongings were stored. I was redirected to the Operations Manager, Kenny, and he told me if I wasn't there to pack up my stuff for storage, that the City didn't have them. I was told that there has to be a name on someone's belongings in order for them to be stored.")

[32] COS_038747, attached as Exhibit S to the Declaration of B. Schuster.

[33] The City publishes site journals for a number of sweeps they conduct wherein they contend notice was provided. *See* online at https://www.seattle.gov/homelessness/unauthorized-encampments/encampment-removals#may8122017. Many of these journals indicate the City destroyed at least some property at the site.

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 9
(No. 2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

encampment removals, Lance Pascubillo.  Of the approximately 80 sweeps that he has been at in the past year,[34] he has seen storage provided for individuals only "three or four times."[35]

These statistics are consistent with the declarations submitted.  For example, at the March 7, 2017 sweep of the Field, Aedan Roberts stood by helplessly as "the City used box cutters on or would otherwise dismantle high quality tents on top of everything inside the tent. In one for example, I could see through the door a mattress and sleeping bag set on top of milk cartons—the person clearly had a nice bed set up.  But the City just took apart everything and destroyed it."[36]  Mr. Roberts witnessed the summary and immediate destruction of at least ten tents while he was in the area, and not once did he see "anyone taking things outside of the tent and setting it aside if a person wasn't there."[37]  The declarations of Jon Grant, Ann-Dee Levine, Reavy Washington, Olivia Mansker-Stoker, and Alicia Raftery describe the same wanton destruction of property.[38]  Twelve Videos submitted with this motion provide incontrovertible evidence of City workers tearing apart Plaintiffs' homes using box cutters and knives without removing any belongings inside.[39]  This footage also shows City workers throwing property either on top of the newly destroyed home, or in piles to be bulldozed.[40]

---

[34] Deposition of L. Pascubillo at 27:22-28:2 attached as Exhibit A to the Declaration of B. Schuster.

[35] *Id*. at 30-31 attached as Exhibit A to the Declaration of B. Schuster.

[36] Declaration of A. Roberts ¶ 29.

[37] Declaration of A. Roberts ¶¶ 28, 31.

[38] Declaration of J. Grant ¶ 27-28; Declaration of A. Levine ¶ 27-30; Declaration of O. Mansker-Stoker ¶ 15; Declaration of R. Washington ¶ 22; Declaration of A. Raftery ¶ 5 (c)(iii).

[39] Exhibit 5 attached to the declaration of A. Roberts; Exhibits 6-7 attached to the Declaration of A. Levine, Exhibits 31-33 attached to the Declaration of S. Stephens; Exhibits J-R attached to the Declaration of B. Schuster.

[40] Exhibit 5 attached to the Declaration of A. Roberts; Exhibits 6-7 attached to the Declaration of A. Levine, Exhibits 31-33 attached to the Declaration of S. Stephens; Exhibits J-R attached to the Declaration of B. Schuster.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

This policy and practice of property destruction has persisted even after the City's new rules were implemented.  At a sweep on April 11, 2017 under the West Seattle Bridge, Edward Rodriguez observed "about ten tents being destroyed," within an hour of Defendants showing up.[41]  Workers were "using knives to slash open tents and cut tent tie-down ropes in a manner that ruined the tents and appeared unnecessary.  For example, instead of pulling down tent poles normally, the workers would cut the fabric pockets holding the ends of the tent poles, so that the tent could no longer support a pole and was thus rendered useless.  The workers were doing this to tents that appeared intact and functional."[42]  Eight videos accompanying this motion show Defendants engaging in on-the-spot destruction of Plaintiffs' personal property.[43]  As the declarations cited *supra* and an additional 19 photos and videos pertaining to sweeps conducted in the past six months demonstrate, this wholesale destruction of property is the norm rather than the exception.[44]

### iii.   Defendants' purported reasons for destroying property fail to pass constitutional muster

Defendants' seek to justify their wholesale destruction of Plaintiffs' belongings on grounds of public health and safety but have no scientific evidence on which to rely. For example, the City's required disposal of any item that may have come in contact with urine is not grounded in fact: Mr. Horan's testimony that urine is hazardous because it can transmit Hepatitis[45] is refuted by the attached declaration of public health expert, Dr. Bill Daniell.  Dr.

---

[41] Declaration of E. Rodriguez ¶ 10 (a).

[42] Declaration of R. Lahiri ¶ 19.

[43] Exhibits 9-11 attached to the declaration of C. Cirillo; Exhibits 13-17 attached to the declaration of R. Lahiri.

[44] Exhibits J-R attached to the Declaration of B. Schuster; Exhibits 24-30 and 41-45 attached to the declaration of S. Stephens; Exhibits 12, 18-20, and 22-23 attached to the Declaration of R. Lahiri.  *See* also Exhibits 48-50 attached to the Declaration of Edward Wixler, which show Defendants engaging in the same on-the-spot destruction of Plaintiffs' property in the fall of 2016.

[45] Deposition of J. Horan at 108:13; attached as Exhibit E to the Declaration of B. Schuster.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 11
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Daniell is a physician and epidemiologist who has taught for 30 years at the University of Washington Schools of Medicine and Public Health.  As Dr. Daniell notes, the transmission of Hepatitis B and C, as well as other blood borne pathogens, are typically not linked to urine transmission.  "Urine that does not contain visible blood is not regarded, under the standard, as blood or other potentially infectious material."[46]  The use of "basic worker precautions" and the drying of any potentially contaminated material (i.e., the same treatment of any materials that are wet) would mitigate any potential risk.[47]

Neither do Defendants have a legitimate government interest in refusing to store Plaintiffs' property because it is wet, in less than perfect condition, of a particular size, or otherwise is inconvenient to the City, yet fails to present an immediate threat to public safety.  *See Lavan* 693 F.3d at 1024 (affirming order enjoining seizure absent immediate threat).  Just as the government cannot act without due process to bulldoze a brick and mortar house because it has a broken window or a leak in the roof, neither can it destroy a tent home because it is torn or wet.  The unbridled discretion to deem personal belongings garbage, debris, and waste, and to destroy them, is nothing short of "collecting and destroying [the homeless litigants'] property on the spot," which is the policy and practice the *Lavan* court ruled unreasonable and in violation of the Fourth Amendment. *Lavan,* 693 F.3d at 1030.

**2.   Plaintiffs Continue to Suffer Deprivations of Their Property without Due Process in Violation of the Fourteenth Amendment of the U.S. Constitution and Article I, Section 3 of the Washington State Constitution**

There is also no dispute that unhoused individuals are entitled to due process before the City or WSDOT seize and/or destroy their property.[48]  The question is whether Defendants

---

[46] Declaration of B. Daniell ¶ 17.

[47] *Id*. ¶¶ 20-25.

[48] *See* ECF 23 at 14-18.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1  provide adequate and effective notice and an opportunity to be heard before before permanently

2  depriving Plaintiffs' of their property.  *Lavan*, 693 F.3d at 1030 ("Application of the Fourteenth

3  Amendment's due process protections require the familiar two-stage analysis": (1) "whether

4  the asserted individuals interests are encompassed within the Fourteenth Amendment's

5  protection of 'life, liberty or property'"; and (2) "if protected interests are implicated, we must

6  then decide what procedures constitute due process of law.").  They do not.

### i. The destruction of property, without any method to challenge the destruction violates the 14th Amendment and Article I, Section 3

As discussed in greater detail *supra*, Defendants engage in the wholesale destruction

of Plaintiffs' property when conducting a sweep, occasionally saving a few items while

treating everything else as garbage.  This immediate destruction provides no means for

unhoused individuals to get their property back.  For example, as Mr. Washington describes

his experience at the sweep of the Field:

> "[t]here was no opportunity for people to get their stuff once it was heaped into a pile—it was immediately destroyed.  And because it was raining, everything was made wet and soiled.  The way the tents were taken down and the belongings piled into a mound, it was clear that the City was doing stuff to make sure the property couldn't be used in case someone came back to get it."[49]

Garth Carroll details similar experiences:

> "Every time I have been swept or know of people who have been swept, the City has thrown everything in the area in the garbage . . . And the way they take things down is to damage or destroy people's belongings.  If any individual is not there to move their belongings . . . all of their property is thrown in the garbage.  And there is no inquiry into where that person is.  Even if someone is nearby and cannot move all of their property, it is thrown in the garbage.  Even if someone's name is on the property, it doesn't make any difference—everything is treated like garbage—people's medication, tents, things to survive."[50]

---

[49] Declaration of R. Washington ¶ 22.

[50] Declaration of G. Carroll at ¶ 10.

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Likewise, Aedan Roberts described the City's actions:

> "At that point, your tent is slashed with a box cutter, making it unusable.  It's in a trash pile with actual trash.  It's wet, muddy.  The piles then go then into the dumpster or dump truck.  The way the city conducted their actions, there was absolutely no way someone could have recovered their belongings if they did not happen to be there at the time of the sweep."[51]

Further, there is no opportunity for individuals to object to this destruction.  As Plaintiff Brandie Osborne explains, when asked if she objected to the destruction of her personal property:

> Q:  So you objected to them?
>
> A:  Like, well yeah.  But what—what can you do?  I mean, you either lay in front of the bulldozer, which is not a smart thing to do unless you have a lot of people behind you to support you.  You don't do anything.  You just pick up what you can and carry on and keep going."[52]

### ii. Defendants' Encampment Rules governing emphasis areas, imminent hazards, and purported obstructions deny plaintiffs any due process whatsoever

The City's amended rules, on their face and in application, deny Plaintiffs and fellow class members basic constitutional rights in their personal property.  Far from expanding protections to unhoused individuals,[53] the amended rules enable the City to remove and destroy the belongings of virtually any unhoused person on City property without notice—as long as the City can deem the unhoused person or their property an "obstruction" or "immediate

---

[51] Declaration of A. Roberts ¶ 33.  See also Declaration of J. Grant ¶ 28; Declaration of A. Raftery at ¶ 5(c)(iii); Declaration of O. Mansker-Stoker ¶ 16-17; Declaration of M. Christian; Declaration of R. Lahiri ¶ 17; Declaration of T. Alexander ¶ 11; and Declaration of R. Massey ¶ 3.

[52] Deposition of B. Osborne at 43, 106, attached as Exhibit T to the Declaration of B. Schuster.

[53] *Cf.* Letter from Mayor Edward Murray to the Seattle City Council, July 29, 2016, *available at* https://www.documentcloud.org/documents/3026940-Mayor-Murray-Letter-to-Council-Members-Regarding.html; *see also,* "City: Next time homeless are cleared they will get notice" Crosscut, Jan. 31, 2017, *available at* http://crosscut.com/2017/01/city-next-time-homeless-are-cleared-they-will-get-notice/

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 14
(No. 2:17-cv-00077-RSM)

hazard."[54]   While the City claims these two categories are exceptions, the "exceptions" are described so broadly and ambiguously defined that they eliminate virtually any requirement of notice and to provide City employees with unbounded discretion in deciding when encampments can be moved without notice.

The amended rules define an obstruction as:

tents, personal property, garbage, debris or other objects related to an encampment that: are in a City park or on a public sidewalk; interfere with the pedestrian or transportation purposes of public rights-of-way; or interfere with areas that are necessary for or essential to the intended use of a public property or facility.[55]

And the amended rules define a hazard as:

an encampment where people camping outdoors are at risk of serious injury or death beyond that caused by increased exposure to the elements or their presence creates a risk of serious injury or death to others; including but not limited to encampments at highway shoulders and off-ramps, areas exposed to moving vehicles, areas that can only be accessed by crossing driving lanes outside of a legal crosswalk, and landslide-prone areas.[56]

The City has used both of these categories to justify conducting at least 28 sweeps between February 22, 2017 and May 1, 2017 under the pretense of being a hazard or obstruction and thereby exempt from any of the City's notice requirements.[57]   This constitutes more than 55 percent of sweeps conducted within this time period.

Rather than addressing immediate public health and safety concerns, the City's hazard and obstruction categories are regularly utilized as convenient rationales to more quickly conduct sweeps—and without the need to follow the normal notice and property preservation

---

[54] *See* FAS Encampment Rule 17-01 ¶ 3.3, 3.4, and 4.1 (attached as Exhibit C to the Declaration of B. Schuster).

[55] FAS Encampment Rule 17-01 ¶ 3.4; attached as Exhibit C to the Declaration of B. Schuster.

[56] FAS Encampment Rule 17-01 ¶ 3.3; attached as Exhibit C to the Declaration of B. Schuster.

[57] COS_038747 (attached as Exhibit S to the Declaration of B. Schuster).

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

procedures.  For example, Defendants conducted two sweeps in the Spokane Street area on March 29, 2017 and April 11, 2017.  Defendants classified both sweeps as obstructions subject to immediate removal, even though unhoused individuals like Rebecca Massey had been living there for months.[58]  Defendants' justification for conducting these sweeps included things like replacing copper wire that had been stolen more than 6 months prior, RV fires that occurred back in January of 2017 and the week earlier, and a woman being confronted near the area (even though the City did not know whether the individual who confronted the woman was even a part of the encampment).[59]  These reasons neither appear to fit within the amended rules' definition of "obstruction" nor explain why notice could not be provided to residents.

Similarly, the City's professed concern about the health of unhoused individuals is belied by statements that show the City is intent only on moving people and clearing areas of unhoused individuals.  In a September 2016 email to WSDOT, the City's Encampment Response Team Program Manager, August Drake-Ericson, encourages WSDOT to "clean up all of the structures including the tents" and "make the tents move" when she learns that WSDOT is planning to move only hard structures from an encampment.[60]  In another email exchange with WSDOT, Ms. Drake-Ericson encourages WSDOT to "start thinking of how we can reclaim [a] space" so that WSDOT doesn't have to repeatedly conduct sweeps of the same area.[61]  Officer Eric Zerr further stated that it is a "high priority" for WSDOT and the City Parks

---

[58] Declaration of R. Massey ¶ 1.

[59] Declaration of G. Carroll ¶ 13; http://homelessness.seattle.gov/reducing-hazards-under-low-bridge-structures-beginning-with-the-spokane-street-viaduct/; http://homelessness.seattle.gov/addressing-trash-and-tents-under-the-spokane-street-viaduct/

[60] Exhibit 4 to Drake-Ericson Dep. (attached as Exhibit U to the Declaration of B. Schuster).

[61] *See* December 5, 2016 email chain (at p. 2) attached as an Exhibit V to the Declaration of B. Schuster; *see also* B. Schuster Decl. Ex. W, deposition of E. Zerr at 73:2–12 (characterizing a sweep as "worthwhile" because the property could finally be secured from future public access)

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 16
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Department to clear out unhoused individuals in order to restrict future access.[62]   When reporting back to a community member who is complaining about an encampment, WSDOT reports that Ms. Drake-Ericson is "working hard on the City to loosen its grip and move back to trespassing people."[63]   And in minutes from a March 2017 meeting of the City's Emergency Operations Command when discussing the top 40 prioritized encampment sites, Ms. Drake-Ericson stated that "the ultimate goal is to have people removed from unauthorized sites and only regular maintenance of sites to be performed."[64]   These statements reflect the City's ultimate goal of simply "moving" unhoused individuals around through repeated sweeps in hopes that they will not return.

This intent is made all the more apparent by the City's prohibition of camping in large swathes of public property that offer some form of shelter from the elements and access to services and that people with housing seldom use.  Through the amended rules, the City has granted itself the authority to immediately seize and destroy the property of unhoused persons who have property in any of the ten "emphasis areas."[65]   These are areas designated by the City wherein camping is completely prohibited.[66]   Although the amended rules impose limits on the number of emphasis areas the City can establish, the areas can be of any size and anywhere within the City limits.[67]   According to the City's Emphasis Map, seven such areas have already been designated, many of which are massive areas where many unhoused people have

---

[62] Zerr Dep. 78:9–79:12 (attached as Exhibit W to the Declaration of B. Schuster).

[63] *See* November 2016 email chain (at p. 1) attached as an Exhibit X to the Declaration of B. Schuster.

[64] Exhibit 6 to Drake-Ericson Dep. (at p. 2) attached as Exhibit Y to the Declaration of B. Schuster.

[65] FAS 17-01 at 3.1; and 13.1-13.6 attached as Exhibit C to the Declaration of B. Schuster

[66] FAS 17-01 at 13.3 attached as Exhibit C to the Declaration of B. Schuster.

[67] *Id.*

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

previously found refuge.[68]  For example, Mr. Washington lived at the Field for a year[69]; Ms. Hooper lived on Freedom Hill for approximately two years[70]; and Ms. Massey lived at the Spokane area eight months before each became emphasis areas.[71]

Exhibit 51 accompanying this motion shows the few areas in which, according to the amended rules, Defendants are required to provide 72 hours' notice prior to clearing an encampment.[72]  Almost every piece of public property in the City could qualify as an "obstruction," "hazard" or is already designated as an emphasis area under Defendants' own rules.

### iii.  Defendants' practices of providing notice prior to sweeps fail to meet minimum due process standards

Defendants have provided unhoused Seattle residents living outside with misleading, conflicting, confusing, and otherwise inadequate notice before seizing and destroying their property in violation of the law and their own rules.  Sometimes this means Defendants neglect to provide any notice at all before coming to an unhoused person's home and demanding that they immediately move all of their belongings under threat that anything left behind will be thrown in the garbage.  This has happened as recently as May 22, 2017 when Defendants conducted a sweep at Columbia Street and Western Avenue.  Around nine or ten in the morning, a Sergeant told Timothy Alexander he had "30 minutes to pack up [his] stuff or the cleanup crew would throw it away."[73]  "There was no notice posted of the sweep beforehand" and no

---

[68] https://www.seattle.gov/homelessness/unauthorized-encampments/emphasis-map.

[69] Declaration of R. Washington ¶ 7;

[70] L. Hooper Deposition at 12:1-8 (attached as Exhibit Z to the Declaration of B. Schuster).

[71] Declaration of R. Washington ¶ 7; Declaration of R. Massey ¶ 1.

[72] Attached to the Declaration of C. Rutan.

[73] Declaration of T. Alexander ¶ 6-7.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

one had informed Mr. Alexander that the City was "going to be sweeping the area."[74]  Anna

Gibson lived in the same area, and had stepped away for just 45 minutes, during which time the

sweep occurred.  When she returned, her tent "and all of the belongings of my fiancée and

myself were gone.  The other four or five tents that belonged to my neighbors were also gone."[75]

She too never saw a posting before the sweep occurred.[76]  The same thing happened to Teresa

Peila on April 7, 2017.  Teresa stepped away from her home for just the afternoon—when she

returned, she discovered everything she owned had been taken by Defendants in another

unannounced sweep.[77]

Defendants do sometimes post a flyer or sticker, warning residents that they must move

and that anything not moved will be discarded.  These postings do not however, provide

sufficient information about when and where a sweep will actually occur.[78]  Many include, for

example, inadequate or confusing descriptions of areas.[79]  Often, Defendants offer conflicting

information to residents as to why, when, and where a sweep will occur.[80]

---

[74] *Id.*

[75] Declaration of A. Gisbson ¶ 8.

[76] Declaration of A. Gibson ¶ 10.

[77] Declaration of T. Peila ¶ 7-8.

[78] Declaration of E. Rodriguez ¶ 13 ("Over the course of sweeps I've seen, postings are vague. Sometimes tents will be posted with order to remove stickers and a date; that's not always the case.  The order to remove sticker is just a picture of a camper in a tent crossed out.  The stickers are also meaningless without context.  The order to remove where?  What?); Hooper Dep. 31:25–32:10, attached as Exhibit Z to the Declaration of B. Schuster ("[B]asically your life went on hold after you were posted.").

[79] For example, "Between I-5 Northbound Exit on Dearborn." *See.* https://www.seattle.gov/Documents/Departments/Homelessness/cleanups/03-21-17-Dearborn-I-5.pdf; and "West Galer Street Flyover & Surrounding Area." *See* https://www.seattle.gov/Documents/Departments/Homelessness/cleanups/04-27-17-Galer-Flyover.pdf.

[80] Declaration of O. Mansker-Stoker ¶ 28, G. Carroll ¶ 13; P. Pitts ¶ 12; and A. Levine ¶ 32-36 (noting significant confusion among residents living near the Spokane Street viaduct about where a sweep would actually occur); Declaration of R. Massey ¶ 7-8 detailing the same ("After an RV fire four nights ago, Police Officers told us they had declared an emergency, none of the protocols applied, and we'd have to leave that day.  Then they said they'd come back tomorrow.  Then word of mouth said Tuesday.  Then

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 19
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   Defendants frequently fail to come on the day indicated on the posting and sweep areas

2   other than those indicated on the posting.[81]  As recently as Memorial Day of 2017, again at

3   Columbia Street and Western Avenue, Defendants summarily informed Ms. Gibson that she

4   had to "evacuate" the area.[82]  At the time, her fiancée was at work, and she was unable to move

5   all of her belongings herself, so she stayed in her tent, missing her shift at Real Change and

6   prolonging using the restroom because she was concerned about Defendants conducting a

7   sweep while she was momentarily absent.[83]  Although she waited for hours, "the clean up crew

8   and police never returned to conduct the sweep."[84]

9   And, in direct violation of their own rules, Defendants often post notices that provide

10   less than 72 hours' notice.[85]  For example:

11   • Defendants' posting dated January 9, 2017 with a time of 2:00pm indicates "Rainier
      Ave., Hillside, Bus Terminal, and Surrounding Grounds" will be cleared on January 12,
12    2017 at 8:45am.[86]

13

14

15

16   we read an article in the paper saying the 17th.  The police came today and said it will happen tomorrow.
     Nothing has been posted."); Declaration of T. Cross Declaration ¶ 4-5 (regarding the same).

17   [81] E.g. Declaration of G. Carroll ¶ 5 (regarding a sweep that occurred in October 2016 where notices
     were posted in a different area, yet the area he was living in was swept); Declaration of O. Mansker-

18   Stoker ¶ 7 (noting the City did not show up for a sweep under the Ballard Bridge until the day after the
     posting claimed it would happen); Declaration of R. Lahiri ¶ 5 (regarding the same); Deposition of

19   Brandie Osborne at 14 (describing a specific incident where 72 hour postings were put up, but two days
     later, somebody showed up and did a cleanup of another area but not the area that was originally posted)

20   (attached as Exhibit T to the Declaration of B. Schuster).

     [82] Declaration of A. Gibson ¶ 17.
21
     [83] Declaration of A. Gibson ¶ 18-20.
22
     [84] Declaration of A. Gibson ¶ 21.
23
     [85] FAS 17-01 at 6.3, attached as Exhibit C to the Declaration of B. Schuster ("The notice shall be posted
     no fewer than 72 hours before an encampment removal and shall provide a removal date no more than
24   7 days after the notice posting date.").

     [86] COS_006637 (attached as Exhibit AA to the Declaration of B. Schuster).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 20
(No. 2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

- Defendants' posting dated January 27, 2017 with a time of 2:30pm indicates "42nd and Pasadena" will be cleared beginning January 30, 2017 at 9:30am.[87]

- Defendants' posting dated February 6, 2017 with a time of 8:30am indicates "7th and NW 42nd" will be cleared on February 8, 2017 at 8:45am.[88]

- Defendants' posting dated March 14, 2017 with a time of 4:00pm indicates "I-5 Northbound 45th and 50th Exists and On Ramps" will be cleared on March 17, 2017 at 8:00am.[89]

- Defendants also conducted a sweep in the James Street area on March 24, 2017. The City put up notices prior to the sweep, which indicated they were posted on March 21, 2017 at 2:00pm. The notices stated material would be removed "no less than 72 hours from the date and time posted above."[90] However, the date and time listed for the sweep was Friday, March 24, 2017 at 8:00am—66 hours after the date of the posting.[91]

The City and WSDOT's failure to commit to follow their own notice procedures is further documented by the City's Office of Civil Rights, which found that only about two-thirds of sweeps in 2016 were conducted in compliance with the MDARs then in effect.[92] The OCR Report flags concerning issues in even the sweeps conducted "in compliance" regarding notice, storage, inter-agency coordination, and civil rights impacts.[93]

Proper notice and the opportunity to be heard before seizing and destroying property is critical in the context of the City's sweeps because it affects an already vulnerable population. "For many of us, the loss of our personal effects may pose a minor inconvenience. However,

---

[87] COS_007313 (attached as Exhibit BB to the Declaration of B. Schuster).

[88] COS_003094 (attached as Exhibit CC to the Declaration of B. Schuster).

[89] COS_007287 (attached as Exhibit DD to the Declaration of B. Schuster).

[90] Exhibit EE attached to the declaration of B. Schuster.

[91] *Id.* It also bears noting that this posting was put up hours after Defendants had originally scheduled a sweep for that area. *See* Exhibit FF attached to the declaration of B. Schuster; declaration of E. Rodriguez at ¶ 8(a).

[92] Exhibit 11 to Connelly Dep. (at p. 2) (attached as Exhibit F to the Declaration of B. Schuster).

[93] *Id.*

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 21
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

the loss can be devastating for the homeless." *Lavan*, 693 F.3d at 1032; *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992). The City's practice of on-the-spot destruction of seized property presents an unacceptable risk of erroneous deprivation, that would be easily remedied by what the Constitution requires: adequate notice and an opportunity to be heard.

### iv. Defendants' inept and inaccessible storage measures deprives Plaintiffs of their property without due process

Defendants' storage process is inconsistent and inadequate to ensure property is actually stored—presuming it was even eligible for storage in the first place. Defendants conduct sweeps without giving residents any information about the property-storage process. For example, according to Amanda Richer, "no one has ever told me about any storage options, or about delivering my belongings. There was just a sticker saying my items would be thrown away if I left them on site."[94] "Nothing was said about storing anything," at least up until the day before the Spokane area sweep in April 2017, either.[95] And if storage is offered, Defendants "don't tell us anything about storage or the sweep until the day of the sweep."[96]

Aside from the general statement that storage is available, Defendants "don't tell you where or how to get it back. No one explains anything to you – you just sign a piece of paper."[97] Attempts to gather more information about storage are often futile.[98] For example,

---

[94] Declaration of A. Richer ¶ 16; Declaration of T. Alexander ¶ 8 (explaining the only help he was offered if he couldn't move his belongings in 30 minutes was to have the City throw them away).

[95] Declaration of R. Massey ¶ 3, P. Pitts ¶ 8 ("And the whole option of storage is not put out as an option unless you ask for it. The number you can call is just an automated phone number. I know some people have gotten the run around – they were told to go to DOT, who then told them to go somewhere else.").

[96] Declaration of P. Pitts ¶ 8.

[97] Declaration of P. Pitts ¶ 9.

[98] Declaration of C. Potts ¶ 8 ("A number appeared on several flyers posted around the camp . . . [t]he flyer explained that residents should call the number in order to schedule storage of their belongings . . . . I called the number on March 3rd, 2017 and was redirected to the Seattle Human Services desk. No one I spoke to that day knew of any city plan to store residents' personal belongings.").

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 22
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    when the Field was swept in March 2017, even aides to City Councilmembers were unable to

2    obtain consistent information about storage options.[99]

3        In addition to providing inadequate and inconsistent information regarding storage,

4    Defendants impose a number of other barriers that make it difficult for individuals to retrieve

5    any property that was not destroyed.  For example, the only information provided to Plaintiffs

6    after their property has been seized is in the form of a piece of paper that indicates where

7    belongings were stored, and directs individuals to call the City's Customer Service Bureau line.

8    Unhoused people who lack a phone, often because they lost that phone during a sweep, are out

9    of luck.  Those individuals who are able to find the number and make the call rarely get a live

10   person who can actually help them retrieve their belongings, and they often do not get a

11   response at all.[100]  As a result, very few are able to successfully retrieve their belongings.[101]  In

12   fact, according to Defendants' own documentation, items have been "retrieved by camper" only

13   twice between February 22, 2017 and May 1, 2017.[102]  Even Mr. Washington, was able to

14   successfully store some of his belongings, is still missing three bikes that Defendants can't seem

15   to find.[103]

16

17

18

19   [99] *See* Exhibit 3 attached to the declaration of K. Brunette (describing difficulties City Council member
     aides had in finding out information about storage opportunities).

20
     [100] Declaration of A. Meisel Gibson ¶ 22; Deposition of B. Osborne at 42, ("I know of a few people that
21   have taken that option and they don't have their belongings.  They can't even get ahold of anybody on
     the phone to try to get their belongings, if they're still there.") (attached as Exhibit T to the Declaration
22   of B. Schuster).

23   [101] Declaration of K. Kinst ¶ 37 ("In my 3 years as an emergency room social worker, I have never
     encountered an individual who has lost their belongings and successfully retrieved them.").

24   [102] COS_038747 (attached as Exhibit S to the Declaration of B. Schuster).

     [103] R. Washington Dep. at 119:15–24 (attached as Exhibit GG to the Declaration of B. Schuster).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 23
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

### v. Defendants' purported reasons for not providing adequate notice fail to pass constitutional muster.

2

Defendants are well aware of the constitutional requirements to provide notice to

3

individuals before seizing and destroying their property—and in fact, frequently do so in a

4

myriad of other contexts, as when evicting individuals from their brick-and-mortar homes.

5

There is no reason Defendants cannot offer sufficient and adequate notice to unhoused

6

individuals prior to taking their property. In fact, Defendants are often able to provide some

7

form of information to individuals *not* living outside.  For example, on March 29, 2017, the

8

City swept an area near the Spokane Street viaduct without providing residents any notice.[104]

9

The City never posted the site for removal.[105]  The City, however "was apparently able to inform

10

the general public about the sweep—but not the residents."[106]   On April 11, 2017, another

11

encampment near the Spokane Street viaduct was cleared.  The City again had the time to

12

inform the general public about their efforts to clear the area of unhoused people—but the only

13

written information offered to residents was a posting put up in the evening of April 10, 2017,

14

15

16

17

[104] Declaration of E. Rodriguez ¶ 9(e), regarding the Spokane Street sweep on March 29, 2017, "There
was no written notice… No one living there knew they were going to be evicted that day."; COS_038728

18

which notes the area was never posted; *See also* site journal for that sweep.
(https://www.seattle.gov/Documents/Departments/Homelessness/cleanups/03-29-17-Spoken-St-Bike-

19

Trail-Obstruction.pdf)

20

[105] Declaration of E. Rodriguez ¶ 9(e), regarding the Spokane Street sweep on March 29, 2017, "There
was no written notice… No one living there knew they were going to be evicted that day."

21

[106] Declaration of Garth Carroll ¶ 5.  See also Addressing trash and tents under the Spokane Street
Viaduct, Homelessness Response, available at

22

https://www.seattle.gov/Documents/Departments/Homelessness/cleanups/03-29-17-Spoken-St-Bike-
Trail-Obstruction.pdf, which explains the City will be clearing "the northern bike trail under the

23

Spokane Street Viaduct, beginning on March 29."  This article was dated March 25, 2017.  *See also*
http://westseattleblog.com/2017/03/video-navigation-team-out-along-spokane-street-bike-path-before-

24

this-weeks-tent-clearing-trash-cleaning/ (in which Sergeant Eric Zerr, leader of the City's Navigation
Team, describes why the City can consider the area a hazard.)

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 24
(No. 2:17-cv-00077-RSM)

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

which stated that all personal property was to be removed—**as of 8:00am that past morning**.[107]
The City claims this retroactive notice was somehow a "courtesy" to Plaintiffs.[108]

**B.   Class Members Have Suffered and Will Continue to Suffer Irreparable Harm in the Absence of Relief**

Each of the Plaintiffs in this litigation has lost critical property as a direct result of Defendants' ongoing policy and practice of seizing and destroying the property of unhoused people living outside without adequate and effective notice, an opportunity to be heard, or a meaningful way to reclaim any property that was not destroyed.  For example:

- Amanda Richer has lost her tent, mattress, clothing, a grill, cooking stuff, food, and emergency blankets.[109]

- Garth Carroll has lost his tents, tarps, building materials, wooden cabinets and boxes, extra bedding and tools; prescription drugs, hygiene items, clothes, utensils, cooking stuff, propane, and electronics including laptops, cell phones, and heaters and stoves.[110]

- Melvin Christian has lost a gold watch, gold ring, 5 pairs of Michael Jordan tennis shoes, all of his jeans, church clothes, medicine, a DVD player, comic book collection, photos of his ex-girlfriend and states he has been to, photos of his daughter and son, fishing rods, boxing gloves, mother's wedding ring from when she died in early 2016, tent, photo of deceased parents, brother, grandmother, and family together, birth certificate, and ID.[111]

- Phillip Pitts has lost tents, furniture, bikes, and electronics, including cell phones.[112]

- Teresa Peila has lost her "skillet, clothing, bedding, kitchen stuff, utensils, plates, cups, glasses, shoes, suitcases, tarp"; "an antique manual typewriter, double burner Coleman white gas stove, a Coleman gasoline lantern, a flashlight, a DVD player, a charger for the

---

[107] Declaration of J. Grant ¶ 30-32; Exhibit 2 of Declaration of Jon Grant; Declaration of E. Rodriguez ¶ 10, noting that there was no posting for the area until the night before the sweep, and that it was backdated.

[108] Declaration of J. Grant ¶ 31.

[109] Declaration of A. Richer ¶ 13.

[110] Declaration of G. Carroll ¶ 7 and 12.

[111] Declaration of M. Christian.

[112] Declaration of P. Pitts ¶ 4-5.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 25
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

DVD player, movies, a harmonica, clothing, my tent, 2 tarps, a down sleeping bag, 2 blankets, books, a bag full of writing utensils, food, a bucket, everything I owned."[113]

- Anna Gibson has lost medications, her Real Change badge and newspapers for work, eulogy for father, birth certificate and other identification, books, coats, shoes, and other clothing, tent, and sleeping bags; and her fiancé lost painter whites and an ORCA card. [114]

- Timothy Alexander has lost his tent, shoes, clothing, jeans, and blankets. [115]

- Reavy Washington has lost a brand new grill, a Colman double burning stove, 2 boom-boxes, a home docking station stereo, a DVD player, 30 DVDs, clothes, including jeans, work gear like pants, jackets, and steel toe boots, canisters of propane, a craftsmen wrench set, glasses, jewelry like a watch, gold chain, and men's ring, binoculars, a canopy for the kitchen, plates, pots, pans, 2 tents, a bed, and other miscellaneous stuff. [116]

- Unhoused patients of Kelleigh Kinst have lost medication like blood thinners, antibiotics, insulin, anti-convulsants, anti-anxiety medication, anti-depressants, mood stabilizers, and anti-psychotic medication; weather appropriate clothing, shoes, bedding, sleeping bags, tents, socks, food, tools or utensils to cook or eat with, identification, cash, hygiene items; clothing they planned to wear for job interview; family pictures and heirlooms or mementos; important toiletries and hygiene items. [117]

Plaintiffs remain at substantial risk of having their property seized and destroyed by Defendants, as Plaintiffs will continue to live outside and Defendants' sweeps are ongoing.  As Ms. Drake-Ericson explained when asked how she determines the schedule for a sweep:

> **A**. I look at a calendar and say we have so many days in a month and essentially **the goal is to have an event four days out of the week**. So that gives us a time frame of when sweeps can occur.[118]

---

[113] Declaration of T. Peila at 4 and 9.

[114] Declaration of A. Gibson ¶ 12.

[115] Declaration of T. Alexander ¶ 12.

[116] Declaration of R. Washington ¶ 23 (attached as Exhibit GG to the Declaration of B. Schuster).

[117] Declaration of K. Kinst ¶ 12, 21, 25, 28, and 30.

[118] Drake-Ericson Dep. at 71:23-72:3 (emphasis added) (attached as Exhibit B to the Declaration of B. Schuster).

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Notwithstanding Ms. Drake-Ericson's statement, City records reflect that sweeps occur more than four days a week.[119]  And as the evidence shows, Defendants routinely seize and destroy Plaintiffs' property without providing adequate or effective notice, an opportunity to be heard, or a meaningful way for Plaintiffs to reclaim any belongings not immediately destroyed. Absent court intervention, Plaintiffs are at serious and imminent risk of additional deprivation as a result of these practices.

When unhoused people are deprived of their property, whether because Defendants summarily destroyed it or seized it without providing a meaningful opportunity to get it back, unhoused individuals suffer serious mental and physical injuries.  The direct consequences of losing property includes but is not limited to loss of sleep as a result of losing bedding and mattresses; [120] physical pain, illness, and hypothermia from the loss of appropriate clothing and shelter; starvation from the loss of food items or appropriate cooking utensils; and embarrassment, toxic shock syndrome, and scabies from the loss of essential hygiene items.[121] The consequences of losing property also include falling behind in school as a result of losing textbooks, missing job opportunities because individuals no longer have anything to wear, or

---

[119] COS_038747 (attached as Exhibit S to the Declaration of B. Schuster); https://www.seattle.gov/homelessness/unauthorized-encampments/encampment-removals#may8122017.

[120] *E.g.* Declaration of A. Richer ¶ 17-19 ("For example, I have spondyloarthritis and fibromyalgia. I have had s traumatic brain injuries and a diffuse axonal injury. Then there are second injuries I have related to these injuries. With these issues, I really need to be able to sleep properly, and I need things like a mattress to be able to sleep without being in pain. Without my mattress, I hurt so badly, and I can't get a full night's sleep. This then causes a decline in cognitive abilities. I can't remember time, I can't remember dates, I can't remember days. I'm having trouble remembering things. I'm trying so hard. I am not asking for much, I just want to be able to have a mattress on the ground.").

[121] Declaration of K. Kinst ¶ 28-29 (describing an incident in March 2017 where an individual contracted scabies because"[t]he morning she hugged her friend, [with scabie] all of her belongings, including her body wash and shampoo, had been tossed by the City or WSDOT in a sweep.  She did not have the money to buy new soap nor the bus money to travel to the Urban Rest Stop in downtown Seattle where she could wash her clothes and take a shower with complimentary toiletries.").

---

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 27
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

being forced to stay in an abusive relationship because the requisite court documents one needed to leave were taken by the City.[122] "Losing identification papers means individuals are left with no identity.  Not only are there numerous essential functions they are unable to perform, but they aren't able to get back their identity because the documents that were lost in the sweep are required to obtain new identification papers."[123] When individuals lose critical medication during a sweep, they can suffer increased anxiety or depression, and are at greater risk of stroke, seizures, diabetic coma, and blot clots and the consequences of each of these events, including brain damage, paralysis, or a heart attack.[124]  Finally, the loss of personal items, like family photos, is "devastating on a human level" and can affect individuals for years.[125]

Plaintiffs also suffer the injury of the constant anxiety and fear of being swept, not to mention the injury of being forced to make impossible choices about how to replace items needed to survive outside and remain stable.  Some have to choose between replacing critical medication and obtaining shelter for that night.[126]  For others, it is impossible to even begin to replace the vast majority of their property.[127]

Further, because the sweeps so frequently happen without adequate and effective notice, they "exacerbate people's mental health issue . . . They cause instability, insecurity, and in that

---

[122] Declaration of K. Kinst ¶ 20-30.

[123] Declaration of D. Montrose.

[124] Declaration of K. Kinst ¶ 13-15.

[125] Declaration of J. Martin ¶ 4; see also Declaration of K. Kinst ¶ 30.

[126] Declaration of K. Kinst ¶ 19. ("We try our best to accommodate and treat every patient that comes in. However the sweeps make it very difficult to do so. Another issue that comes up is that many times we see individuals who have to choose between obtaining necessary medication and finding an indoor place to sleep at night. Numerous individuals have come in with a medical complaint, but the emergency room can take a long time to resolve their issue and they need to get in line for a shelter. Sometimes people will choose to get in line for the shelter rather than refill their medication, and the most we can do for them is call a taxi to take them there.")

[127] Declaration of T. Peila ¶ 13; Declaration of A. Richer ¶ 20.

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

instability, it's hard to continue to try to function on a somewhat normal level because you're already having trouble."[128]  And because individuals are so afraid of leaving their belongings unattended for fear they will be summarily seized, they are confined to their home 24 hours a day, 7 days a week—afraid of leaving to pursue hobbies,[129] work or secure a job,[130]or even go to the bathroom.[131]

## C.      The Balance of Equities Is in Plaintiffs' Favor

The balance of equities tips sharply to Plaintiffs.  Defendants seize and destroy the only property that Plaintiffs own—property that constitutes Plaintiffs' only forms of shelter and warmth; essential medication for their physical and mental health; vital documents like court papers and identification documents; food and requisite cooking utensils; and numerous irreplaceable family mementos.

And while Plaintiffs will continue to suffer irreparable harm if an injunction is not granted, the City will not suffer if it is ordered to follow the law, as Los Angeles was also ordered to in *Lavan* and *Mitchell*.  Plaintiffs' interests in survival also outweighs Defendants' (often speculative) public health and safety concerns—especially since Defendants could easily take measures to control the very health and safety concerns they cite without destroying and seizing Plaintiffs' property.  For example, one service provider has stated "[w]e can bring them portable toilets, garbage collection, rat traps, rat-proof food containers, and housing case managers.  If we do this, we can create safer situations right now while building housing for all without violating anyone's civil rights or creating public health hazards."[132]

---

[128] Declaration of A. Richer ¶ 19

[129] Declaration of A. Richer ¶ 22.

[130] Declaration of A. Gibson ¶ 13, 19; Declaration of P. Pitts ¶ 13.

[131] Declaration of A. Gibson ¶ 20.

[132] Declaration of Patacara Community Services ¶ 10.

**CORR CRONIN MICHELSON**
**BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Defendants' nebulous health and safety concerns also run contrary to the *Lavan* Court's insistence that only "immediate health and safety" concerns could possibly justify infringing homeless individuals' property rights. *Lavan* at 1026. In fact, the Ninth Circuit specifically imposed that limitation even though in Los Angeles, as here, had pointed out that it swept sidewalk encampments with "rotting food, fecal matter, and drug paraphernalia." *Id*. at 1034. Other courts have similarly confined sweeps to "immediate" public health and safety risks. *See Mitchell v. Los Angeles*, Case 2:16-cv-01750-SJO-JPR (C.D. Cal. April 13, 2016), Dkt. No. 51 at 11 (granting preliminary injunction preventing Defendants from seizing property "absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband"); *Kincaid v. City of Fresno*, No. 1:06-cv-1445 OWW SMS, 2006 WL 3542732, at *42 (E.D. Cal. Dec. 8, 2006) (granting preliminary injunction; enjoining defendants from seizing and immediately destroying the property of homeless persons, absent probable cause to believe that the property is evidence of a crime, contraband, or presents an immediate threat to public health or safety).

## D.    A Preliminary Injunction Is In the Public Interest

The "public has a fundamental interest in the protection of all people's constitutional rights." *Klein v. City of Laguna Beach*, 381 F. App'x 723, 727 (9th Cir. 2010).

In 2017, the number of unhoused individuals living outside reached an all-time high— meaning more individuals are now part of the proposed class and at risk of imminent harm.[133] And while Defendants' assert that sweeps are for the health and safety of Plaintiffs and their fellow class members as a reason for sweeping encampments, the irony is that Defendants' practices directly place the health and safety of encampment residents in peril. For example,

---

[133] Count Us In: 2017 King County Point in Time Count of People Experiencing Homelessness. *Available at* http://allhomekc.org/wp-content/uploads/2016/11/2017-King-PIT-Count-Comprehensive-Report-FINAL-DRAFT-5.31.17.pdf

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   "The loss of medication not only harms the individual, but the community at large—and it is

2   an issue of public health and safety . . . there are varied risks to someone with a mental illness

3   that has a component of psychosis when they are off their medication.  One of them could

4   become a danger to themselves or others."[134]

5           If Defendants wanted to actually address alleged public health and safety concerns of

6   encampments, they could do so without seizing and destroying the property of unhoused

7   persons.  For example, as the declarations of Mr. Roberts, Mr. Grant, Ms. Brunette, and Ms.

8   Raftery show that it is not only possible, but actually quite simple, to conduct a clean-up of an

9   area where unhoused individuals live without throwing away the critical possession of people

10  who live there.[135]

11                          **III.    CONCLUSION**

12          This action challenges an ongoing practice and policy of the City of Seattle and WSDOT

13  of seizing and destroying the property of people who are unhoused and living outside within

14  the City of Seattle.  For the aforementioned reasons, Plaintiffs and members of the proposed

15  class are entitled to injunctive relief to ensure adequate notice and to prevent their property

16  from being destroyed.  A proposed order is submitted herewith.

17          DATED this 14th day of June, 2017.

18                                          CORR CRONIN MICHELSON
                                            BAUMGARDNER FOGG & MOORE LLP
19

20                                           *s/ Todd T. Williams*
                                            Blake Marks-Dias, WSBA No. 28169
21                                          Todd T. Williams, WSBA No. 45032
                                            Eric A. Lindberg, WSBA No. 43596
22                                          1001 Fourth Avenue, Suite 3900

23  _____
    [134] Declaration of K. Kinst ¶ 16.

24  [135] Declaration of A. Roberts ¶ 9-10; Declaration of K. Brunette ¶ 3-4, 6; Declaration of A. Raftery ¶ 6;
    Declaration of J. Grant ¶ 12.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 31
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Seattle, Washington 98154-1051
Telephone: (206) 625-8600
Email: bmarksdias@corrcronin.com
        twilliams@corrcronin.com
        elindberg@corrcronin.com

Emily Chiang, WSBA No. 50517
Nancy Talner, WSBA No. 11196
Breanne Schuster, WSBA No. 49993
AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
Telephone: (206) 624-2184
Email: echiang@aclu-wa.org
        talner@aclu-wa.org
        bschuster@aclu-wa.org

*Attorneys for Plaintiffs*

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on **June 14, 2017**, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system, which will send notification of such filing to the

4

following:

5

| *Attorneys for Defendant City of Seattle:* | *Attorneys for Defendants Washington State Department of Transportation and Roger Millar, Secretary of Transportation for WSDOT:* |
|---|---|
| Matthew J. Segal, WSBA No. 29797<br>Gregory J. Wong, WSBA No. 39329<br>Taki V. Flevaris, WSBA No. 42555<br>PACIFICA LAW GROUP LLP<br>1191 2nd Avenue, Suite 2000<br>Seattle, WA 98101<br>matthew.segal@pacificalawgroup.com<br>greg.wong@pacificalawgroup.com<br>taki.flevaris@pacificalawgroup.com<br><br>Patrick Downs, WSBA No. 25276<br>Andrew T. Myerberg, WSBA No. 47746<br>Gregory C. Narver, WSBA No. 18127<br>Carlton W.M. Seu, WSBA No. 26830<br>Gary T. Smith, WSBA No. 29718<br>SEATTLE CITY ATTORNEY<br>701 Fifth Avenue, Suite 2050<br>Seattle, WA 98104-70197<br>patrick.downs@seattle.gov<br>andrew.myerberg@seattle.gov<br>gregory.narver@seattle.gov<br>carlton.seu@seattle.gov<br>gary.smith@seattle.gov | Alicia O. Young, WSBA No. 35553<br>Assistant Attorney General<br>ATTORNEY GENERAL OF<br>WASHINGTON<br>P.O. Box 40126<br>Olympia, WA 98504-0126<br>AliciaO@atg.wa.gov<br><br>Matthew D. Huot, WSBA No. 40606<br>Assistant Attorney General<br>ATTORNEY GENERAL OF<br>WASHINGTON<br>P.O. Box 40113<br>Olympia, WA 98504-0113<br>MattH4@atg.wa.gov |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                                        CORR CRONIN MICHELSON
                                          BAUMGARDNER FOGG & MOORE LLP

22
                                           *s/ Todd T. Williams*
23                                        Todd T. Williams, WSBA No. 45032
                                          1001 Fourth Avenue, Suite 3900
24                                        Seattle, Washington 98154-1051
                                          Telephone: (206) 625-8600
                                          Email: twilliams@corrcronin.com

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 33
(No. 2:17-cv-00077-RSM)

**CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900