UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LISA HOOPER, *et al.*, | Case No. C17-77RSM |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| CITY OF SEATTLE, *et al.*, | |
| Defendants. | |

## I.     INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Class Certification (Dkt. #2) and Plaintiffs' Motion for Preliminary Injunction (Dkt. #93). Oral argument on this matter was heard on September 7, 2017. Having considered the parties' oral and written arguments, along with the remainder of the record, the Court, for the reasons stated herein, DENIES Plaintiffs' motions.

## II.     BACKGROUND

Plaintiffs' suit stems from Defendant City of Seattle's (the "City"), Defendant Washington State Department of Transportation's ("WSDOT"), and Defendant Roger Millar's (collectively "Defendants") enforcement of rules and guidelines that authorize the removal of

unauthorized encampments from City-owned and Washington State-owned property.[1]  *See* Dkt. #87 ¶¶ 3, 5, 14–31, 90–96.  In 2008, the City enacted rules, the Multi-Departmental Administrative Rules 08-01 ("MDAR 08-01"), to establish, in part, standard procedures for the removal of unauthorized encampments, camping equipment, and personal property left on City-owned property.  *See id.* ¶ 97; *also* Dkt. #33, Ex. A at 8.  That same year, WSDOT also adopted guidelines, entitled WSDOT's Guidelines to Address Illegal Encampments within State Right of Way ("WSDOT Guidelines"), establishing similar removal procedures for unauthorized encampments.  *See* Dkts. #87 ¶ 97 and #33, Ex. B.

When this suit was filed on January 19, 2017, the MDAR 08-01 were still in effect.  *See* Dkt. #33, Ex. A.  At the time, Plaintiffs' putative class action alleged the MDAR 08-01 and WSDOT Guidelines were unconstitutional on their face, and as applied, because exceptions and exclusions within both policies rendered their notice and storage provisions meaningless.  Dkt. #1 ¶¶ 65–90.  Specifically, the named individual plaintiffs alleged they were victims of Defendants' ongoing policy and practice of seizing and destroying the property of unhoused people living outside without adequate notice, an opportunity to be heard, or a meaningful way for them to reclaim any of their undestroyed property.  *Id.* ¶¶ 1, 5.  Plaintiffs alleged Defendants' policies, and actual encampment removal practices, violated Plaintiffs' federal and state constitutional rights.  *Id.* ¶¶ 91–137, 158–65.

On January 31, 2017, the City proposed two new rules to modify the MDAR 08-01.  Dkt. #87 ¶ 123; *also* Dkt. #33, Exs. C and D.  The Finance and Administrative Services Encampment Rule 17-01 ("Proposed FAS 17-01") proposed a uniform set of rules and procedures for removing encampments on City property, while the Multi-Departmental Administrative Rules ("Proposed

---

[1]  Defendant Roger Millar is WSDOT's Secretary of Transportation; Plaintiffs bring suit against Mr. Millar in his official capacity.  Dkt. #87 ¶ 74.  WSDOT and Mr. Millar are referred to, collectively, as "State Defendants."

MDAR 17-01") proposed a uniform set of rules and procedures for addressing encampments on City property. *See id.*

On February 6, 2017, Plaintiffs moved for a temporary restraining order ("TRO"). Dkt. #23. A TRO hearing was scheduled on February 13, 2017; Plaintiffs' TRO motion was subsequently denied because Plaintiffs did not demonstrate a likelihood of success on the merits or irreparable harm. Dkt. #65 at 14–17. Following this denial, Plaintiffs amended their initial Complaint. *See* Dkt. #73. Subsequently, after a public comment period and revisions, the City's MDAR 08-01 was superseded by the final versions of the Proposed FAS 17-01 and the Proposed MDAR 17-01. *See* Dkt. #94, Ex. C at 2 and Ex. D at 2. On April 3, 2017, the FAS 17-01 and MDAR 17-01 (collectively the "Updated Encampment Rules") went into effect. *See id.* Plaintiffs filed a Second Amended Complaint on May 23, 2017. Dkt. #87.

Plaintiffs' Second Amended Complaint raises facial and as-applied challenges to the City's Updated Encampment Rules and the WSDOT Guidelines.[2] *Id.* ¶¶ 102, 108–109, 111–115, 124–138. Plaintiffs claim Updated Encampment Rule exceptions governing "obstructions" and "immediate hazards" allow the City to remove any unauthorized encampment without notice. *Id.* ¶¶ 126–130. Plaintiffs also claim the City's creation of "Emphasis Areas" force unhoused persons to live in dangerous areas or leave them subject to immediate removal. *Id.* ¶¶ 131–134. Plaintiffs also assert the Updated Encampment Rules do not contain a prior MDAR 08-01 requirement that allowed unhoused persons to return to an encampment location to pack up their belongings, and thus fail to provide an opportunity for unhoused persons to contest the seizure and destruction of their property. *Id.* ¶ 135. Finally, Plaintiffs contend the Updated Encampment

---

[2] Plaintiffs' Second Amended Complaint erroneously asserts the MDAR 08-01 is still in effect and constitutes the City's "only known official published policies pertaining directly to sweeps." *See* Dkt. #87 ¶ 98. In reality, the MDAR 08-01 was superseded by the MDAR 17-01. *See* Dkt. #94, Ex. D at 2. With this in mind, the Court will not set forth Plaintiffs' facial challenges to the MDAR 08-01.

Rules do not require training for City personnel, and they claim the enforcement of the rules remains discretionary. *See id*. ¶¶ 136–37. Plaintiffs likewise claim that exceptions and exclusions to the WSDOT Guidelines "exempt many, if not most, people living outside from even the most minimal of notice protections," and they claim the WSDOT Guidelines lack provisions to ensure pre- and post-deprivation due process. *Id*. ¶¶ 102, 108, 116.

Aside from their facial challenges, Plaintiffs also claim Defendants' actual cleanup practices are unconstitutional. Dkt. #87 ¶¶ 139–188. Plaintiffs' Second Amended Complaint identifies eight practices that allegedly result in the inadequate, inconsistent, inaccurate, inaccessible, and/or misleading provision of notice. *Id*. ¶¶ 144–157. These practices include Defendants' alleged provision of notice less than 72-hours before a cleanup, posting notice in inconspicuous areas, notices that fail to specify where a cleanup will occur, notices that do not reflect the date a cleanup actually occurs, and notices that are inaccessible to unhoused persons who cannot read written English.

Regarding the seizure of property, Plaintiffs' Second Amended Complaint identifies six practices they claim are unconstitutional. *See id*. ¶¶ 162–173. These practices include Defendants alleged use of heavy equipment machinery to summarily seize and destroy the property of unhoused persons, Defendants' physical seizure and destruction of property on site, the off-site disposal of items unilaterally determined to be garbage or of insufficient value, Defendants' practice of piling up all items at an encampment site (including garbage), Defendants' seizure and destruction of property without an owner's permission (notwithstanding that the owner is present), and the seizure and destruction of unabandoned property left momentarily unattended. *Id*.

Plaintiffs also identify several storage and storage-retrieval practices they claim are unconstitutional. *See* Dkt. #187 ¶¶ 174, 178–88. These practices include: (1) Defendants'

alleged "official sanctioned practice" of ignoring policies that govern whether an item should be stored; (2) Defendants ignore policies that require them to notify unhoused persons of whether their property will be stored, where it will be stored, for how long it will be stored, and how it may be retrieved; (3) when Defendants provide storage information, they only provide a phone number, thus leaving people without phone access or money for phone access without recourse; (4) Defendants do not inventory or keep track of destroyed or confiscated items, thus preventing unhoused persons from knowing whether their property was stored; and (5) Defendants impose additional barriers—including the location of Defendants' storage facilities and the facilities' limited operating hours—that burden an unhoused person's ability to retrieve their personal property. *Id*.

The individual named Plaintiffs, Lisa Hooper, Brandi Osborne, Kayla Willis, and Reavy Washington (collectively the "Individual Plaintiffs"), live outside, on public property, in the City of Seattle. Dkt. #87 ¶¶ 34, 41, 50, 55. They allege they are victims of Defendants' ongoing policy and practice of seizing and destroying the property of unhoused people living outside without adequate and effective notice, an opportunity to be heard, or a meaningful way for them to reclaim any of their undestroyed property. *Id*. ¶¶ 34–59. Plaintiffs further allege they have had critical personal belongings taken and destroyed during cleanups conducted by the City and WSDOT, and were not given an opportunity to contest the confiscation and destruction of their property. *Id*. ¶¶ 35–36, 42–43, 46–47, 51, 56–57. They further assert they were not given notice or reason to believe their property would be stored and could later be retrieved. *See id*. ¶¶ 35–59. Three organizational plaintiffs, the Diocese of Olympia, Trinity Parish of Seattle, and Real Change, also join the Individual Plaintiffs' suit. *Id*. ¶¶ 61–71.

Through this suit, Plaintiffs seek a declaratory judgment that Defendants' alleged policy and practice of confiscating and/or destroying the personal property of unhoused persons without

a warrant, probable cause, and the requisite due process safeguards is unlawful under federal and state law. *Id.* at 51. Plaintiffs also seek injunctive relief. *Id.*

### III.     LEGAL STANDARDS

**A. Class Certification.**

Federal Rule of Civil Procedure 23 governs class certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Under Rule 23(a), the party seeking certification must demonstrate "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). After satisfying the Rule 23(a) requirements, the proposed class must also satisfy at least one of the three requirements listed in Rule 23(b). *Dukes*, 564 U.S. at 345; *also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). In this case, Plaintiffs seek to certify a class under Rule 23(b)(2). Dkt. #2 at 7–8. Rule 23(b)(2) requires Plaintiffs to demonstrate "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

Notably, Rule 23 "does not set forth a mere pleading standard." *Id.* at 350. Instead, the party seeking certification must "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* "Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 350–51 (internal quotation omitted). "[I]t may be necessary for the court to probe behind the pleadings

before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). This is because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (internal quotation omitted). Nonetheless, the ultimate decision regarding class certification "involve[s] a significant element of discretion." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010).

**B. Preliminary Injunction.**

To obtain a preliminary injunction, Plaintiffs must establish the following: (1) their likelihood to succeed on the merits; (2) that it is likely they will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where a moving party's assertions are "substantially controverted by counter-affidavits," relief should not be granted unless that party makes a "further showing" that it will "probably succeed on the merits." *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1089 (9th Cir. 1972).

## IV.    DISCUSSION

**A. Class Certification Motion.**

The Individual Plaintiffs seek certification of a class comprised of all unhoused[3] people who live outside[4] within the City of Seattle and who keep their personal possessions on public property. Dkt. #2 at 1, 8. They assert certification is proper because they satisfy the requirements of Rule 23. Defendants do not dispute that Plaintiffs have established Rule 23(a)(1)'s numerosity requirement, but disagree that Plaintiffs demonstrate the remaining requirements needed for class certification. The Court addresses each requirement in turn.

---

[3] Plaintiffs use the term "unhoused" to refer to individuals who lack fixed, stable, or adequate shelter or housing.
[4] Plaintiffs indicate the phrase "people who live outside" includes Seattle residents who, for at least part of the year, sleep and keep their belongings outdoors.

**a. Rule 23(a).**

    i. *Plaintiffs Establish Numerosity.*

Under Rule 23(a)(1), a class action may only be maintained if "the class is so numerous that joinder of all members is impracticable." Courts consider several factors to determine if joinder of class members is impracticable, and plaintiffs need not demonstrate that joinder is impossible. 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 1762 (3d ed. 2017). The size of the proposed class, the location of putative class members, the nature of the action and relief sought, and the class members' reluctance, or inability, to sue on their own may all contribute to a court's Rule 23(a)(1) analysis. *Id.*; *also Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501, 508 (N.D. Cal. 2011); *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982).

Plaintiffs satisfy numerosity for three reasons. First, Plaintiffs have submitted a report indicating there are at least 2,942 people in Seattle without fixed, regular, or adequate housing, and at least 2,000 of these people live outside. *See* Dkt. #202, Ex. 1 at 3. Second, considering that unhoused persons typically lack the financial means to pursue individual litigation, and because this population may be transient, the Court agrees with Plaintiffs that individual joinder is unlikely. *See* Dkt. #2 at 9–10. Finally, the Court also agrees that because the proposed class may contain unknown members who may also be subject to Defendants' alleged policies and practices, joinder is impracticable. In summary, given the potential size and demographics of the proposed class, the Court agrees that joinder is impracticable, if not impossible. Plaintiffs thus satisfy Rule 23(a)(1)'s numerosity requirement.

ii.  *Plaintiffs Fail to Establish Commonality.*

Commonality can be established if Plaintiffs demonstrate they and the proposed class members "'have suffered the same injury.'"  *Dukes*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157).  This can be done if Plaintiffs raise a "common contention" between them and the proposed class members of "such a nature that it is capable of classwide resolution."  *Id*. at 350.  A contention is capable of classwide resolution if determining its truth or falsity resolves "an issue that is central to the validity of each one of the claims in one stroke."  *Id*.  Consequently, "what matters to class certification . . . is not the raising of common questions—even in droves— but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id*.  Commonality is thus usually satisfied where plaintiffs allege that the same conduct or practice by the same defendant underlies their claims.  1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 4:7, at 623 (13th ed. 2016).  This requirement is construed permissively, and all questions of fact and law need not be common to satisfy Rule 23(a)(2).  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  "In the civil rights context, commonality is satisfied 'where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'"  *Parsons v. Ryan*, 289 F.R.D. 513, 516 (D. Ariz. 2013) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)).  However, Plaintiffs must present "significant proof" of the alleged system-wide practice or policy.  *Id*. at 521–22 ("[T]he crucial question is whether there is sufficient evidence of systemic issues in the provision of health care or whether Plaintiffs' allegations are simply many examples of isolated instances of deliberate indifference.").

Plaintiffs do not meet the evidentiary burden necessary to demonstrate commonality.  As explained by the Ninth Circuit in *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014), in analyzing commonality, it is critical for district courts to identify the policies and practices

plaintiffs allege they and the proposed class members are exposed to. By identifying these policies and practices, the Court can then determine if Plaintiffs demonstrate that the proposed class members are all exposed to the challenged policies, which in turn allows the Court to assess whether determining common questions raised by these policies will "resolve an issue that is central to the validity of each one of the [individual class members'] claims in one stroke." *Dukes*, 564 U.S. at 350.

Here, although Plaintiffs' Second Amended Complaint identifies several notice, storage, and storage-retrieval practices Defendants allegedly engage in, Plaintiffs' class certification motion does not try to demonstrate the existence of the practices alleged. *See* Dkts. #2 at 10–11 and #87 ¶¶ 139–188. Instead, in their Reply, Plaintiffs refer to declarations, videos, and photographs they contend support the existence of Defendants' alleged unlawful practices. *See* Dkt. #159 at 2, 4. However, Plaintiffs' conclusory statement is not supported by the evidence cited. *See* Dkts. #94, Exs. J–R and #121. The declarations, photographs, and videos cited do not provide enough context for the Court to determine at which point in the City's multi-stage cleanup process the declarants observed the alleged destruction of property. Notably, at least one source of the videos and photographs admits not knowing this critical information, and Plaintiffs' own counsel admitted at oral argument he did not know at which stage in the cleanup process the videos and photographic evidence were taken. *See* Dkts. #180, Ex. E at 209–211 and #208 at 13. This is unlike *Parsons*, where the plaintiffs submitted significant proof of the existence of the systemic policies and practices alleged. 754 F.3d at 681–84. Here, Plaintiffs fail to do the same.

Plaintiffs' raising of five questions they claim are common to the entire proposed class also fails to satisfy commonality. *See* Dkt. #2 at 11. Plaintiffs contend they satisfy commonality

because the proposed class members share common questions of fact and law. Plaintiffs list the following as representative questions shared by the proposed class:

1. Whether Defendants have a practice and policy of seizing and destroying the personal property of people living outside without a warrant, probable cause, adequate notice, an opportunity to have a meaningful pre- or post-deprivation hearing, or an opportunity to retrieve vital personal property before its seizure or destruction?;

2. Whether Defendants' policy and practice violates Plaintiffs' constitutional rights against unreasonable search and seizures under the U.S. Constitution?;

3. Whether Defendants' custom, policy, or practice violates class members' right to privacy under Article I, Section 7 of the Washington State Constitution?;

4. Whether Defendants' custom, policy, or practice violates class members' constitutional rights to due process under the U.S. Constitution?; and

5. Whether Defendants' custom, policy, or practice violates class members' constitutional rights to due process under Article I, Section 3 of the Washington State Constitution?

Dkt. #2 at 10–11. These questions not only fail to satisfy commonality because Plaintiffs fail to present sufficient evidence of the existence of the practices alleged—which prevents the Court from determining whether the questions posed will resolve issues "central to the validity of each one of the claims in one stroke"—commonality is also not established because, at their core, all five questions merely ask whether Defendants' conduct violates the law. However, to demonstrate commonality plaintiffs must do more than merely ask whether they and the proposed class have suffered violations of the same provisions of law. *See Dukes*, 564 U.S. at 349 (finding that recitation of questions, including the question "Is that an unlawful employment practice?" is not enough to obtain class certification); *also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 844 (5th Cir. 2012) ("mere allegations of systemic violations of the law . . . will not automatically satisfy Rule 23(a)'s commonality requirement") (quotation marks and citations omitted).

The Court's analysis is not changed by Plaintiffs' citation to *Lyall v. City of Denver*, 319 F.R.D. 558 (D. Colo. 2017), *Lehr v. City of Sacramento*, 259 F.R.D. 479 (E.D. Cal. 2009), *Kincaid v. City of Fresno*, 244 F.R.D. 497 (E.D. Cal. 2007), *Justin v. City of Los Angeles*, No. CV0012352LGBAIJX, 2000 WL 1808426 (C.D. Cal. Dec. 5, 2000), *Pottinger v. City of Miami*, 720 F. Supp. 955, 960 (S.D. Fla. 1989), or *Joyce v. City and County of San Francisco*, No. C-93-4149 DLJ, 1994 WL 443464 (N.D. Cal. Aug. 4, 1994). *See* Dkt. #159 at 3. Five of these cases were decided prior to *Wal-Mart v. Dukes*, and do not undertake the commonality analysis set forth by the Supreme Court in *Dukes*. Additionally, the only case decided post-*Dukes* is not analogous because the common question set forth by plaintiffs in that case was different from the questions posed by Plaintiffs here. *See Lyall*, 319 F.R.D at 562–64.

In summary, because Plaintiffs fail to provide significant proof of the existence of the practices alleged, and because they fail to raise common questions of fact or law, they do not satisfy Rule 23(a)(2)'s commonality requirement.

### iii. *Plaintiffs Fail to Establish Typicality*.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims of the class." FED. R. CIV. P. 23(a)(3). Under this requirement, the Court must "focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 4:16 (13th ed. 2016). To make this determination, the Court must compare the Plaintiffs' claims or defenses, with the claims or defenses of the class. *Id*.; *see Parsons*, 754 F.3d at 685 ("The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'") (quoting *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992)).

Notably, the "commonality and typicality requirements of Rule 23(a) tend to merge," as "both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13. The Ninth Circuit has also explained that in cases challenging policies or practices, "'the underlying issue presented with respect to typicality is similar to that presented with respect to commonality,'" and although the injuries of the class representatives need not be identical to those of the proposed class members, their injuries must result from the same, injurious course of conduct. *Parsons*, 754 F.3d at 685 (quoting *Armstrong*, 275 F.3d at 868–69).

Here, Plaintiffs' failure to establish commonality affects their ability to demonstrate they satisfy Rule 23(a)(3)'s typicality requirement. Plaintiffs contend their claims are typical of the proposed class's claims because they, like the proposed class, live in danger that their property will be seized and destroyed by Defendants, they seek the same relief as the proposed class members, the prosecution of individual actions against Defendants creates the risk of inconsistent adjudications (resulting in variable standards of conduct for Defendants), and they and the proposed class members will continue to suffer from Defendants' unconstitutional policies and practices until class-wide relief is granted. Dkt. #2 at 12–13. Plaintiffs' arguments fail to convince the Court.

Although Plaintiffs claim they and the proposed class are at risk of having their property seized and destroyed, Plaintiffs have failed to demonstrate their risk of injury and the proposed class's risk of injury derives from the same, injurious course of conduct. And while Plaintiffs claim they, like the proposed class, have not received constitutionally adequate notice, *see* Dkt. #87 ¶¶ 34–59, Defendants have provided evidence that all four Plaintiffs have explicitly and

implicitly acknowledged their notice injury differs from that of the proposed class; Defendants cite to deposition testimony where Plaintiffs implicitly acknowledge the notice provided by Defendants was sufficient. Dkt. #130 at 8; *also, e.g.*, Dkts. #54 ¶ 7, #122 ¶¶ 7–8, 13, #131, Ex. B at 4–8, 10, Ex. C at 5–6, Ex. D at 4–5, and Ex. E at 5–6, 8–10, 13. Because Plaintiffs have acknowledged receipt of constitutionally adequate notice, and because Plaintiffs only reference isolated instances where notice was allegedly inadequate and their injuries stemmed from their failure to act upon the notice given, Defendants argue that Plaintiffs cannot claim their alleged injuries are typical of those suffered by the proposed class. Dkt. #130 at 7–10. Additionally, Defendants argue that three of the proposed class representatives' storage-related injuries are not typical of those of the class they seek to represent because all three have testified that they either have never or would never accept Defendants' offers to store their property. *Id*. at 11–12 (citing Dkt. #131, Ex. C at 12, Ex. D at 16–18, and Ex. E at 7, 11–12). Consequently, Defendants argue Ms. Hooper, Ms. Osborne, and Ms. Willis do not, unlike the class they seek to represent, have a stake in this aspect of the litigation. *Id*. The Court agrees that the named Plaintiffs' deposition testimony exposes them to unique defenses that render their claims atypical of the claims set forth by the proposed class.

In summary, because Plaintiffs fail to establish the existence of a policy or practice to which they and the proposed class are exposed, Plaintiffs fail to establish that the risk of injury they allege is the same, or similar, to any risk of injury which the proposed class members may be exposed to. The Individual Plaintiffs' deposition testimony further underscores this lack of typicality. Plaintiffs thus fail to satisfy Rule 23(a)(3)'s typicality requirement.

        iv. *Plaintiffs Fail to Establish Adequacy of Representation*.

A class action will only be certified if plaintiffs can demonstrate "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).

ORDER - 14

Representation is adequate where: (1) the class representative and their counsel do not have conflicts of interest with other class members; and (2) the class representatives and their counsel will "prosecute the action vigorously on behalf of the class." *Gray*, 279 F.R.D. at 520. Although Defendants do not challenge the adequacy of Plaintiffs' class counsel, the City challenges the adequacy of naming Ms. Hooper, Ms. Osborne, Ms. Willis, and Mr. Washington as class representatives. Here, because Plaintiffs fail to establish commonality and typicality, the Court also finds Plaintiffs fail to demonstrate they are adequate representatives. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625–26 n.20 (1997) ("The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'") (quoting *Falcon*, 457 U.S. at 157 n.13). Plaintiffs' failure to establish commonality and typicality leads to this conclusion because, having failed to provide significant proof of the practices Plaintiffs allege they are exposed to, Plaintiffs cannot rightfully seek to represent a proposed class that it has not demonstrated it shares common questions with. Nor can Plaintiffs serve as adequate representatives considering they fail to establish their claims are typical of the proposed class's claims.

However, even if Plaintiffs had satisfied commonality and typicality, the Court is concerned that Ms. Willis's and Mr. Washington's interests in bringing this suit are at odds with the interests of the proposed class. Before certifying a class, district courts must examine potential conflicts of interest. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (citing *Hanlon*, 150 F.3d at 1020). Only those conflicts "'that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'" *Id.* (quoting 1 WILLIAM B. RUBENSTEIN ET AL., NEWBERG ON CLASS

ACTIONS § 3.58 (5th ed. 2011)). Conflicts are fundamental if they go "to the specific issues in controversy." *Id.* Here, Plaintiffs' Second Amended Complaint seeks declaratory and injunctive relief to assure the City's Updated Encampment Rules, and Defendants' practices, do not violate their state and federal constitutional rights. However, Defendants cite deposition testimony where Ms. Willis and Mr. Washington state they hope to stop Defendants' cleanups altogether. *See* Dkts. #131, Ex. C. at 4, 7, and #138, Ex. C at 104 and Ex. D at 141–42. Plaintiffs do not dispute this contention. *See* Dkt. #159 at 9–10. Given this distinction in their purported interests, Ms. Willis and Mr. Washington are also not adequate class representatives on this basis.[5] Ms. Osborne is also not an adequate class representative because she has indicated she only seeks to represent herself, and she cannot represent anybody else. *See* Dkt. #160, Ex. 7 at 24.

In summary, because Plaintiffs have not satisfied Rule 23(a)'s commonality, typicality, and adequacy of representation requirements, their motion for class certification is DENIED.[6]

## B. Preliminary Injunction Motion.

In addition to class certification, Plaintiffs also seek a preliminary injunction prohibiting Defendants from seizing and summarily destroying their property without probable cause and constitutionally adequate notice. *See* Dkt. #93. Defendants oppose a preliminary injunction, and argue that Plaintiffs fail to demonstrate they are likely to succeed on the merits of their claims, Plaintiffs cannot demonstrate irreparable harm, the balance of equities does not tip in Plaintiffs'

---

[5] Defendants also argue Plaintiffs are inadequate class representatives because they have provided inconsistent testimony about key facts that support their suit, and because Plaintiffs' unfamiliarity with the City's Updated Encampment Rules demonstrates they are not committed to fulfilling their duties as class representatives. Dkt. #132 at 22–25. Because the Court finds that the named Plaintiffs are not adequate representatives on separate grounds, the Court will not address these arguments.

[6] Given Plaintiffs' failure to satisfy three of Rule 23(a)'s requirements, the Court will not assess whether Plaintiffs satisfy Rule 23(b)(2). However, the Court notes that because Plaintiffs have not provided significant proof of the existence of the alleged unlawful practices, Rule 23(b)(2), which requires plaintiffs to demonstrate defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," is likely not met. FED. R. CIV. P. 23(b)(2).

favor, and Plaintiffs' proposed preliminary injunction is not in the public interest.[7] *See* Dkts. #130 and #171. The Court addresses the preliminary injunction requirements in turn.

### a. Likelihood of Success on the Merits.

Plaintiffs contend they are likely to succeed on the merits of their Fourth and Fourteenth Amendment claims for two reasons. Plaintiffs first argue the City's Updated Encampment Rules are unconstitutional on their face. To support this argument, Plaintiffs contend the Updated Encampment Rules' definitions of "personal property," and "hazardous items," violate the Fourth Amendment. Dkt. #93 at 7–12. Plaintiffs also contend the Updated Encampment Rules are facially unconstitutional under the Fourteenth Amendment because their definitions of "obstruction," "immediate hazard," and the creation of "emphasis areas," essentially do away with pre-seizure notice and provide City personnel with too much discretion.[8] *Id*. at 18–22. Aside from their facial challenges, Plaintiffs next argue they are likely to succeed on the merits of their Fourth and Fourteenth Amendment Claims because Defendants engage in a pattern of conduct that summarily destroys personal property without the provision of the constitutionally requisite procedural safeguards. *Id*. at 12–15, 17–18, 22–27.

The City disagrees that Plaintiffs are likely to succeed on the merits of their Fourth and Fourteenth Amendment facial challenges. Dkt. #171 at 16–18. The City argues Plaintiffs' facial challenges are unlikely to succeed because its definitions of "personal property," "hazardous items," "obstruction," and "immediate hazard" are reasonable. *Id*. at 17–18. The City contends

---

[7] The City also asks the Court to strike, or otherwise not consider, testimony allegedly containing hearsay and statements made without personal knowledge in several of Plaintiffs' declarations. Dkt. #171 at 33. Because the Ninth Circuit has held that trial courts "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial," at this juncture the Court DENIES the City's request. *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, CIVIL, § 2949, at 471 (1973)).

[8] Notably, although Plaintiffs' Second Amended Complaint also raises facial challenges to State Defendants' WSDOT Guidelines, *see* Dkt. #87 ¶¶ 102, 108, 116, Plaintiffs' Motion for Preliminary Injunction is devoid of any argument in support of these claims. Consequently, the Court does not address Plaintiffs' challenges to the WSDOT Guidelines.

that while some discretion is required in determining whether an item fits within the "personal property" and "hazardous items" definitions, such discretion is inherent in cleanups. *Id*. at 17. The City further contends that, at the very least, Plaintiffs do not demonstrate the challenged definitions can never be properly applied. *Id*. at 17–18. The City also argues Plaintiffs are unlikely to demonstrate it engages in a pattern of conduct that subjects the City to municipal liability. *Id*. at 18–25. The State Defendants argue the seizure of property from Washington State right of way is reasonable, and they provide adequate due process safeguards through notices, and by providing unhoused persons opportunities to avoid any deprivations of property.[9] Dkt. #162 at 12–30.

The Court addresses each of these arguments in turn.

### i. Fourth Amendment Claims.

The Fourth Amendment prohibits "unreasonable" seizures of property. *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1013 (C.D. Cal. 2011). Seizures of property occur "when there is 'some meaningful interference with an individual's possessory interests in that property.'" *Id*. (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992)). Although the taking and destroying of property is considered a "seizure," this act is only unlawful if a party can demonstrate unreasonableness. *Id*. Courts assess reasonableness by "'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id*. (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Here, Plaintiffs claim the City's Updated Encampment Rules violate the Fourth Amendment on their face; they also claim Defendants' actual practices

---

[9] "Right of way" refers to real property acquired by WSDOT for purposes of building, operating, and maintaining Washington State highways, bridges, and other structures that support Washington State highways. Dkt. #162 at 4.

ORDER - 18

in enforcing the Updated Encampment Rules violate their Fourth Amendment rights. Each claim is addressed in turn.

A. <u>Fourth Amendment Facial Challenges to the City's Updated Encampment Rules.</u>

The Court agrees that Plaintiffs have not shown they are likely to succeed on the merits of their Fourth Amendment facial challenges to the City's Updated Encampment Rules. Plaintiffs contend the Updated Encampment Rules' definitions of "personal property," and "hazardous items," violate the Fourth Amendment because they are vague and provide Defendants with an impermissible amount of discretion that allows them to summarily destroy the property of unhoused persons. Dkt. #93 at 7–12. To succeed on their Fourth Amendment facial challenge, Plaintiffs must demonstrate the definitions of "personal property" and "hazardous items" result in unreasonable seizures. *See Lavan*, 797 F. Supp. 2d at 1013 ("While taking and destroying property is a seizure, such seizures are only unlawful if they are unreasonable.") (internal citation omitted). The Updated Encampment Rules define "personal property" as "an item that: is reasonably recognizable as belonging to a person; has apparent utility in its present condition and circumstances; and is not hazardous." Dkt. #94, Ex. C at 3 and Ex. D at 7. Any doubts regarding the classification of an item are to be resolved in favor of treating the item as personal property. *Id*. "Hazardous items" are defined, in part, as "item[s] that reasonably appear[] to pose a health or safety risk to members of the public or to City employees or to other authorized personnel." *Id*. Ex. D at 6.

Plaintiffs fail to demonstrate they are likely to succeed on their Fourth Amendment facial challenge because they do not explain why seizures caused by the alleged vagueness of the definitions of "personal property," and "hazardous items," are unreasonable. *See* Dkt. #93 at 7–12. Instead, Plaintiffs cite to deposition testimony, cite to the minimal training the City's

employees allegedly receive on the Updated Encampment Rules, and cite to a 2016 Seattle Office for Civil Rights report, to support the position that seizures of property occur as a result of the Updated Encampment Rules' vagueness. *Id.* However, citing to evidence that purportedly demonstrates the definitions of "personal property" and "hazardous items" allow Defendants a degree of discretion, does not by itself demonstrate that exercise of that discretion is unreasonable. Additionally, the Updated Encampment Rules place limits on that discretion by directing that any dispute about the status of an item be resolved in favor of treating the item as personal property. *See* Dkt. #94, Ex. C at 3 and Ex. D at 7.

The Court's analysis is unchanged by Plaintiffs' argument that the definitions of "personal property" and "hazardous items" impermissibly allow Defendants to refuse to store wet items, muddy items, items in less than perfect condition, items near drug paraphernalia, and items near urine.[10] Plaintiffs contend the City's reasons for refusing to store urine-contaminated items do not outweigh Plaintiffs' property interests because those reasons are not supported by scientific evidence. *See* Dkt. #93 at 15–16. To support this position, Plaintiffs rely on the declaration of Dr. William Daniell, a physician and epidemiologist. *See* Dkt. #110. Dr. Daniell explains that certain viral agents (including hepatitis B and C) are "not linked to urine transmission, unless the urine is grossly contaminated with blood." *Id.* ¶ 14. However, as the City points out, Dr. Daniell also acknowledges that diseases can in fact be transmitted by urine from infected persons (and animals), and he further indicates that protective measures can reduce, but not eliminate, the risk of disease posed by contaminated urine. *See* Dkt. #171 at 27–28; *also* Dkt. #110 ¶¶ 12–13, 19–23. Notably, the City also provides the declaration of an expert, Dr. David Cowan, who explains the increased risk of disease transmission present in

---

[10] Under the Updated Encampment Rules the City has no obligation to store hazardous items (which may include needle-strewn tents), as well as items that may become hazards (such as wet bedding materials). Dkt. #94, Ex. C at 7.

ORDER - 20

unauthorized encampments. *See* Dkt. #174, Ex. B at 31–32. Dr. Cowan, unlike Dr. Daniell, visited unauthorized encampments in order to prepare his declaration. *Compare* Dkt. #174 ¶ 8, *with* Dkt. #110 ¶¶ 5–7. Given Plaintiffs' and the City's expert declarations on this matter, the Court is not convinced that the City's policy with respect to urine-contaminated items or wet items is "not grounded in fact." *See* Dkt. #93 at 15.

In summary, Plaintiffs fail to show how the definitions of "personal property" and "hazardous items" allow Defendants to engage in the unreasonable seizure of property. Plaintiffs thus fail to demonstrate they are likely to succeed on the merits of their Fourth Amendment facial challenge to the Updated Encampment Rules.

B. <u>Plaintiffs' Fourth Amendment Challenge to Defendants' Enforcement of the City's Updated Encampment Rules.</u>

The Court also agrees that Plaintiffs have not shown they are likely to succeed on the merits of their Fourth Amendment challenge to the City's cleanup practices. To succeed on their Section 1983 claims against the City, Plaintiffs must show their injury is caused by "action pursuant to official municipal policy." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *also L.A. Cnty., Cal. v. Humphries*, 562 U.S. 29, 31 (2010) ("The question presented is whether the 'policy or custom' requirement also applies when plaintiffs seek prospective relief, such as an injunction or a declaratory judgment. We conclude that it does so apply."). Practices that are "so persistent and widespread as to practically have the force of law," are considered official municipal policy. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Existence of a practice is not established where plaintiffs can only demonstrate "isolated or sporadic" instances. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents . . . . "). Aside from demonstrating the existence of a policy or practice, Plaintiffs must also demonstrate that "through

its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). Here, Plaintiffs have not demonstrated they are likely to succeed in demonstrating the existence of a policy or practice that is "so persistent and widespread as to practically have the force of law."

The Court is not convinced the evidence cited by Plaintiffs evinces the City's engagement in a persistent and widespread practice of summarily destroying the property of unhoused persons. Citing to declarations, a spreadsheet that purportedly demonstrates the City did not store property in nearly 30 percent of cleanups occurring between February 22, 2017, and May 1, 2017, videos, photographs, and the deposition testimony of a WSDOT employee, Plaintiffs contend the City fails to store property. Dkt. #93 at 12–13; *also* Dkts. #94, Exs. A and S, #95, #111, #113, #118, #119, and #122. Plaintiffs argue this failure to store property demonstrates the City engages in the summary destruction of property. The Court is not convinced.

As an initial matter, Plaintiffs' attempt to use the deposition testimony of a WSDOT employee to bolster their claim is unavailing. Although the City coordinates with WSDOT to clean dangerous encampments off of WSDOT right of way, for most of the cleanups the City, not WSDOT, coordinates and carries out storage efforts. *See* Dkts. #162 at 11 and #167 ¶¶ 4, 15–26. Indeed, even in the deposition testimony cited by Plaintiffs, Lance Pascubillo, the WSDOT employee deposed, indicates that the City's cleanup coordinator, not he, is best suited to answer questions about the provision of storage. *See* Dkt. #94, Ex. A at 8–9. Additionally, on those occasions when WSDOT has not partnered with the City, WSDOT has submitted counterevidence, a declaration by Mr. Pascubillo, which demonstrates WSDOT has stored property found on its right of way. Dkt. #167 ¶¶ 5–15. Given that Mr. Pascubillo—a WSDOT employee—is not involved with the City's storage efforts, the Court would be remiss to conclude

that his testimony serves as proof that the City summarily destroys the property of unhoused persons.

The Court is equally unconvinced that Plaintiffs' citation to a spreadsheet documenting cleanups between February 22, 2017, and May 1, 2017, establishes the existence of a widespread and persistent pattern of the summary destruction of unhoused individuals' property. That the City may not have stored property in 30 percent of cleanups between this timeframe does not automatically indicate the City summarily destroys property. Plaintiffs acknowledge as much when they admit that the spreadsheet does not indicate what happens to property that is not stored. *See* Dkt. #93 at 13. Considering the number of reasons why property may not be stored— including that property may have been abandoned—the Court is not convinced that citation to a statistic derived from a two-month period demonstrates the City's widespread engagement in a pattern of summarily destroying property.

Plaintiffs' citation to declarations, videos, and photographs likewise fail to demonstrate that the City engages in a widespread and persistent pattern of summarily destroying the property of unhoused individuals. Although the videos and photographs submitted by Plaintiffs appear to show the destruction of property, Plaintiffs do not provide the Court with sufficient context to determine at what stage in the City's cleanup process these photographs and videos were taken. *See* Dkts. #94, Exs. J–R, and #121. Plaintiffs' declarations likewise fail to provide the Court with sufficient context to determine at which point in the cleanup process the declarants observed the alleged wanton destruction of property. Consequently, the Court is not convinced that Plaintiffs are likely to succeed in establishing the existence of a persistent and widespread City practice that violates their Fourth Amendment rights.

The Court is likewise unconvinced that Plaintiffs have demonstrated they are likely to succeed on their Fourth Amendment claims against Defendant Millar and Defendant WSDOT[11]. Not only do Plaintiffs not dispute the State Defendants' contention that WSDOT was only involved in ten cleanups cited by Plaintiffs to support the assertion that Defendants summarily destroy property, Plaintiff Brandi Osborne's deposition testimony also demonstrates that State Defendants engaged in the opposite of summary destruction—WSDOT employees waited for Ms. Osborne to remove her property before they conducted their cleanup, and none of Ms. Osborne's property was summarily destroyed. *See* Dkt. #164 ¶¶ 8–21, and Ex. 1; *also* Dkt. #169, Ex. 4 at 22–26. This, coupled with the State Defendants contention that they provide notice and otherwise allow unhoused persons opportunities to avoid any property deprivation, lead the Court to conclude that Plaintiffs have not demonstrated they are likely to demonstrate that the State Defendants' seizure of property on Washington State right of way is unreasonable.

In summary, Plaintiffs have not demonstrated they are likely to succeed on the merits of their Fourth Amendment claims against Defendants.

### ii. *Fourteenth Amendment Claims*.

Under the Fourteenth Amendment "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. The possessions of unhoused persons are considered "property" for due process analysis purposes. *See Lavan*, 797 F. Supp. 2d at 1016 (unhoused persons' possessions considered "property" in due process analysis) (citing, *e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 84 (1972)). Consequently, the Fourteenth Amendment requires the City to provide unhoused persons with notice, and an "'opportunity to be heard at a meaningful time and in a meaningful manner,'" before their property can be seized

---

[11] At this juncture, the Court will not examine the propriety of Plaintiffs' Section 1983 claims against WSDOT.

and destroyed. *Id.* at 1016–17 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 339–43 (1976)). However, a hearing may be postponed in "'extraordinary situations, where some valid government interest is at stake that justifies the postponing.'" *Id.* (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)). To determine if the basic procedural due process requirements have been met, the Court must consider the following three factors:

> (1) The private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail."

*Mathews*, 424 U.S. at 321.

Plaintiffs not only contend the Updated Encampment Rules are facially unconstitutional under the Fourteenth Amendment, they also claim Defendants, in practice, do not provide unhoused persons with the requisite procedural safeguards to prevent deprivations of property. Dkt. #93 at 16–20. The Court addresses each claim in turn.

### A. Fourteenth Amendment Facial Challenges to the City's Updated Encampment Rules.

Plaintiffs do not demonstrate they are likely to succeed on their Fourteenth Amendment facial challenges to the City's Updated Encampment Rules. Plaintiffs first contend the Updated Encampment Rules are facially unconstitutional because they allow for the immediate removal of "obstructions" and "immediate hazards" without the provision of pre-seizure notice. Dkt. #93 at 18–19. However, while it is true that failure to provide pre-seizure notice has the potential to fail a *Mathews v. Eldridge* analysis, Plaintiffs fail to acknowledge that the Updated Encampment Rules not only require the City to store personal property removed from encampments categorized as "obstructions" and "immediate hazards," they also require the City to provide post-seizure notice at these sites to notify unhoused persons of a cleanup, and to provide

unhoused persons with information on how to recover property seized and stored.  *See* Dkt. #94, Ex. C at 3–4.  Given Plaintiffs' failure to explain how these safeguards do not provide sufficient due process, Plaintiffs do not demonstrate they are likely to succeed on the merits of their Fourteenth Amendment facial challenge to the Updated Encampments Rules' provisions governing "obstructions" and "immediate hazards."  For this same reason, Plaintiffs also fail to demonstrate the insufficiency of the process the Updated Encampment Rules provide in "emphasis areas."  *See* Dkt. #94, Ex. C at 8.

Plaintiffs claim the City's creation of "emphasis areas" coupled with the City's "obstruction" and "immediate hazard" categories, leave very few areas throughout the City of Seattle that actually require Defendants to provide pre-cleanup notice.  Dkt. #93 at 21–22.  However, as with "obstruction" and "immediate hazard" cleanups, the Updated Encampment Rules provide for post-seizure notice after encampments are removed from "emphasis" areas.  *See* Dkt. #94, Ex. C at 8.  Given the Updated Encampment Rules' inclusion of these procedural safeguards, the Court cannot conclude that Plaintiffs are likely to succeed on their claim that the provisions governing "obstructions" and "immediate hazards" are unconstitutional on their face.

Plaintiffs also fail to demonstrate they are likely to succeed on their Fourteenth Amendment claim that the terms "obstruction" and "immediate hazard" are defined so broadly[12], and ambiguously, that "they eliminate virtually any requirement of notice," and provide City personnel with "unbounded discretion" to decide when to move an encampment without notice.  Dkt. #93 at 18–20.  To succeed on a Fourteenth Amendment facial challenge claiming a rule is vague, a party must "demonstrate that 'the enactment is impermissibly vague in all of its applications.'"  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971–72 (9th

---

[12] The Court notes that while a First Amendment overbreadth argument appears to be raised by Plaintiffs' motion for preliminary injunction, Plaintiffs do not set forth this claim in their Second Amended Complaint.  *See* Dkt. #87.  Consequently, the Court will only address Plaintiff's facial vagueness challenge under the Fourteenth Amendment.

Cir. 2003) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).  Here, Plaintiffs point out that the City classified the twenty-eight cleanups it carried out between February 22, 2017, and May 1, 2017, as "obstructions" or "immediate hazards." Dkt. #93 at 19.  This statistic, without more, does not demonstrate why the definitions of "obstruction" and "immediate hazard" are impermissibly vague.

Plaintiffs' citation to two Spokane Street cleanups likewise fails to demonstrate impermissible vagueness.  *See id.* at 20.  Plaintiffs contend the City's reasons for classifying the encampments located on Spokane Street (near the West Seattle Bridge) as an "obstruction" did not comport with the definition of that term.  The Updated Encampment Rules define an "obstruction" as:

> [P]eople, tents, personal property, garbage, debris or other objects related to an encampment that: are in a City park or on a public sidewalk; interfere with the pedestrian or transportation purposes of public rights-of-way; or interfere with areas that are necessary for or essential to the intended use of a public property or facility.

Dkt. #94, Ex. C at 3.  Plaintiffs conclude that Defendants' purported justifications for this classification—which allegedly included Defendants' need to replace copper wire, RV fires, and the alleged "confrontation" of a pedestrian on a nearby trail—do not fall within the "obstruction" definition.  Plaintiffs' conclusion is not only unpersuasive because of its failure to engage in legal analysis, it is also belied by Defendants' counterevidence, which demonstrates that Spokane Street encampment tents were located on bike paths and posed collision threats, while fires, which occurred several days prior to the April 11, 2017, removal of another Spokane Street encampment, threatened the structural integrity of the West Seattle bridge.  *See* Dkt. #98 ¶¶ 7–14.

In summary, Plaintiffs fail to demonstrate they are likely to succeed on their Fourteenth Amendment facial challenges.

B. <u>Plaintiffs' Fourteenth Amendment Challenge to Defendants' Enforcement of the City's Updated Encampment Rules.</u>

Aside from their facial challenges, Plaintiffs also contend they are likely to succeed on the merits of their Fourteenth Amendment claims because Defendants engage in a pattern of conduct that deprives them of constitutionally requisite procedural safeguards. Dkt. #93 at 16–18, 22–27. Plaintiffs contend they are deprived of due process in four ways. Plaintiffs first argue Defendants' "wholesale" destruction of unhoused persons' property deprives them of the opportunity to recover their property. *Id*. at 17. Plaintiffs next contend Defendants do not provide them with an opportunity to object to the destruction of their property. *Id*. at 18. Plaintiffs also contend Defendants' notice provision practices fail to meet minimum due process standards, and finally, Plaintiffs contend Defendants' post-seizure, storage process is inconsistent, inadequate, and fails to assure the storage of property. *Id*. at 22–27.

The City opposes Plaintiffs' Fourteenth Amendment claims on the ground that Plaintiffs are unlikely to demonstrate their injuries are caused by "action pursuant to official municipal policy." *See* Dkt. #171 at 18–23 (quoting *Monell*, 436 U.S. at 690–91). The State Defendants oppose Plaintiffs' Fourteenth Amendment claims on the ground that their processes provide unhoused persons with multiple opportunities to prevent the deprivation of personal property. Dkt. #162 at 28–30. The Court agrees that Plaintiffs have not demonstrated they are likely to succeed on the merits of their Fourteenth Amendment claims.

First, as with their Fourth Amendment *Monell* claims, to succeed on this Section 1983 claim against the City, Plaintiffs must show their Fourteenth Amendment injuries are caused by "action pursuant to official municipal policy." *Monell*, 436 U.S. at 690–91. Here, Plaintiffs again fail to demonstrate that the pre-seizure and post-seizure conduct Defendants allegedly engage in is "so persistent and widespread as to practically have the force of law." *Connick*, 563

U.S. at 61. Plaintiffs cite to three cleanups where unhoused persons were not given notice, they also cite a couple of instances where they claim an inadequate description of a cleanup location was provided, and they cite to five instances where notice was posted less than 72-hours in advance. *See* Dkt. #93 at 22–26. The Court is not convinced these instances have occurred to such a degree that they can be considered persistent and widespread. On the contrary, considering that the City conducted 136 cleanups between January 2017 and August 2017, the examples provided by Plaintiffs appear to be isolated and sporadic instances, and do not establish the existence of a pattern of unconstitutional conduct. *See* Dkt. #200 at 3–4.

Notably, although Plaintiffs attempt to rely on two spreadsheets they claim demonstrate Defendants did not provide notice in sixty percent of cleanups, *see* Dkt. #185 at 2, n.1, the City offers counterevidence which demonstrates that Plaintiffs' counsel was aware that these spreadsheets list complaints, not separate cleanups, and "may in many cases include multiple references for the same cleanup (i.e., not each entry represents a separate cleanup)." *See* Dkt. #199, Ex. A. at 2, 4. Plaintiffs' counsel was also aware that the spreadsheets cited in Plaintiffs' motion, and at oral argument, contain instances where a complaint did not accrue into a cleanup. *See* Dkt. #199, Ex. A. at 2, 4. Given this knowledge, the Court is troubled by Plaintiffs' counsel's representations about the data in these spreadsheets.

The Court is equally troubled by Plaintiffs' similar mischaracterizations of a Seattle Office for Civil Rights report which they claim indicates the City only complied with the MDAR 08-01 in two-thirds of cleanups conducted in 2016. *See* Dkt. #93 at 25 (citing Dkt. #94, Ex. F). Contrary to Plaintiffs' assertions, the Seattle Office for Civil Rights report cited presented findings on 59 cleanups conducted between September 12, 2016, through December 20, 2016, and the report only found that fourteen percent, not one-third, of those cleanups did not comply with the MDAR 08-01. Dkt. #94, Ex. F at 2–3. Additionally, Defendants submit

ORDER - 29

counterevidence which demonstrates the report relied on by Plaintiffs was eventually revised to reflect that the Seattle Office for Civil Rights only monitored 50 cleanups. *See* Dkt. #178 ¶ 21 and Ex. A. The revised Seattle Office for Civil Rights Report indicates that only four of seven cleanups were halted or called off by the Seattle Office for Civil Rights due to Defendants' failure to provide adequate notice. *See Id*. Ex. A at 15–17.

Plaintiffs also fail to demonstrate they are likely to succeed on the merits of their Fourteenth Amendment claims against the State Defendants. As the State Defendants point out, they provide Plaintiffs with the ability to avoid property deprivations through the following: (1) the use of notices notifying individuals they have no right to be on WSDOT right of way; (2) when possible, 72-hour, written notice that an encampment will be removed; (3) additional, oral notice, along with an opportunity to remove items, at the time of cleanup; and (4) storage of non-hazardous item for at least 70 days before the property is destroyed. Dkt. #162 at 29. Here, Plaintiffs fail to explain why WSDOT's provision of these due process safeguards fails the *Mathews v. Eldridge* test. And to the extent Plaintiffs allege WSDOT employees do not comport with these rules, they fail to demonstrate that WSDOT employees fail to do so based on established state procedure. *See Zinermon v. Burch*, 494 U.S. 113, 127–30 (1990) (explaining that tort remedies "are the only remedies the State could be expected to provide" where State-provided procedural safeguards could not have addressed the risk of the deprivation experienced). Plaintiffs also do not explain why Washington State's tort remedies do not provide sufficient due process in instances where WSDOT employees do not act in accordance with WSDOT's established procedures. *See id*.

In summary, Plaintiffs fail to demonstrate they are likely to succeed on the merits of their Fourteenth Amendment claims.

### iii. *Plaintiffs' State Constitutional Claims.*

Plaintiffs also fail to show they are likely to succeed on the merits of their state constitutional claims. In their Second Amended Complaint, Plaintiffs claim Defendants' alleged policy, pattern, and/or custom of seizing and destroying their property violates Article I, Sections 3 and 7 of the Washington State Constitution. Dkt. #87 ¶¶ 218–21. However, Plaintiffs do not address their State Constitutional claims in their Motion for Preliminary Injunction (Dkt. #93), nor do they explain why they are likely to succeed on the merits of those claims. Plaintiffs thus fail to demonstrate they are likely to succeed on the merits of their State-law claims.

### b. Irreparable Harm

Plaintiffs seeking a preliminary injunction must demonstrate they will be exposed to irreparable harm absent the issuance of the preliminary injunction. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202–03 (9th Cir. 1980)). Speculative injuries are not enough to warrant granting a preliminary injunction, and plaintiffs "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id*. (emphasis in original). Thus, if a party fails to demonstrate a sufficient likelihood of success on the merits of their constitutional claims they may also fail to demonstrate the possibility of irreparable harm. *See Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410–12 (9th Cir. 1991) (finding that irreparable injury was not shown where plaintiffs did not demonstrate a sufficient likelihood of success on the merits of their constitutional claims).

Considering that Plaintiffs have failed to demonstrate they are likely to succeed on the merits of their constitutional claims, the Court finds that Plaintiffs have not demonstrated they are likely to suffer irreparable harm if the Court does not grant their motion for preliminary injunction.

### c. Balance of Equities and the Public Interest

Plaintiffs fail to demonstrate the balance of equities tips in their favor, or that issuing a preliminary injunction is in the public interest. In determining whether to issue a preliminary injunction, Courts must "balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *L.A. Mem'l Coliseum*, 634 F.2d at 1203. Here, Plaintiffs contend the balance of equities tips in their favor because Defendants seize and destroy the only property the Individual Plaintiffs own, and they argue that Defendants' justifications for seizing this property are "nebulous." Dkt. #93 at 33–34. Plaintiffs reason that while they will continue to suffer irreparable harm if an injunction is not granted, the City will not be harmed if it is ordered to limit its cleanups to those which pose immediate public health and safety risks. *Id*. Plaintiffs further contend a preliminary injunction is reasonable because the "'public has a fundamental interest in the protection of all people's constitutional rights.'" *Id*. at 34 (quoting *Klein v. City of Laguna Beach*, 381 F. App'x 723, 727 (9th Cir. 2010)).

In response, WSDOT argues the balance of equities tips in favor of allowing them to continue removing items left on Washington State right of way because Plaintiffs can avoid, or minimize, potential harms caused by the deprivation of their property by not trespassing on WSDOT's property, moving their property when notice is provided, or by reclaiming their property after WSDOT stores it. Dkt. #162 at 32. WSDOT explains that if a preliminary injunction is issued, the harm caused to WSDOT will be significantly worse, as it would "severely restrain" WSDOT from performing necessary maintenance, construction, and operation of State right of way. *Id*. at 4. WSDOT also argues that a preliminary injunction will unconstitutionally convert State right of way into a housing and storage facility; this will not only interfere with public transportation and the construction and maintenance of transportation

infrastructure, it will also pose risks to unhoused persons, motorists, and WSDOT workers.  *Id.* at 32.  WSDOT further contends that restricting its ability to maintain Washington State right of way might expose it to liability claims for hazards posed by encampments.  For the same reasons, State Defendants argue Plaintiffs' proposed preliminary injunction is not in the public interest. WSDOT explains that Washington State right of way "provides important infrastructure to the travelling public," and allowing items to remain on this property hampers its ability to maintain these spaces, and its statutory duty to anticipate and address reasonably foreseeable hazards.  *Id.* at 32–33.

The City contends the balance of equities tips in its favor because, even though it respects and accommodates Plaintiffs' property rights (and even invited Plaintiffs' input on the Updated Encampment Rules), Plaintiffs have refused the City's offers of alternative shelter, submitted inaccurate and exaggerated declarations to the Court, and are using this lawsuit as a way to pressure the City to stop cleanups altogether.  Dkt. #171 at 32–33.  Relying on *Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle*, 2009 WL 224 3796, at *5 (W.D. Wash. July 24, 2009), in which this Court acknowledged the City has a "substantial interest in protecting its public spaces," the City argues that it is acting in the public interest, is responding to a genuine crisis, and that the Court should "defer to government officials' 'specific, predictive judgments about how [a] preliminary injunction would reduce the effectiveness' of their programs."  *Id.* at 33.

The Court agrees that Plaintiffs have not demonstrated the balance of equities tip in their favor.  Given that Plaintiffs have failed to demonstrate they are likely to succeed on the merits of their claims, the Court cannot find that the speculative harm Plaintiffs claim outweighs Defendants' interest in maintaining its property free of items that may pose threats to motorists,

pedestrians, City and WSDOT workers, and other unhoused persons. For the same reason, Plaintiffs also fail to demonstrate the preliminary injunction is in the public interest.

## V.  CONCLUSION

The Court continues to recognize the hardships faced by Plaintiffs, and it acknowledges their constitutional property rights. The optimum solution for the difficult issues raised in this lawsuit may, ultimately, only be found outside of a courtroom. However, having reviewed Plaintiffs' Motion for Class Certification, Plaintiffs' Motion for Preliminary injunction, the corresponding responses and replies, along with the declarations and exhibits submitted by the parties, and the remainder of the record, the Court hereby finds and ORDERS:

1) Plaintiffs' Motion for Class Certification (Dkt. #2) is DENIED.

2) Plaintiffs' Motion for Preliminary Injunction (Dkt. #93) is DENIED.

3) The Clerk of the Court is directed to forward a copy of this Order to all counsel of record.

DATED this 4 day of October, 2017.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE